## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORIN CARPENTER, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>    v.<br><br>OSCAR HEALTH, INC., MARIO SCHLOSSER, SIDDHARTHA SANKARAN, ARI FISCHEL, JEFFERY H. BOYD, JOEL CUTLER, JOSHUA KUSHNER, TERI LIST, CHARLES E. PHILLIPS, JR., DAVID PLOUFFE, ELBERT O. ROBINSON, JR., VANESSA A. WITTMAN, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, WELLS FARGO SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, LIONTREE ADVISORS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Lorin Carpenter ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Oscar Health, Inc. ("Oscar" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Oscar; and (c) review of other publicly available information concerning Oscar.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Oscar Class A common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's March 2021 initial public offering ("IPO" or the "Offering"). Plaintiff pursues claims against under the Securities Act of 1933 (the "Securities Act").

2.      Oscar is a health insurance company that claims to be the first such company "built around a full stack technology platform" which will "allow [Oscar] to continue to innovate like a technology company and not a traditional insurer."

3.      On March 3, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold d 36,391,946 shares of Class A common stock at a price of $39.00 per share. The Company received net proceeds of approximately $1.3 billion from the Offering. The proceeds from the IPO were purportedly to be used to repay in full outstanding borrowings, including fees and expenses, under Oscar's Term Loan Facility ($167 million), and the remainder proceeds were to be used for general corporate purposes.

4.     On August 12, 2021, Oscar disclosed that the Company's Medical Loss Ratio ("MLR") for the second quarter of 2021 was 82.4%, an increase of 2170 basis points year-over year. The Company claimed that "[t]he MLR increased to 82.4% in 2Q21 from 60.7% in 2Q20, primarily driven by meaningfully lower utilization in 2Q20 as a result of COVID-19, as well as higher COVID-19 testing and treatment costs and a return to more normalized utilization in 2Q21." The Company also disclosed that its net loss for the quarter was $73.1 million, an increase of $32.1 million year-over-year.

5.     On November 10, 2021, Oscar disclosed that its third quarter 2021 MLR increased 920 basis points year-over-year, to 99.7%. The Company claimed that the MLR increase was "primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, an unfavorable prior year Risk Adjustment Data Validation (RADV) result, and the impact of significant SEP membership growth." The Company also disclosed that its net loss for the quarter was $212.7 million, an increase of $133.6 million year-over-year.

6.     During a conference call held the same day, Scott Blackley, the Company's Chief Financial Officer, stated: "We recognized approximately $20 million of risk adjustment expense this quarter related to our risk adjustment data validation audit or RADV results. The RADV exercise is atypical this year due to COVID. It spans two years, 2019 and 2020. The majority of the RADV headwinds relate to the 2019 audit results, which were recently completed."

7.     On this news, Oscar's share price fell $4.05 per share, or 24.5%, to close at 12.47 per share on November 11, 2021.

8.     By the commencement of this action, Oscar stock has traded as low as $5.76 per share, a more than 85% decline from the $39.00 per share IPO price.

9.     The Registration Statement was materially false and misleading and omitted to state: (1) that Oscar was experiencing growing COVID-19 testing and treatment costs; (2) that Oscar was experiencing growing net COVID costs; (3) that Oscar would be negatively impacted by an unfavorable prior year Risk Adjustment Data Validation (RADV) result relating to 2019 and 2020; (4) that Oscar was on track to be negatively impacted by significant SEP membership growth; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Lorin Carpenter, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Oscar Class A common stock

3

pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Oscar is incorporated under the laws of Delaware with its principal executive offices located in New York, New York. Oscar's Class A common stock trades on the New York Stock Exchange "NYSE" under the symbol "OSCR."

17.     Defendant Mario Schlosser ("Schlosser") was the Chief Executive Officer and a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.     Defendant Siddhartha Sankaran ("Sankaran") was the Chief Financial Officer and a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.     Defendant Ari Fischel ("Fischel") was the Vice President of Finance and Accounting at the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     Defendant Jeffery H. Boyd ("Boyd") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Joel Cutler ("Cutler") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Joshua Kushner ("Kushner") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.     Defendant Teri List ("List") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendant Charles E. Phillips, Jr. ("Phillips") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.     Defendant David Plouffe ("Plouffe") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.     Defendant Elbert O. Robinson, Jr. ("Robinson") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

27.     Defendant Vanessa A. Wittman ("Wittman") was a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

28.     Defendants Schlosser, Sankaran, Fischel, Boyd, Cutler, Kushner, List, Phillips, Plouffe, Robinson, and Wittman are collectively referred to hereinafter as the "Individual Defendants."

