## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORIN CARPENTER and VICKI RILEY-FISCHER, Individually and on Behalf of All Others Similarly Situated, <br><br>              Plaintiff, <br><br>     v. <br><br> OSCAR HEALTH, INC., MARIO SCHLOSSER, SIDDHARTHA SANKARAN, ARI FISCHEL, JEFFERY H. BOYD, JOEL CUTLER, JOSHUA KUSHNER, TERI LIST, CHARLES E. PHILLIPS, JR., DAVID PLOUFFE, ELBERT O. ROBINSON, JR., VANESSA A. WITTMAN, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, WELLS FARGO SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, LIONTREE ADVISORS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC, <br><br>              Defendants. | Case No. 1:22-cv-03885-ALC <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.   JURISDICTION AND VENUE ................................................................................... 3

III.  PARTIES ........................................................................................................................ 3

    A.    Plaintiffs ........................................................................................................... 3

    B.    Corporate Defendant ........................................................................................ 4

    C.    Individual Defendants ...................................................................................... 4

    D.    The Underwriter Defendants............................................................................. 5

IV.   SUBSTANTIVE ALLEGATIONS ................................................................................ 7

    A.    Oscar Is A Technology Company That Had Real-Time Access To All Its Customers' Data................................................................................................. 7

    B.    The Success Of The Company Is Measures By Its Medical Loss Ratio .............. 8

    C.    Risk Adjustment Data Validation Audits Can Lead To Adjustments That Impact Oscar's MLR................................................................................................. 9

    D.    The Company Sells $1.3 Billion Of Stock In Its IPO.......................................... 12

    E.    The Company Reveals That It Had Failed To Maintain Adequate Controls And Systems To Ensure The Integrity Of the Premium Data Submitted To Regulatory Authorities For The RADV Audit ...................................................................... 13

    F.    The Company Admits That It Lacked Effective Controls Over Its Information Technology Controls........................................................................................ 15

V.    DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT............................. 16

    A.    Section 11 Disclosure Requirements ................................................................. 16

    B.    Disclosure Requirements Under Regulation S-K ................................................ 17

        1.    Item 303 Disclosure Requirements......................................................... 17

        2.    Item 105 Disclosure Requirements......................................................... 18

    C.    Defendants Violated Their Disclosure Obligations In the Registration Statement............................................................................................................. 19

VI.     MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS
        IN THE REGISTRATION STATEMENT........................................................................ 20

VII.    CLASS ACTION ALLEGATIONS ................................................................................ 22

VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................... 24

IX.     CLAIMS FOR RELIEF ................................................................................................. 24

X.      PRAYER FOR RELIEF ................................................................................................. 27

Court-appointed Lead Plaintiff Vicki Riley-Fischer and additional plaintiff Lorin Carpenter (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Oscar Health, Inc. ("Oscar" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Oscar; (c) review of reports issued by industry and securities analysts; and (d) review of other publicly available information concerning Oscar.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all individuals and entities that purchased or acquired Oscar Class A common stock pursuant and/or traceable to the Company's false and misleading registration statement and prospectus, as amended (collectively, the "Registration Statement"),[1] issued in connection with Oscar's March 2021 initial public offering (the "IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Oscar, certain of its officers and directors (the "Individual Defendants") and the underwriters of the IPO ("Underwriter Defendants") (collectively, "Defendants").

---

[1] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on February 5, 2021, all amendments thereto, and the Prospectus filed on Form 424B4 on March 4, 2021, which was incorporated into and formed a part of the Registration Statement that became effective on March 2, 2021

2.      Oscar is a health insurance company that provides health insurance policies to businesses-employers and to individuals, to the latter through both Medicare Advantage programs and through healthcare exchanges created under the 2010 Affordable Care Act ("ACA"), formally known as the Patient Protection and Affordable Care Act.

3.      The claims in this action arise from the materially false and/or misleading Registration Statement issued in connection with the IPO.  In the IPO, the Company sold more than 36 million shares of Class A common stock at $39.00 per share. The Company received aggregate net proceeds of $1.3 billion after deducting underwriting discounts and commissions of $71.0 million.