29.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the Company's IPO. In the IPO, Goldman Sachs agreed to purchase 12,760,633 shares of the Company's Class A common stock, exclusive of the over-allotment option.

30.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO. In the IPO, Morgan Stanley agreed to purchase 10,186,282 shares of the Company's Class A common stock, exclusive of the over-allotment option.

31.     Defendant Allen & Company LLC ("Allen") served as an underwriter for the Company's IPO. In the IPO, Allen agreed to purchase 3,889,308 shares of the Company's Class A common stock, exclusive of the over-allotment option.

32.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter for the Company's IPO. In the IPO, Wells Fargo agreed to purchase 5,685,797 shares of the Company's Class A common stock, exclusive of the over-allotment option.

33.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the Company's IPO. In the IPO, Credit Suisse agreed to purchase 2,592,872 shares of the Company's Class A common stock, exclusive of the over-allotment option.

34.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the Company's IPO. In the IPO, BofA agreed to purchase 926,026 shares of the Company's Class A common stock, exclusive of the over-allotment option.

35.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO. In the IPO, Cowen agreed to purchase 555,615 shares of the Company's Class A common stock, exclusive of the over-allotment option.

36.     Defendant LionTree Advisors LLC ("LionTree") served as an underwriter for the Company's IPO. In the IPO, LionTree agreed to purchase 185,205 shares of the Company's Class A common stock, exclusive of the over-allotment option.

37.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") served as an underwriter for the Company's IPO. In the IPO, Ramirez agreed to purchase 129,644 shares of the Company's Class A common stock, exclusive of the over-allotment option.

38.     Defendant Siebert Williams Shank & Co., LLC ("Siebert Williams") served as an underwriter for the Company's IPO. In the IPO, Siebert Williams agreed to purchase 129,644 shares of the Company's Class A common stock, exclusive of the over-allotment option.

39.     Defendants Goldman Sachs, Morgan Stanley, Allen, Wells Fargo, Credit Suisse, BofA, Cowen, LionTree, Ramirez, and Siebert Williams are collectively referred to hereinafter as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Oscar Class A common stock pursuant and/or traceable to the Company's false and/or misleading Registration Statement and Prospectus issued in connection with the Company's IPO, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  The Company sold 36,391,946 shares of Class A common stock in the IPO. Moreover, record owners and other members of the Class may be identified from records maintained by Oscar or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

    (b)     whether the Registration Statement and statements made by Defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operations, and prospects of Oscar; and

    (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

46.     Oscar is purportedly a health insurance company that claims to be the first "built around a full stack technology platform" which will "allow [Oscar] to continue to innovate like a technology company and not a traditional insurer."

### The Company's False and/or Misleading
### Registration Statement and Prospectus

47.     On February 5, 2021, the Company filed its Registration Statement on Form S-1 with the SEC. On March 2, 2021, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective the same day.

48.     On March 4, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 36,391,946 shares of Class A common stock at a price of $39.00 per share. The Company received net proceeds of approximately $1.3 billion from the Offering. The proceeds from the IPO were purportedly to be used to repay in full outstanding borrowings, including fees and expenses, under Oscar's Term Loan Facility ($167 million), and the remainder proceeds were to be used for general corporate purposes.

49.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

50.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

51.     The Registration Statement touted the Company's "Growth Opportunities," including:

We are in the early stages of addressing our market opportunity and reimagining health care in the U.S. The key elements of our growth strategy are to:

- **Acquire more members in existing markets and states**. We believe that we have a significant opportunity to expand and grow share within our current footprint of markets and states as we continue to refine our member engagement engine.

- **Launch new markets and states**. We believe we can substantially grow our member base by launching into new counties and states. Today, we serve members in 291 counties and 18 states in the U.S., and we expect to be able to selectively and strategically expand into new geographies in the future.