4.      As Defendants have admitted, unbeknownst to the shareholders of the Company, at the time of the IPO, the Company had failed to maintain adequate controls and systems to ensure the integrity of the premium data submitted to regulatory authorities.  This failure led to the Company providing incorrect premium data to the Centers for Medicare and Medicaid Services ("CMS"), resulting in a $20 million expense within months of the IPO related to a risk adjustment audit.

5.      As such, the Registration Statement contained materially false and misleading statements and omitted material information in violation of Sections 11 and 15 of the Securities Act.  Specifically, the Registration Statement did not disclose that the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the Risk Adjustment Data Validation audit and that, as a result, there was a material risk that the Centers for Medicare & Medicaid Services would impose a financial adjustment following this audit for the 2019 benefit year.

6.      As a result of Defendants securities law violations, Plaintiffs and the Class have suffered significant losses and damages.  While the Company sold its Class A common stock for $39.00 per share in the IPO, the current price of its stock is less than $3 per share.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

9.      Venue is proper in this District pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) as the Company conducts business in this District and maintains its principal executive offices in this District.  Moreover, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District and many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.    Plaintiffs

11.     Lead Plaintiff Vicki Riley-Fischer, as set forth in the previously-filed certification, incorporated by reference herein, purchased Oscar stock pursuant and/or traceable to the Offering Materials, and was damaged thereby.

12.     Plaintiff Lorin Carpenter, as set forth in the previously-filed certification, incorporated by reference herein, purchased Oscar stock pursuant and/or traceable to the Offering Materials, and was damaged thereby.

**B.    Corporate Defendant**

13.     Defendant Oscar is incorporated under the laws of Delaware with its principal executive offices located in New York, New York.  Oscar's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OSCR."

**C.    Individual Defendants**

14.     Defendant Mario Schlosser ("Schlosser") was the Chief Executive Officer and a Director of the Company at all relevant times.

15.     Defendant Siddhartha Sankaran ("Sankaran") was the Chief Financial Officer and a Director of the Company at all relevant times until March 16, 2021.

16.     Defendant Ari Fischel ("Fischel") was the Vice President of Finance and Accounting at the Company at all relevant times.

17.     Defendant Jeffery H. Boyd ("Boyd") was, at all relevant times, a Director of the Company.

18.     Defendant Joel Cutler ("Cutler") was, at all relevant times, a Director of the Company.

19.     Defendant Joshua Kushner ("Kushner") was, at all relevant times, a Director of the Company.

20.     Defendant Teri List ("List") was, at all relevant times, a Director of the Company.

21.     Defendant Charles E. Phillips, Jr. ("Phillips") was, at all relevant times, a Director of the Company.

22.    Defendant David Plouffe ("Plouffe") was, at all relevant times, a Director of the Company.

23.    Defendant Elbert O. Robinson, Jr. ("Robinson") was, at all relevant times, a Director of the Company.

24.    Defendant Vanessa A. Wittman ("Wittman") was, at all relevant times, a Director of the Company.

25.    Defendants Schlosser, Sankaran, Fischel, Boyd, Cutler, Kushner, List, Phillips, Plouffe, Robinson, and Wittman, are herein referred to as the "Individual Defendants." All of the Individual Defendants signed and/or authorizing the signing of the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's common stock to investors in the IPO for their own financial benefit and the financial benefit of Oscar.

**D.    The Underwriter Defendants**

26.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter and co-lead managing bookrunner for the Company's IPO. In the IPO, Goldman Sachs agreed to purchase 12,760,633 shares of the Company's Class A common stock, exclusive of the over-allotment option.

27.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter and co-lead managing bookrunner for the Company's IPO. In the IPO, Morgan Stanley agreed to purchase 10,186,282 shares of the Company's Class A common stock, exclusive of the over-allotment option.

28.      Defendant Allen & Company LLC ("Allen") served as an underwriter and co-lead managing bookrunner for the Company's IPO. In the IPO, Allen agreed to purchase 3,889,308 shares of the Company's Class A common stock, exclusive of the over-allotment option.