- **Introduce new products and plans**. Our platform is built to be extensible to new products and plans, and we plan to continue investing and scaling to address the needs of consumers and partners. In 2017, we entered the Small Group market, and in 2020, we expanded our presence in this market with Cigna + Oscar co-branded plans. In 2019, we announced that we would be launching Medicare Advantage, and in 2020, we served our first members in that market.

- **Develop new partnerships and evaluate potential acquisitions**. We believe there is substantial opportunity for us to continue partnering with health care's key stakeholders through innovative fee-based and/or risk-sharing arrangements that reimagine the way health care is delivered. We will also consider growth through acquisition.

- **Monetize our platform**. We have made significant investments to build a unique full stack technology platform that enables innovation in the global health care system. We believe we are well-positioned to monetize our platform through risk-sharing partnerships or, even more directly, through fee-based service arrangements. In January 2021, we entered into a services agreement with Health First Shared Services, Inc., for itself and on behalf of certain of its Florida based health plan subsidiaries, or collectively, Health First, pursuant to which we will perform certain administrative functions and services and provide Health First's individual commercial

10

and Medicare Advantage members with access to our technology platform, largely beginning on January 1, 2022.

52.     The Registration Statement further stated with respect to the Company's MDL as

follows:

### Medical Loss Ratio

Medical loss ratio is calculated as set forth in the table below. Medical claims are total medical expenses incurred by members in order to utilize health care services less any member cost sharing. These services include inpatient, outpatient, pharmacy, and physician costs. Medical claims also include risk sharing arrangements with certain of our providers. The impact of the federal risk adjustment program is included in the denominator of our MLR. **We believe MLR is an important metric to demonstrate the loss ratio of our costs to pay for health care of our members to the premiums before ceded reinsurance. We believe our member engagement engine and full stack technology platform will allow us to more efficiently manage total claims incurred**. MLRs in our existing products are subject to various federal and state minimum requirements.

(Emphasis added.)

53.     With respect to the impact of COVID-19, the Registration Statement, in relevant

part, stated:

To date, we have experienced or expect to experience the following impacts on our business model due to COVID-19:

- *Virtual Care*. The utilization of telehealth in primary care visits for Oscar's subscribing members increased by more than 50%, from 21% of total primary episodes in 2019 to 33% in 2020. We intend to continue to offer our members flexible options when seeking care, including our Oscar virtual care solutions. In 2021, we launched innovative virtual primary care plan designs in three key states for a more convenient, efficient, and cost-effective doctor experience.

- *Medical Loss Ratio*. Because of the suspension of many elective medical appointments and procedures due to COVID-19, we have experienced a decrease in our MLR from 2019 as compared to 2020. We also have experienced and may continue to experience depressed non-COVID-19 related medical costs, as the pandemic continues to affect the United States, and our members continue to change the way they utilize care. Some of these costs will likely be incurred at a later date, resulting in increased medical claims expenses in the future. We cannot accurately estimate the

11

future net potential impact, positive or negative, to our medical claims expenses at this time.

- *Work From Home Arrangements*. We have taken significant steps to support our employees to protect their health and safety, while also ensuring that our business can continue to operate and that services continue without disruption. We have implemented our business continuity plans and have taken actions to support our workforce. We have transitioned the vast majority of our employees to work from home, allowing us to continue to operate at close to full capacity, while continuing to maintain our internal control focus. As a result, we have experienced and expect continued incremental costs due to investments and actions we have already taken and continued efforts to protect our members and employees and the communities we serve.

- *Member Solutions*. We have expanded benefit coverage in areas such as COVID-19 care and testing, telemedicine, and pharmacy benefits; offered additional enrollment opportunities to those who previously declined employer-sponsored offerings; extended certain premium payment terms for customers experiencing financial hardship; simplified administrative practices; and accelerated payments to care providers, all with the aim of assisting our customers, providers and members in addressing the impacts of the COVID-19 pandemic.