29.      Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter and a managing bookrunner for the Company's IPO. In the IPO, Wells Fargo agreed to purchase 5,685,797 shares of the Company's Class A common stock, exclusive of the over-allotment option.

30.      Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter and a bookrunner for the Company's IPO. In the IPO, Credit Suisse agreed to purchase 2,592,872 shares of the Company's Class A common stock, exclusive of the over-allotment option.

31.      Defendant BofA Securities, Inc. ("BofA") served as an underwriter and a bookrunner for the Company's IPO. In the IPO, BofA agreed to purchase 926,026 shares of the Company's Class A common stock, exclusive of the over-allotment option.

32.      Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO. In the IPO, Cowen agreed to purchase 555,615 shares of the Company's Class A common stock, exclusive of the over-allotment option.

33.      Defendant LionTree Advisors LLC ("LionTree") served as an underwriter for the Company's IPO. In the IPO, LionTree agreed to purchase 185,205 shares of the Company's Class A common stock, exclusive of the over-allotment option.

34.      Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") served as an underwriter for the Company's IPO. In the IPO, Ramirez agreed to purchase 129,644 shares of the Company's Class A common stock, exclusive of the over-allotment option.

35.     Defendant Siebert Williams Shank & Co., LLC ("Siebert Williams") served as an underwriter for the Company's IPO. In the IPO, Siebert Williams agreed to purchase 129,644 shares of the Company's Class A common stock, exclusive of the over-allotment option.

36.     Defendants Goldman Sachs, Morgan Stanley, Allen, Wells Fargo, Credit Suisse, BofA, Cowen, LionTree, Ramirez, and Siebert Williams are collectively referred to hereinafter as the "Underwriter Defendants."  The Underwriter Defendants served as underwriters for the IPO. Their failure to conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement was a substantial factor leading to the harm complained of herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Oscar Is A Technology Company That Had Real-Time Access To All Its Customers' Data

37.      Oscar, originally formed in 2012 as Mulberry Health, Inc. and renamed in January 2021, is a health insurance company that provides health insurance policies to businesses-employers and to individuals, to the latter through both Medicare Advantage programs and through healthcare exchanges created under the ACA.

38.     Oscar differentiates itself as the "first health insurance company built around a full stack technology platform," whereby the Company offers conventional health insurance plans with a focus on using technology-driven customer interfaces, a full-service smartphone app, telemedicine, and online claims processing.

39.     In the Registration Statement, Oscar has boasted that its "full stack technology platform … allow[s] [Oscar] … to innovate like a technology company and not a traditional insurer…" and that Oscar "use[s] the tools and mindset of a consumer technology company to solve problems in health care."  For example, on the August 12, 2021 earnings call, Defendant Schlosser explained in response to a question from an analyst about "the tech stack and [Oscar's]

claims of visibility" that "all the stuff [data] is really available to [] my fingertips, I mean if I care

to look it, and obviously, I do quite a bit."  Schlosser further explained that "these numbers that

we can pull up even by the minute basically . . . . Even on the claims side, we generally think

we've got really good visibility there, because it's obviously also a single source of truth, which

means the claim comes in, and we can see it right away."   CFO R. Scott Blackley[2] even further

explained that "And I'll just comment that if you were here with me, you would see that Mario

[Schlosser] literally pulled up the dashboards and ***was giving that answer using real-time data***.

It's really one of the most amazing parts of this company that I've seen since I've joined."[3]

### B.    The Success Of The Company Is Measures By Its Medical Loss Ratio

40.    Medical Loss Ratio ("MLR") is a metric that measures the portion of an insurer's

income spent on paying patients' claims. According to the Registration Statement, Oscar's MLR

is the quotient of the net claims before ceded quota share reinsurance and the net premiums before

ceded quota share reinsurance.

41.    Many states have established a minimum MLR to limit the amount of premium

dollars that insurers can keep for administration, marketing, and profits. The ACA established

federal MLR minimums wherein health insurance issuers like Oscar are required to provide an

annual rebate to enrollees if the issuer's MLR fails to meet minimum requirements. These

requirements were established in response to concerns that "[m]any insurance companies spend a

substantial portion of consumers' premium dollars on administrative costs and profits, including

---

[2] Blackley became CFO within weeks of the IPO.