54.    With respect to RADV, the Registration Statement, in relevant part, stated:

The DOJ and the OIG have continuously increased their scrutiny of health care payers and providers, and Medicare Advantage insurers, under the FCA, in particular, which has led to a number of investigations, prosecutions, convictions, and settlements in the health care industry. We expect this trend to continue, particularly in light of the HHS's December 4, 2020 announcement regarding the creation of a new False Claims Act Working Group aimed at enhancing HHS's partnership with the DOJ to combat fraud and abuse. CMS and the OIG also periodically perform risk adjustment data validation, or RADV, audits of selected Medicare Advantage health insurance plans to validate the coding practices of, and supporting documentation maintained by health care providers. ***Certain of our health plans may be selected for such audits, which could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans, or other adverse action by CMS***. On November 24, 2020, CMS issued a final rule that amends the RADV program by: (i) revising the methodology for error rate calculations beginning with the 2019 benefit year; and (ii) changing the way CMS applies RADV results to risk adjustment transfers beginning with the 2020 benefit year. According to CMS, these changes are designed to give insurers more stability and predictability with respect to the RADV program and promote fairness in how health insurers receive adjustments. However, the future impact of these changes remains unclear, and such changes may ultimately increase financial

recoveries from the government's ability to retrospectively claw back or recover funds from health insurers.

55.    The Registration Statement was materially false and misleading and omitted to state: (1) that Oscar was experiencing growing COVID-19 testing and treatment costs; (2) that Oscar was experiencing growing net COVID costs; (3) that Oscar would be negatively impacted by an unfavorable prior year Risk Adjustment Data Validation (RADV) result relating to 2019 and 2020; (4) that Oscar was on track to be negatively impacted by significant SEP membership growth; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Subsequent Disclosures**

56.    On August 12, 2021, Oscar disclosed that the Company's Medical Loss Ratio ("MLR") for the second quarter of 2021 was 82.4%, an increase of 2170 basis points year-over year. The Company claimed that "[t]he MLR increased to 82.4% in 2Q21 from 60.7% in 2Q20, primarily driven by meaningfully lower utilization in 2Q20 as a result of COVID-19, as well as higher COVID-19 testing and treatment costs and a return to more normalized utilization in 2Q21." The Company also disclosed that its net loss for the quarter was $73.1 million, an increase of $32.1 million year-over-year. In greater part, Oscar stated:

- Membership as of June 30, 2021 of 563,114, a 34.9% increase YoY
- For the quarter ended June 30, 2021:
  - Direct policy premiums of $838.1 million, a 44.4% increase YoY
  - Premiums earned of $528.2 million, a 364.3% increase YoY
  - Medical Loss Ratio of 82.4%, increased 2170 bps YoY
  - InsuranceCo Administrative Expense Ratio of 19.8%, improved 330 bps YoY
  - InsuranceCo Combined Ratio of 102.2%, increased 1840 bps YoY
  - Net loss of $(73.1) million, an increase of $32.1 million YoY; Adjusted EBITDA loss of $(50.4) million, an increase of $21.6 million YoY

NEW YORK--(BUSINESS WIRE)-- Health insurtech company Oscar Health, Inc. (NYSE: OSCR) today announced its financial results for the second quarter ended June 30, 2021.

"Our second quarter results tell a clear story: that our member-centric, tech-first approach to health care, continues to generate market demand and value for our members and +Oscar clients," said Mario Schlosser, CEO and Co-Founder of Oscar. "With membership steadily increasing, we're well-positioned on our path towards profitability for our Insurance business. We look forward to building upon this momentum in 2022 by entering three new states and 146 counties.1 For +Oscar, we are actively driving growth through a robust and active pipeline."

Total direct policy premiums were $838.1 million in the quarter, up 44.4% year-over-year ("YoY"), driven primarily by higher membership growth in existing and new states and business mix shifts as well as increased enrollment from the Special Enrollment Period. Premiums earned in the quarter were up 364.3% YoY, driven both by membership growth and lower quota share cession rates in 2021.

Oscar's InsuranceCo Combined Ratio, which is the sum of its Medical Loss Ratio ("MLR") and the InsuranceCo Administrative Expense Ratio, increased 1840 bps YoY to 102.2% largely reflecting a higher MLR. ***The MLR increased to 82.4% in 2Q21 from 60.7% in 2Q20, primarily driven by meaningfully lower utilization in 2Q20 as a result of COVID-19, as well as higher COVID-19 testing and treatment costs and a return to more normalized utilization in 2Q21***. The InsuranceCo Administrative Expense Ratio improved by 330 bps YoY, driven by increasing operating leverage from higher revenue, scale efficiencies from our tech stack, and the repeal of the health insurer fee ("HIF").

(Emphasis added.)