[3] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

executive salaries, overhead, and marketing."[4] Accordingly, the MLR requirements "encourage health plans to provide value to enrollees."[5]

42.    Given the operational importance of the MLR, Oscar has included its MLR as a key non-GAAP metric in each of its financial reports filed with the SEC. According to the Registration Statement, "MLR is an important metric to demonstrate the loss ratio of [Oscar's] costs to pay for health care of [its] members to the premiums before ceded reinsurance."

43.    That Oscar values the MLR is further evidenced by the fact that the Company made performance-based awards to COO Meghan Joyce and CFO R. Scott Blackley contingent on Oscar achieving an InsuranceCo Combined Ratio less than or equal to 100%, a ratio that is computed by adding Oscar's MLR to the Company's InsuranceCo Administrative Expense Ratio. *See* Sept. 3, 2021 Form 8-K.

44.    Defendants frequently touted MLR trends during conference calls with analysts, underscoring that the metric was important and closely followed by management. For example, during the first quarter 2021 conference call held on May 13, 2021, Defendant Schlosser stated "In fact, we view our improving MLR performance as a validation that our technology-powered model is working."

C.    **Risk Adjustment Data Validation Audits Can Lead To Adjustments That Impact Oscar's MLR**

45.    Under the ACA, insurers cannot deny coverage or charge higher premiums on the basis of health status. There was a concern that this would lead to "risk selection," whereby insurers

---

[4] https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/Medical-Loss-Ratio

[5] https://www.healthcare.gov/glossary/medical-loss-ratio-mlr/

are incentivized to avoid enrolling those who require costly medical care (by, for example, limiting the benefits they cover) and instead attracting healthier consumers, which would "make the market less efficient because insurers may compete on the basis of attracting healthier people to enroll, as opposed to competing by providing the most value to consumers."[6] To protect against this and a related concern that those most in need of healthcare are more likely to purchase insurance, thereby increasing premiums, the law implemented several risk mitigation strategies, including the risk adjustment program.

46.     The risk adjustment program "compensate[s] health insurance plans for differences in enrollee health mix so that plan premiums reflect differences in scope of coverage and other plan factors, but not differences in health status."[7] In other words, the risk adjustment program helps spread healthcare costs such that plans that end up with healthier populations compensate plans that have more costly enrollees (*i.e.*, plans with low actuarial risk compensate those with high actuarial risk).

47.     The risk adjustment program is effectuated via risk adjustment data validation ("RADV") audits performed by the U.S. Centers for Medicare and Medicaid Services ("CMS") and the Office of the Inspector General for the U.S. Department of Health and Human Services ("OIG"). RADV audits seek to verify the coding practices tied to hierarchical condition categories and supporting documentation maintained by healthcare providers. After assessing each

---

[6]   https://www.kff.org/health-reform/issue-brief/explaining-health-care-reform-risk-adjustment-reinsurance-and-risk-corridors/

[7] Kautter, John, et al, *Affordable Care Act Risk Adjustment: Overview, Context, and Challenges*, Medicare & Medicaid Research Review, Volume 4, Issue 3 (2014), available at https://www.cms.gov/mmrr/Downloads/MMRR2014_004_03_a02.pdf.

individual's relative risk based on their demographics and diagnoses, the operative model "averages all individual risk scores in risk adjustment covered plans and uses the plan average risk scores combined with other factors[] to calculate the funds transferred between plans."[8] Transfers are intended to bridge the gap between the estimated premium with risk selection and the estimated premium without risk selection.