57.    On the same day, August 12, 2021, the Company held a conference call with analysts and investors to present Oscar's Q2 2021 results. On the call, Scott Blackley, the Company's Chief Financial Officer, stated:

Our medical loss ratio was 82.4% in the quarter. In terms of drivers, COVID-related medical costs declined slower than we expected and were roughly $35 million in the quarter, contributing 500 basis points to the MLR. We had approximately $34 million of favorable prior period development related to the prior year, a benefit of 400 basis points in the quarter. The prior year period development impacted our risk adjustment, which is included in the denominator of the MLR calculation. So while the dollars of the COVID-related medical costs, MPPD item basically offset, the COVID costs had a larger impact to MLR.

58.     On November 10, 2021, Oscar disclosed that its third quarter 2021 MLR increased 920 basis points year-over-year, to 99.7%. The Company claimed that the MLR increase was "primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, an unfavorable prior year Risk Adjustment Data Validation (RADV) result, and the impact of significant SEP membership growth." The Company also disclosed that its net loss for the quarter was $212.7 million, an increase of $133.6 million year-over-year. In greater Part, Oscar stated:

- Membership as of September 30, 2021 of 594,284, a 41% increase YoY
- For the quarter ended September 30, 2021:
    - Direct policy premiums of $895.4 million, a 53.1% increase YoY
    - Premiums earned of $441.7 million, a 345.6% increase YoY
    - Medical Loss Ratio of 99.7%, increased 920 bps YoY
    - InsuranceCo Administrative Expense Ratio of 23.1%, increased 70 bps YoY
    - InsuranceCo Combined Ratio of 122.8%, increased 990 bps YoY
    - Net loss of $212.7 million, an increase of $133.6 million YoY; Adjusted EBITDA loss of $188.7 million, an increase of $117.7 million YoY

NEW YORK--(BUSINESS WIRE)-- Health insurtech company Oscar Health, Inc. (NYSE: OSCR) today announced its financial results for the third quarter ended September 30, 2021.

"Oscar saw meaningful growth across its insurance business in the third quarter, and we experienced volatility on our Medical Loss Ratio as short term pressures from COVID, Special Enrollment Period ("SEP") membership growth and prior year risk adjustments created headwinds in the quarter," said Mario Schlosser, CEO and Co-Founder of Oscar. "Our best-in-class member engagement and tech-driven ethos continues to drive demand and provide value for our members. With respect to 2022, we took a disciplined approach to pricing, balancing growth and margin improvement for our insurance business and are well-positioned heading into Open Enrollment."

Total direct and assumed policy premiums were $899.2 million in the quarter, up 53.8% year-over-year ("YoY"), driven primarily by higher membership growth, including increased enrollment from SEP, and business mix shifts. Premiums earned in the quarter were up 345.6% YoY, driven both by membership growth and lower quota share cession rates in 2021.

Oscar's InsuranceCo Combined Ratio, which is the sum of its Medical Loss Ratio ("MLR") and the InsuranceCo Administrative Expense Ratio, increased 990 bps

YoY to 122.8% largely reflecting a higher MLR. ***The MLR increased 920 bps YoY to 99.7% in 3Q21 from 90.5% in 3Q20, primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, an unfavorable prior year Risk Adjustment Data Validation (RADV) result, and the impact of significant SEP membership growth. The InsuranceCo Administrative Expense Ratio increased by 70 bps YoY, largely driven by the impact of RADV on the denominator as well as higher SEP distribution costs.***

(Emphasis added.)

59.    On the same day, November 10, 2021, the Company held a conference call with analysts and investors to present Oscar's Q2 2021 results. On the call, Defendant Schlosser stated:

Now, turning to our Medical Loss Ratio. Scott will be spending more time on this shortly, but I want to note that we had pressure on the MLR this quarter. Our consolidated Medical Loss Ratio for the quarter was 99.7%. This is clearly higher than anticipated, ***driven in part by net core utilization that was higher than expected, by higher-than-expected special enrollment growth and by some adverse risk adjustment audit results***.

(Emphasis added.)