48.    For each benefit year, the issuer of a covered plan submits data regarding enrollees' individual risk scores to HHS through a dedicated data environment, *i.e.* an EDGE server. "To ensure accurate reporting, HHS recommends that insurers first validate their data through an independent audit and then submit the data to HHS for a second audit."[9] If there are any errors found through these audits, the insurer's payments will be retrospectively adjusted. *Id.*

49.    For the 2019 benefit year, CMS issued a memo dated November 7, 2019 entitled "Evaluation of EDGE Data Submissions for the 2019 Benefit Year," outlining the consequences for submitting incorrect data.[10] Because incorrect *claims* data will understate an issuer's plan average risk score but would not impact other issuers in the risk pool, CMS would not impose a penalty other than preventing the issuer from submitting supplementary data. However, incorrect *premium* data **would** affect the risk adjustment transfers of other issuers, so CMS would impose a monetary penalty for material errors. Specifically, in a section entitled "Adjustment to Total Risk Adjustment Transfers Due to Submission of Incorrect Data," CMS stated:

---

[8] *Id.* at 3 (footnote omitted).

[9]    https://www.kff.org/health-reform/issue-brief/explaining-health-care-reform-risk-adjustment-reinsurance-and-risk-corridors/

[10] https://www.cms.gov/files/document/edge-2019-qq-guidance.pdf

However, if an issuer has submitted incorrect EDGE server premium data, that action will increase or decrease the magnitude of risk adjustment transfers to other issuers in the State market risk pool depending on the direction of the premium error, holding constant the other elements of the state payment transfer formula. CMS will similarly require an issuer that has submitted incorrect EDGE server premium data to adhere to its initial data submission, and to accept the consequences of the submission, even where the monetary impact of the inaccuracy on the issuer may be substantial. ***However, in cases where there is a material impact on risk adjustment transfers for that particular State market risk pool as a result of incorrect EDGE server premium data, CMS will calculate the dollar value of differences in risk adjustment transfers where the difference is detrimental to another issuer in the State market risk pool, adjust that other issuer's risk adjustment transfer amount by that calculation, and increase the risk adjustment charge (or decrease the risk adjustment payment) to the issuer making the data error, in order to balance the State market risk pool.***

50.    In sum, an error in premium data submitted by an issuer will distort the risk adjustment analysis for all issuers in the risk pool, so some issuers would receive less payment than they otherwise are entitled to, which would make the marketplace inefficient. To safeguard against this result, CMS disincentivized issuers from submitting incorrect data: if an issuer submitted incorrect premium data that materially impacted the risk adjustment analysis, CMS would negatively adjust that issuer's transfer amount to balance the risk pool. This negative adjustment would be in the form of an increased risk adjustment charge or reduced risk adjustment payment, depending on the remainder of the analysis.

51.    The result from the RADV audit would increase net premiums (if there was a payment) or reduce net premiums (if there was a charge/expense). Accordingly, reducing the net premiums for a given period will affect the denominator of the MLR, thereby increasing the MLR for that period.

### D.    The Company Sells $1.3 Billion Of Stock In Its IPO

52.    On March 2, 2021, the Company's registration statement on Form S-1 related to its to its IPO was declared effective and the Company's Class A common stock began trading on the NYSE on March 3, 2021. On March 5, 2021, the Company completed its IPO, in which the

Company sold 36,391,946 shares of Class A common stock at a price to the public of $39.00 per share. The Company received aggregate net proceeds of $1.3 billion after deducting underwriting discounts and commissions of $71.0 million.

> ### E.    The Company Reveals That It Had Failed To Maintain Adequate Controls And Systems To Ensure The Integrity Of the Premium Data Submitted To Regulatory Authorities For The RADV Audit

53.    On November 10, 2021, Oscar disclosed that its third quarter 2021 MLR increased 920 basis points year-over-year, to 99.7%. The Company claimed that the MLR increase was "primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, *an unfavorable prior year Risk Adjustment Data Validation (RADV) result*, and the impact of significant SEP membership growth."   As the Company further explained:

> Oscar's InsuranceCo Combined Ratio, which is the sum of its Medical Loss Ratio ("MLR") and the InsuranceCo Administrative Expense Ratio, increased 990 bps YoY to 122.8% largely reflecting a higher MLR. *The MLR increased 920 bps YoY to 99.7% in 3Q21 from 90.5% in 3Q20, primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, an unfavorable prior year Risk Adjustment Data Validation (RADV) result, and the impact of significant SEP membership growth. The InsuranceCo Administrative Expense Ratio increased by 70 bps YoY, largely driven by the impact of RADV on the denominator as well as higher SEP distribution costs.*