60.    On the same call, Scott Blackley stated:

Turning to risk adjustment. ***We recognized approximately $20 million of risk adjustment expense this quarter*** related to our risk adjustment data validation audit or RADV results. ***The RADV exercise is atypical this year due to COVID. It spans two years, 2019 and 2020. The majority of the RADV headwinds relate to the 2019 audit results, which were recently completed***. We're seeing a marked improvement in 2020 audit results. And thus far, we've seen better results in 2020 – excuse me, and we have made further enhancements in our risk adjustment process in 2021. As such, we expect this is a headwind for the quarter, but not going forward.

. . .

***Our Medical Loss Ratio was 99.7% in the third quarter. There were three items that impacted the MLR. The first item was the effect of the COVID spike in the third quarter, which inclusive of our COVID pricing in 2021was approximately 500 basis points unfavorable on a year-over-year basis***. Net COVID spend to the Delta wave accounted for approximately 600 basis points of MLR in the current quarter, which was modestly above our expectations.

Lower non-COVID utilization offset roughly half of the direct COVID expense in the quarter. As Mario mentioned, COVID costs spiked in August and declined

through October, suggesting a potential lower impact in the fourth quarter, all else equal.

***The second item impacting the MLR was the adverse risk adjustment data validation results, which drove approximately 300 basis points of MLR impact on a year-over-year basis***. As I mentioned, this is a headwind in the quarter, but it's not impacting our baseline.

***The third item impacting year-over-year MLR was the growth in our SEP membership***, which was higher than we anticipated. We estimate that the growth in our SEP membership drove approximately 100 basis points of pressure on the MLR versus same quarter last year. As we mentioned in our last call, SEP members run less favorably than our OE population, driven largely by risk adjustment dynamics for the partial year. We have seen this effect come through in our results as we expected. And as we have more SEP members than last year, our MLR was higher versus the same period last year. Looking forward, growth in SEP membership is a headwind for 2021 MLR, but we expect that retaining SEP members during our OE 22 will be a tailwind to next year.

(Emphasis added.)

61.    On this news, Oscar's share price fell $4.05 per share, or 24.5%, to close at 12.47 per share on November 11, 2021.

62.    By the commencement of this action, Oscar stock has traded as low as $5.76 per share, a more than 85% decline from the $39.00 per share IPO price.

## **FIRST CLAIM**

### **Violation of Section 11 of the Securities Act**

### **(Against All Defendants)**

63.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

65.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

66.     Oscar is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

67.     As issuer of the shares, Oscar is strictly liable to Plaintiff and the Class for the misstatements and omissions.

68.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

69.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

70.     Plaintiff acquired Oscar shares pursuant and/or traceable to the Registration Statement for the IPO.

71.     Plaintiff and the Class have sustained damages.  The value of Oscar Class A common stock has declined substantially subsequent to and due to the Defendants' violations.

## SECOND CLAIM

### Violation of Section 15 of the Securities Act

### (Against the Individual Defendants)

72.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

74. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Oscar within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Oscar to engage in the acts described herein.

75. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

76. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2022                              **GLANCY PRONGAY & MURRAY LLP**

                                                 By: _/s/ Gregory B. Linkh_
                                                 Gregory B. Linkh (GL-0477)
                                                 230 Park Ave., Suite 358
                                                 New York, NY 10169
                                                 Telephone: (212) 682-5340
                                                 Facsimile: (212) 884-0988
                                                 Email: glinkh@glancylaw.com

                                                 Robert V. Prongay
                                                 Charles H. Linehan
                                                 Pavithra Rajesh
                                                 1925 Century Park East, Suite 2100
                                                 Los Angeles, CA 90067
                                                 Telephone: (310) 201-9150
                                                 Facsimile: (310) 201-9160

                                                 *Counsel for Plaintiff Lorin Carpenter and*
                                                 *Proposed Lead Counsel for the Class*

**SWORN CERTIFICATION OF PLAINTIFF**
**OSCAR HEALTH, INC. (OSCR) SECURITIES LITIGATION**

I, Lorin Carpenter, certify that:

1.   I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.   I did not purchase the Oscar Health, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in Oscar Health, Inc. securities during the period set forth in the Complaint are as follows:

     (See attached transactions)

5.   I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

_____
5/11/2022
Date

_____
Lorin Carpenter
Lorin Carpenter

**Lorin Carpenter's Transactions in Oscar Health, Inc. (OSCR)**

| Date | Transaction Type | Quantity | Unit Price |
|------|-----------------|----------|------------|
| 3/17/2021 | Bought | 400 | $35.0000 |