54.    On the same day, November 10, 2021, the Company held a conference call with analysts and investors to present Oscar's 2021 fiscal second quarter 2021 results. On the call, Defendant Schlosser reiterated that the increase in MLR was in part the result of the adverse risk adjustment audit results:

> Now, turning to our Medical Loss Ratio. Scott will be spending more time on this shortly, but I want to note that we had pressure on the MLR this quarter. Our consolidated Medical Loss Ratio for the quarter was 99.7%. This is clearly higher than anticipated, *driven in part by net core utilization that was higher than expected, by higher-than-expected special enrollment growth and by some adverse risk adjustment audit results*.

55.     On the same call, the Company's CFO, Scott Blackley, further explained that the Company recognized approximately $20 million of risk adjustment expense this quarter related to the RADV audit and that as a result, they had "made further enhancements" to the Company's "risk adjustment process in 2021."   As a result of these changes, or "enhancements," Blackley stated that they did not believe that there would be this same issue, or "headwind" with the 2021 RADV audit.   As Blackley stated:

> Turning to risk adjustment. ***We recognized approximately $20 million of risk adjustment expense this quarter*** related to our risk adjustment data validation audit or RADV results***. The RADV exercise is atypical this year due to COVID. It spans two years, 2019 and 2020. The majority of the RADV headwinds relate to the 2019 audit results, which were recently completed.*** We're seeing a marked improvement in 2020 audit results. And thus far, we've seen better results in 2020 – excuse me, and we have made further enhancements in our risk adjustment process in 2021. As such, we expect this is a headwind for the quarter, but not going forward.
>
> \*       \*       \*
>
> ***Our Medical Loss Ratio was 99.7% in the third quarter. There were three items that impacted the MLR. The first item was the effect of the COVID spike in the third quarter, which inclusive of our COVID pricing in 2021 was approximately 500 basis points unfavorable on a year-over-year basis.***
>
> \*       \*       \*
>
> ***The second item impacting the MLR was the adverse risk adjustment data validation results, which drove approximately 300 basis points of MLR impact on a year-over-year basis.*** As I mentioned, this is a headwind in the quarter, but it's not impacting our baseline.

56.     As discussed above, because incorrect claims data will understate an issuer's plan average risk score but would not impact other issuers in the risk pool, CMS would not impose a penalty other than preventing the issuer from submitting supplementary data.   This is not what occurred here.   Instead, since CMS imposed a monetary penalty, this means that Oscar provided incorrect premium data to CMS.   Blackley confirmed that this penalty, or expense, was partly "operational about how we got the data together to execute the audit."   As such, this is an

admission that the Company lacked adequate controls and systems to ensure the integrity of the premium data submitted to regulatory authorities for the RADV audit.  This is even further confirmed by the fact that the Company was forced to make the changes, or "enhancements," that Blackley mentioned to ensure that the systems were in place to ensure accurate premium data was able to be supplied to CMS.

57.    Following these disclosures, Oscar's share price fell $4.05 per share, or 24.5%, to close at 12.47 per share on November 11, 2021.

### F.    The Company Admits That It Lacked Effective Controls Over Its Information Technology Controls

58.    In the Company's 2021 fiscal year annual report filed on February 25, 2022, the Company admitted that it Oscar had a material weakness in internal control over its financial reporting related to information systems.  As the Company explained:

> We did not design and maintain effective controls over certain information technology ("IT") general controls for information systems that are relevant to the preparation of our financial statements. Specifically, we did not design and maintain (i) program change management controls for certain financial systems to ensure that IT program and data changes affecting certain IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately, (ii) user access controls that adequately restrict user and privileged access to certain financial applications, programs and data to appropriate company personnel, and (iii) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

59.    While the Company claimed that these deficiencies did not result in a material misstatement to its financial statement, it admitted that:

> the deficiencies, when aggregated, could impact the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected. ***Accordingly, management has determined these deficiencies in the aggregate constitute a material weakness.***

## V.    DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT

60.    "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

61.    To effectuate this purpose, a Company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering"); *see also* 15 U.S.C. § 77k(a).

### A.    Section 11 Disclosure Requirements

62.    Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. See 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every

person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security."  15 U.S.C. § 77k(a)(1)-(5).

### B.    Disclosure Requirements Under Regulation S-K

#### 1.    Item 303 Disclosure Requirements

63.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4; see also 17 C.F.R. § 229.303(a). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required."  *Id.*

64.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.
>
> ii.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or

infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

65.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

66.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See* Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

### 2.    Item 105 Disclosure Requirements

67.     Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 CFR § 229.105(a). Item 105 further requires the offering

documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 CFR § 229.105(b). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

### C.    Defendants Violated Their Disclosure Obligations In the Registration Statement

68.    Defendants violated their disclosure obligations in the Registration Statement by failing to disclose that the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would impose a financial adjustment following its RADV audit for the 2019 benefit year.  Defendants' failure to disclose these material facts and risks violated Section 11 and Item 105.  Additionally, Defendants' omission of the fact that Oscar failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit violated Item 303 given that Oscar was actively engaged in a practice that was likely to have an unfavorable impact on revenues, net premiums, and the Company's medical loss ratio.

69.    Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent or motive as required elements.

## VI.    MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

70.    Oscar sold more than 39 million shares of stock in the IPO pursuant to the Registration Statement.  The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  Nowhere did the Registration Statement disclose that the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would impose a financial adjustment following its RADV audit for the 2019 benefit year.  However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were negligently omitted.

71.    The Registration Statement explained in a section entitled "Fraud, Waste and Abuse Laws and the False Claims Act" that the Company "perform[s] ongoing monitoring of our compliance with CMS risk adjustment requirements and other applicable laws" in light of "increased scrutiny by the DOJ on health plans' diagnosis coding and risk adjustment practices, particularly for Medicare Advantage plans."  As discussed in full:

> Fraud, waste, and abuse prohibitions encompass a wide range of activities, including, but not limited to, kickbacks or other inducements for referral of members or for the coverage of products (such as prescription drugs) by a plan, billing for unnecessary medical services by a health care provider, payments made to excluded providers, and improper marketing and beneficiary inducements. In particular, *there has recently been increased scrutiny by the DOJ on health plans' diagnosis coding and risk adjustment practices, particularly for Medicare Advantage plans.* The regulations, contractual requirements, and policies applicable to participants in government health care programs are complex and subject to change. Health insurers are required to maintain compliance programs to prevent, detect, and remediate fraud, waste, and abuse, and are often the subject of fraud, waste, and abuse investigations and audits. *We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and other applicable laws*.

72.    These statements in the preceding paragraph were materially false and/or misleading when made because, as the Company has admitted, Oscar failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would a impose a financial adjustment following its RADV audit for the 2019 benefit year.

73.    The Registration Statement also stated that the "Company refines its estimates as new information becomes available" as part of its risk adjustment process.  As the Company explained:

### Risk Adjustment

The risk adjustment programs in the Individual, Small Group, and Medicare Advantage markets we serve are designed to mitigate the potential impact of adverse selection and provide stability for health insurers. Under the Individual and Small Group risk adjustment program, each plan is assigned a risk score based upon demographic information and current year claims information related to its members. Plans with lower than average risk scores will generally pay into the pool, while plans with higher than average risk scores will generally receive distributions. This amount is calculated based on the risk score of the Company's members. **The Company refines its estimate as new information becomes available and the Company receives the final report from CMS in August of the following year.** In the Medicare Advantage risk adjustment program, each member is assigned a risk score that reflects the member's predicted health costs compared to an average member. Plans receive higher payments for members with higher risk scores than members with lower risk scores.

74.    The statement in the preceding paragraph was materially false and/or misleading when made because, as the Company has admitted, Oscar the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would a impose a financial adjustment following its RADV audit for the 2019 benefit year.

75.    The Registration Statement also contained a misleading risk factor which stated in relevant part, that:

***The result of risk adjustment programs may impact our revenue, add operational complexity, and introduce additional uncertainties that have a material adverse effect on our results of operations, financial condition, and cash flows.***

The Individual, Small Group, and Medicare Advantage markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores, and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates. Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenues related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows. The data provided to CMS to determine the risk score are subject to audit by CMS even several years after the annual settlements occur. If the risk adjustment data we submit are found to incorrectly overstate the health risk of our members, we may be required to refund funds previously received by us and/or be subject to penalties or sanctions, including potential liability under the FCA, which could be significant and would reduce our revenue in the year that repayment or settlement is required. Further, if the data we provide to CMS incorrectly understates the health risk of our members, we might be underpaid for the care that we must provide to our members, which could have a negative impact on our results of operations and financial condition.

76.     The statements in the preceding paragraph were materially false and/or misleading when made because they represented as a mere hypothetical that a CMS audit could impact the Company's financial results when, as the Company has admitted, Oscar was failing to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk at the time of the IPO that CMS would a impose a financial adjustment following its RADV audit for the 2019 benefit year.

## VII.    CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all individuals and entities that purchased or acquired Oscar Class A common stock pursuant and/or traceable to the Company's false and misleading Registration Statement, seeking to pursue remedies under Sections 11 and 15

of the Securities Act.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  Oscar common stock is actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Oscar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Oscar; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

83.     Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO alleged herein.

## IX.    CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation Of Section 11 Of The Securities Act**
**Against All Defendants**

84.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

85.     This claim is brought under §11 of the Securities Act [15 U.S.C. §77k], on behalf of the Class, against all Defendants.

24

86.     This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability and negligence.

87.     The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

88.     Oscar is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement. The Individual Defendants signed or authorized the signing of the Registration Statement on their behalves. The Underwriter Defendants marketed and underwrote the IPO and sold the Oscar stock issued in the IPO to Plaintiffs and the Class.

89.     As the issuer of the shares, Oscar is strictly liable to Plaintiffs and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Plaintiffs and the Class for such material misstatements and omissions. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

90.     Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained

misrepresentations and/or omissions of material fact. As such, Defendants are strictly liable to Plaintiffs and the Class.

91. By reason of the conduct alleged herein, Defendants violated §11 of the Securities Act. Plaintiffs and the Class members purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

92. Because of the foregoing, Plaintiffs and the members of the Class are entitled to damages under Section 11 of the Securities Act.

**SECOND CLAIM**
**Violation Of Section 15 Of The Securities Act**
**Against The Individual Defendants**

93. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

94. This claim is brought under §15 of the Securities Act [15 U.S.C. §77o], against the Individual Defendants.

95. This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability and negligence.

96. As detailed herein, each of Defendants committed primary violations of the Securities Act by committing conduct in contravention of §11 of the Securities Act.

97. By reason of the conduct alleged herein, the Individual Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

98.     The Individual Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Oscar within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power, influence, and knowledge—and exercised the same—to cause Oscar to engage in the acts described herein.

99.     The Individual Defendants, at all relevant times, participated in the operation and management of Oscar and conducted and participated, directly and indirectly, in the conduct of Oscar's business affairs.  The Individual Defendants were under a duty to disseminate accurate and truthful information with respect to Oscar's financial condition and prospects.  Because of their positions of control and authority as officers and directors of Oscar, the Individual Defendants were able to, and did, control the contents of the Registration Statement (including the IPO Prospectus), which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

100.    Because of their conduct, the Individual Defendants are liable under Section 15 of the Securities Act to Plaintiffs and the members of the Class who purchased or acquired shares pursuant to the Registration Statement.  As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs and the other members of the Class suffered damages in connection with their purchase and acquisition of shares pursuant to the Registration Statement.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 6, 2022

By: */s/ Casey E. Sadler*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiff Vicki Riley-Fischer and Additional Plaintiff Lorin Carpenter and Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 6, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 6, 2022.


*s/ Casey E. Sadler*
Casey E. Sadler