UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LORIN CARPENTER and VICKI RILEY-FISCHER, Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

OSCAR HEALTH, INC., MARIO SCHLOSSER, SIDDHARTHA SANKARAN, ARI FISCHEL, JEFFERY H. BOYD, JOEL CUTLER, JOSHUA KUSHNER, TERI LIST, CHARLES E. PHILLIPS, JR., DAVID PLOUFFE, ELBERT O. ROBINSON, JR., VANESSA A. WITTMAN, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, WELLS FARGO SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, LIONTREE ADVISORS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: 1:22-cv-03885 (VSB) (VF)

: ECF CASE

## MEMORANDUM OF LAW IN SUPPORT
## OF THE OSCAR DEFENDANTS' MOTION TO DISMISS

Jay B. Kasner
Alexander C. Drylewski
Tansy Woan
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001-8603
(212) 735-3000

*Attorneys for Defendants Oscar Health, Inc., Mario Schlosser, Siddhartha Sankaran, Ari Fischel, Jeffery H. Boyd, Joel Cutler, Joshua Kushner, Teri List, Charles E. Phillips, Jr., David Plouffe, Elbert O. Robinson, Jr., and Vanessa A. Wittman*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................................... 1

STATEMENT OF FACTS .................................................................................................................. 6

    A.  Oscar Operates in a Highly Regulated Industry ................................................................ 6

    B.  The IPO Documents Fully Disclosed the Material Risks Associated with
        RADV Audits ..................................................................................................................... 8

    C.  Regulatory Changes and a Global Pandemic Trigger Particular Uncertainty for
        the 2019 RADV Audit ...................................................................................................... 9

    D.  Post-IPO Disclosures ..................................................................................................... 10

    E.  This Action ...................................................................................................................... 10

ARGUMENT ..................................................................................................................................... 12

I.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR
       OMISSION ................................................................................................................................ 12

    A.  Plaintiffs Fail To Allege a False or Misleading Statement ........................................... 13

    B.  The IPO Documents Fully Disclosed the Risks at Issue ............................................... 17

    C.  Plaintiffs Fail To Plead Violations Under Regulation S-K ........................................... 19

II.    PLAINTIFFS FAIL TO PLEAD MATERIALITY ................................................................. 23

III.   PLAINTIFFS FAIL TO PLEAD SCIENTER .......................................................................... 25

IV.   PLAINTIFFS FAIL TO STATE A SECTION 15 CLAIM ....................................................... 25

CONCLUSION .................................................................................................................................. 25

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
        823 F.3d 51 (2d Cir. 2016)..................................................................................................6

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
        493 F.3d 87 (2d Cir. 2007)..................................................................................................6

*Axar Master Fund, Ltd. v. Bedford*,
        308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)..................22

*In re Bank of America AIG Disclosure Securities Litigation*,
        980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)..................22

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
        No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)........................................21

*Caiafa v. Sea Containers Ltd.*,
        Nos. 06 Civ. 2565 (RMB), 06 Civ. 2670 (RMB), 06 Civ. 2744 (RMB), 06 Civ.
        2776 (RMB), 06 Civ. 2909 (RMB), 06 Civ. 3099 (RMB), 06 Civ. 3563 (RMB),
        06 Civ. 5655 (RMB), 2008 WL 11516813 (S.D.N.Y. May 15, 2008)..............................25

*Carpenters Pension Trust Fund of Street Louis v. Barclays PLC*,
        750 F.3d 227 (2d Cir. 2014)..............................................................................................18

*Castellano v. Young & Rubicam, Inc.*,
        257 F.3d 171 (2d Cir. 2001)..................................................................................5, 23, 25

*In re Chembio Diagnostics, Inc. Securities Litigation*,
        No. 20-CV-2706 (ARR) (PK), 2022 WL 2872671 (E.D.N.Y. July 21, 2022)..................25

*Coronel v. Quanta Capital Holdings Ltd.*,
        No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)........................13, 16

*In re Coty Inc. Securities Litigation*,
        No. 14-cv-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)..............12, 20, 21, 22

*Das v. Rio Tinto PLC*,
        332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................................................................4, 5, 14

*Day v. MTA New York City Transit Authority*,
        No. 17-CV-7270 (VSB), 2021 WL 4481155 (S.D.N.Y. Sept. 30, 2021)...........................6

*In re Deutsche Bank Aktiengesellschaft Securities Litigation*,
No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28, 2017),
*aff'd*, 729 F. App'x 55 (2d Cir. 2018)..................................................................................13

*Dine Citizens Against Ruining Our Environment v. Jewell*,
No. CIV 15-0209 JB/SCY, 2015 WL 4997207 (D.N.M. Aug. 14, 2015) ...........................6

*In re DraftKings Inc. Securities Litigation*,
No. 21 Civ. 5739 (PAE), 2023 WL 145591 (S.D.N.Y. Jan. 10, 2023)...............................23

*In re Duke Energy Corp. Securities Litigation*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................................18

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................ 24, 25

*Employees Retirement System of City of Providence v. Embraer S.A.*,
No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018).........................14

*In re Express Scripts Holdings Co. Securities Litigation*,
773 F. App'x 9 (2d Cir. 2019) ...........................................................................................16

*Garnett v. RLX Technology Inc.*,
No. 21 Civ. 5125 (PAE), 2022 WL 4632323 (S.D.N.Y. Sept. 30, 2020)....................17, 23

*Gordon v. Tencent Music Enterprise Group*,
No. 19-CV-5465 (LDH) (PK), 2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021) .................23

*Gutman v. Lizhi Inc.*,
No. 21-CV-317 (LDH) (PK), 2022 WL 4646471 (E.D.N.Y. Oct. 1, 2022) ......................23

*Harris v. AmTrust Financial Services, Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015)................................................................................12

*In re HEXO Corp. Securities Litigation*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)..........................................................................16, 23

*Hutchison v. Deutsche Bank Securities Inc.*,
647 F.3d 479 (2d Cir. 2011)...............................................................................................23

*Indiana Public Retirement System v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016).................................................................................................21

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)................................................21

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 486 (Mem)..................................6

iii

*In re Lions Gate Entertainment Corp. Securities Litigation*,
　　165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...............................................................20, 22

*In re Magnum Hunter Resource Corp. Securities Litigation*,
　　26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)..................19

*Menora Mivtachim Insurance Ltd. v. International Flavors & Fragrances Inc.*,
　　No. 19 Civ. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021),
　　*aff'd sub nom. Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.,*
　　54 F.4th 82 (2d Cir. 2022) ....................................................................19, 24

*In re Micro Focus International Plc Securities Litigation*,
　　No. 1:18-cv-06763-ALC, 2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020).........................12

*In re Morgan Stanley Information Fund Securities Litigation*,
　　592 F.3d 347 (2d Cir. 2010)......................................................................12

*Mucha v. Volkswagen Aktiengesellschaft*,
　　540 F. Supp. 3d 269 (E.D.N.Y. 2021),
　　*aff'd sub nom. Mucha v. Winterkorn*, 2022 WL 774877 (2d Cir. Mar. 15, 2022).............22

*In re Noah Educational Holdings, Ltd. Securities Litigation*,
　　No. 08 Civ. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ...........................20

*North Collier Fire Control & Rescue District Firefighter Pension Plan & Plymouth
　　County Retirement Ass'n v. MDC Partners, Inc.*,
　　No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).....................14, 19

*Oklahoma Law Enforcement Retirement System v. Papa John's International, Inc.*,
　　517 F. Supp. 3d 196 (S.D.N.Y. 2021)...............................................................16

*Olkey v. Hyperion 1999 Term Trust*,
　　98 F.3d 2 (2d Cir. 1996)...........................................................................4, 17

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
　　575 U.S. 175 (2015)....................................................................................18

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
　　538 F. Supp. 2d 662 (S.D.N.Y. 2008)...............................................................16

*Peifa Xu v. Gridsum Holding Inc.*,
　　No. 18 Civ. 3655 (ER), 2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) ..............................14

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
　　752 F.3d 173 (2d Cir. 2014)....................................................................16, 23

*In re Pretium Resources Inc. Securities Litigation*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732
    F. App'x 37 (2d Cir. 2018) .........................................................................................17, 20

*In re ProShares Trust Securities Litigation*,
    728 F.3d 96 (2d Cir. 2013)....................................................................................................17

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................4, 12, 13

*In re Royal Bank of Scotland Group plc Securities Litigation*,
    No. 09 Civ. 300 (DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012), *aff'd sub
    nom. Freeman Group v. Royal Bank of Scotland Group PLC,* 540 F. App'x 33 (2d
    Cir. 2013) .............................................................................................................................14

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anonima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018)...................................................................................13

*Schaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................20

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)........................................................................................5, 17, 24

*Singh v. Schikan*,
    106 F. Supp. 3d 439 (S.D.N.Y. 2015)...................................................................................16

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021)...................................................................................24

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)..............................................................................................17, 19

*Thomas v. Bridgeport Board of Education*,
    No. 3:20-cv-1487 (VLB), 2022 WL 3646175 (D. Conn. Aug. 24, 2022) .............................6

*In re TVIX Securities Litigation*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit
    Suisse AG*, 588 F. App'x 37 (2d Cir. 2014)....................................................................1, 16

*Union No. 58 Pension Trust Fund & Annuity Fund v. RBS Group, PLC*,
    783 F.3d 383 (2d Cir. 2015)..................................................................................................24

*Wandel v. Gao*,
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)....................................................................................6

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021)...................................................................................20

*Yaroni v. Pintec Technology Holdings Ltd.*,
    600 F. Supp. 3d 385 (S.D.N.Y. Apr. 25, 2022) ..................................................................18

*In re Yunji Inc., Securities Litigation*,
    No. 19-CV-6403 (LDH) (SMG), 2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021)........20, 21

## REGULATIONS

17 C.F.R. § 229.105 .........................................................................................................19, 23

17 C.F.R. § 229.303 .........................................................................................................19, 22

Defendants Oscar Health, Inc. ("Oscar" or the "Company"), Mario Schlosser, Siddhartha Sankaran, Ari Fischel, Jeffery Boyd, Joel Cutler, Joshua Kushner, Teri List, Charles Phillips, Jr., David Plouffe, Elbert Robinson, Jr., and Vanessa Wittman (the "Individual Defendants" and with Oscar, the "Oscar Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 72, the "AC")[1] with prejudice pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This putative class action is a hindsight-based attempt to recover Plaintiffs' market losses through an improper invocation of the securities laws.  Plaintiffs allege that because Oscar booked an immaterial expense as a result of a routine regulatory audit eight months after its initial public offering ("IPO"), it must have failed to maintain adequate internal controls, and thus its IPO documents describing those controls were materially false and misleading.  But "[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight," *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014), and, as described below, the evolving nature of Plaintiffs' theory from the initial to amended complaint highlights how this action is a lawyer-driven attempt to manufacture a claim where none exists.

Oscar is a technology-based health insurance company that launched its IPO in March 2021.  Oscar differentiates itself as the first health insurance company built around a full stack technology platform, using technology to help members access health care at an affordable price.  Oscar's health insurance subsidiaries offer high-quality health insurance plans and, like other

---

[1]    The AC is attached as Exhibit A to the accompanying Declaration of Tansy Woan, dated April 4, 2023, exhibits to which are cited herein as "Ex. __."  Pin cites for all exhibits reference the original pagination at the bottom of the page.  All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

health insurers, Oscar's health insurance companies are subject to extensive regulatory oversight. As explained in Oscar's IPO Registration Statement and Prospectus (the "IPO Documents"), its health insurance plans must submit certain data received from health care providers to the U.S. Centers for Medicare and Medicaid Services ("CMS") so that CMS can assess the relative risk of the insured populations.  CMS then audits this health care provider data annually in a process known as risk adjustment data validation ("RADV").  Through RADV audits, CMS verifies the data and calculates whether the insurer's previous risk adjustment payments from the government should be revised, either by increasing the amount due to the insurer or clawing back amounts previously paid to them.  (AC ¶¶ 45-51; Ex. B, Prospectus at 32-33, 36, 101, 131.)

At the time of the IPO, Oscar warned that the "risk adjustment programs may impact [its] revenue" and "introduce additional uncertainties," including that Oscar "may be required to refund funds previously received" or be "subject to penalties or sanctions . . . which could be significant."  (*Id.* at 36, 131.)  Oscar further disclosed the inherent uncertainty in risk adjustment estimates, noting the great "variability of certain factors that go into the development of the risk adjustment [Oscar] recognize[s]," and flagging "unanticipated results of risk adjustment programs" as an "important factor[]" that could cause Oscar's actual results to differ materially from those in the IPO Documents.  (*Id.* at 36, 65.)  Oscar also explained that CMS recently had revised its RADV audit methodology and warned, among other things, that "the future impact of these changes [was] unclear" and may "increase financial recoveries from the government's ability to retrospectively claw back or recover funds from health insurers."  (*Id.* at 33, 135.) Adding to the uncertainty, the RADV audit in 2021 was atypical due to COVID-19 because it spanned two years (2019 and 2020) as opposed to one.  (AC ¶ 55.)

2

On November 10, 2021, Oscar disclosed that its third quarter medical loss ratio ("MLR") had increased to 99.7%, which was driven by higher COVID costs, a RADV audit that resulted in a $20 million risk adjustment expense, and the impact of significant Special Enrollment Period ("SEP") membership growth.  (AC ¶¶ 53-55.)  MLR measures the portion of an insurer's income spent on paying patients' claims.  (*Id.* ¶ 40.)  On May 12, 2022, Lorin Carpenter filed the initial complaint in this action, claiming that the IPO Documents were false or misleading because they failed to disclose growing COVID costs, that Oscar would be negatively impacted by SEP growth, and that Oscar would be impacted by an unfavorable RADV audit.  (ECF No. 1, ¶ 9.) On December 6, 2022, Ms. Carpenter and Ms. Riley-Fischer[2] filed an amended complaint challenging a new set of statements based on a new theory that Oscar failed to disclose that it had inadequate controls to prevent the $20 million adjustment.  (AC ¶¶ 70-76.)  Although the initial complaint did not once suggest that Oscar had inadequate controls, Plaintiffs now ask this Court to find that this omission was materially misleading and assert claims under Sections 11 and 15 of the Securities Act of 1933 against Oscar, the individuals who signed and authorized the signing of the Registration Statement, and the IPO underwriters.  Plaintiffs' new theory falls apart under even a cursory review, and the AC should be dismissed for the following reasons.

***Plaintiffs fail to allege an actionable misstatement or omission (*infra* § I).***

Plaintiffs challenge three statements: (1) that Oscar "perform[s] ongoing monitoring of [its] compliance with CMS risk adjustment requirements," (2) Oscar "refines its estimates as new information becomes available" as part of its risk adjustment process, and (3) "[t]he result of risk adjustment programs may impact [Oscar's] revenue."  (AC ¶¶ 68-76.)  But Plaintiffs plead no

---

[2]  Although Ms. Carpenter did not move for appointment of lead plaintiff, her counsel—who filed the initial complaint—was ultimately appointed as lead counsel representing lead plaintiff, Ms. Riley-Fischer, and filed the AC on behalf of both individuals and the putative class.  (ECF No. 63, at 9.)

facts demonstrating that any of these statements were false, under either a Rule 8 or Rule 9(b) standard.[3]  Instead, Plaintiffs make an inferential leap that because of the $20 million adjustment, Oscar must have "failed to maintain adequate controls" which purportedly "led to the Company providing incorrect premium data" to CMS.  (*Id.* ¶ 4.)  But "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  The mere fact that an annual, routine audit results in an unfavorable outcome "is not necessarily the result of faulty internal controls," *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018), and Plaintiffs allege no facts as to "how any internal controls may have been insufficient or not followed, or what actions could or should have been taken."  *Id.*  And far from being indicative of faulty controls, unfavorable risk adjustments may result due to no fault of an insurer.  For example, as Oscar warned, COVID-19 had the potential to impact Oscar's ability to "appropriately document [members'] health risks and diagnoses to substantiate payments" that Oscar may be entitled to under "risk adjustment programs" (Ex. B, Prospectus at 39), thus risking an unfavorable adjustment.

Plaintiffs' claims also fail because the IPO Documents expressly "warn[ed] investors of exactly the risk[s] the plaintiffs claim w[ere] not disclosed."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).  Oscar readily disclosed that it was subject to governmental "scrutiny" through RADV audits, the effects of which were "unclear" and could "impact [Oscar's] revenue."  (*Infra* § I(B).)  These disclosures sent an unmistakable message that this was an area of considerable risk, and Oscar's statements about compliance—such as that it

---

[3]    As explained below, Plaintiffs' allegations sound in fraud and are thus subject to Rule 9(b).  Accordingly, Plaintiffs must also plead particularized facts giving rise to a strong inference of scienter, which the AC fails to do.  (*See infra* § III.)

was continually "refin[ing] its estimates" as part of the risk adjustment process (AC ¶ 73)—

"suggest[ed] a company actively working to improve its compliance efforts, rather than one

expressing confidence in their complete (or even substantial) effectiveness." *Singh v. Cigna

Corp.*, 918 F.3d 57, 64 (2d Cir. 2019).

Plaintiffs also allege a duty to disclose under Regulation S-K (AC ¶ 63), which requires

disclosure of "***known*** trends or . . . uncertainties," but fail to "plead, with specificity, facts

establishing that [Oscar] had actual knowledge of the purported trend. . . or uncertainty"—*i.e.*,

that alleged inadequate controls would lead to a $20 million RADV adjustment. *See Das*, 332 F.

Supp. 3d at 810-11. Indeed, Plaintiffs do not rely on a single document or witness to support

their theory, relying instead on conclusory allegations and ***post-IPO*** disclosures about material

weaknesses in controls wholly unrelated to the RADV audit at issue. These shortcomings

warrant dismissal. (*Infra* § I(C).)

### *Plaintiffs fail to allege materiality* (*infra* § II).

Even if Plaintiffs had pled a false statement (they have not), they fail to allege materiality

because the challenged statements are too generic for a reasonable stockholder to have

considered them important in deciding whether to buy shares. *See Singh*, 918 F.3d at 60-63.

Moreover, the $20 million adjustment represented only 1% of Oscar's $1.8 billion revenue for

the year and amounted to a mere 0.74% MLR increase for the year (FY 2021). Plaintiffs fail to

allege how this would "affect the desire of investors to buy, sell, or hold the company's

securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001).[4]

---

[4] Because Plaintiffs fail to allege a Section 11 claim, their Section 15 claim must be dismissed. (*Infra* § IV.)

**STATEMENT OF FACTS[5]**

A.    **Oscar Operates in a Highly Regulated Industry**

Like many other health insurance companies, Oscar's health insurance plans are subject to government regulation. (Ex. B, Prospectus at 131.) For example, CMS operates a risk adjustment program, which is designed to redistribute health care costs and incentivize health plans to manage costs in lieu of avoiding high-cost, high-risk individuals. (Ex. B, Prospectus at 101; Ex. C, Nov. 2020 CMS Fact Sheet, at 1; AC ¶ 46.) Specifically, CMS redistributes funds from plans with lower-than-average risk enrollees (*i.e.*, healthier enrollees) to plans with higher-than-average risk enrollees (*e.g.*, those with chronic conditions), such that plans with healthier, lower-cost populations compensate plans that have less healthy, higher-cost populations. (Ex. B, Prospectus at 101; Ex. C, Nov. 2020 CMS Fact Sheet, at 1; AC ¶ 46.) This transfer of funds is referred to as "risk adjustment." (Ex. C, Nov. 2020 CMS Fact Sheet, at 1.)

This risk adjustment program operates in two phases: (1) the risk adjustment phase and (2) the RADV audit phase. In the first phase, insurers submit data on their enrollees' demographic information and current year claims to CMS. (Ex. B, Prospectus at 101; Ex. D, 2018 CRS Report, at 7.) CMS uses this data to assign each plan a risk score, which is a relative

---

[5]    The facts set forth herein are based on (i) the allegations in the AC; (ii) documents known to Plaintiffs upon which they relied in bringing suit, including those on the CMS website (*see* AC ¶¶ 41, 46, 49, n.4, 7, & 10), *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); (iii) Oscar's SEC filings, *see id.*; and (iv) "publicly available" documents whose "accuracy cannot reasonably be questioned," *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); *see also Thomas v. Bridgeport Bd. of Educ.*, 2022 WL 3646175, at *4 n.5 (D. Conn. Aug. 24, 2022) (taking judicial notice of a National Bureau of Economic Research study on the effects of remote learning during the pandemic). This includes "information available on government websites," such as the CMS and Congressional Research Service ("CRS") websites. *See Wandel v. Gao*, 590 F. Supp. 3d 630, 636 n.4 (S.D.N.Y. 2022); *Day v. MTA New York City Transit Auth.*, 2021 WL 4481155, at *2 n.5 (S.D.N.Y. Sept. 30, 2021) (Broderick J.) (taking judicial notice of rules "publicly available on the City's government website"); *see also Kareem v. Haspel*, 986 F.3d 859, 867 n.7 (D.C. Cir. 2021) (taking judicial notice of facts about the Syrian conflict because "they are generally known and can be readily determined from reliable sources, such as the Congressional Research Service"), *cert. denied* 142 S. Ct. 486 (Mem); *Dine Citizens Against Ruining Our Env't v. Jewell*, 2015 WL 4997207, at *5 n.4 (D.N.M. Aug. 14, 2015) (taking judicial notice of "background facts" in a CRS report), *aff'd*, 839 F.3d 1276 (10th Cir. 2016).

measure of how costly an enrollee is anticipated to be for the plan.  (Ex. B, Prospectus at 101; Ex. D, 2018 CRS Report, at 7-8; AC ¶ 73.)  After comparing each plan's risk score to statewide averages, CMS prepares a report detailing (i) how much each plan either has to transfer to CMS to then be redistributed, or (ii) how much each plan can expect to receive.  (Ex. B, Prospectus at 79-80, 101; Ex. D, 2018 CRS Report, at 8; AC ¶ 47.)  Plans with lower-than-average risk scores will generally pay into the pool, while plans with higher than average risk scores will generally receive distributions.  (Ex. B, Prospectus at 101, F-19; AC ¶ 47.)

After those redistributions are made, CMS proceeds to the second phase, where CMS audits the enrollee data provided by insurers in the first phase.  (Ex. B, Prospectus at 33, 36; Ex. E, Dec. 2019 CMS White Paper, at 8; AC ¶ 47.)  Through these audits, CMS reviews the underlying medical documentation to substantiate the previously determined risk scores.  (Ex. B, Prospectus at 33, 36, 131; Ex. E, Dec. 2019 CMS White Paper, at 14.)  Specifically, CMS selects a sample of enrollees to audit; issuers like Oscar must then obtain medical records and other supporting documentation for those enrollees from third-party health care providers, which are then transmitted to the issuer's independent auditor, which then validates the data and provides its final results to CMS.  (Ex. E, Dec. 2019 CMS White Paper, at 14-15.)  CMS next reviews this information to determine whether the documentation maintained by and obtained from third-party providers is sufficient to support the previously determined risk scores and, based on the results of that review, issuers may be subject to retrospective payment adjustments.  (Ex. B, Prospectus at 33, 36; Ex. E, Dec. 2019 CMS White Paper, at 16; AC ¶¶ 48-50.)  The outcome of these audits is particularly hard to predict given that CMS makes adjustments based on an insurer's performance relative to other insurers, as opposed to against a fixed metric.  (Ex. E, Dec. 2019 CMS White Paper, at 73.)

### B.     The IPO Documents Fully Disclosed the Material Risks Associated with RADV Audits

On March 2, 2021, Oscar announced the pricing to the public of its IPO at $39.00 per share. (AC ¶ 3.) Oscar's IPO Documents specifically highlighted risks related to the government's increased scrutiny on risk adjustment—a trend that Oscar "expect[ed] . . . to continue." (Ex. F, Reg. St. at 31, 126.) More specifically, Oscar explained that certain of its plans are subject to RADV audits, which could result in retrospective adjustments to payments it received or other adverse action by CMS:

> CMS and the OIG also periodically perform risk adjustment data validation, or RADV, audits of selected Medicare Advantage health insurance plans to validate the coding practices of, and supporting documentation maintained by health care providers. Certain of our health plans may be selected for such audits, ***which could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans, or other adverse action by CMS***. . . . In particular, there has recently been increased scrutiny by the government on health insurers' diagnosis coding and risk adjustment practices, particularly for Medicare Advantage plans.

(Ex. F, Reg. St. at 31.) Oscar emphasized the variability and judgment involved in risk adjustment, and explained that "[t]he result of risk adjustment programs may impact [its] revenue, add operational complexity, and introduce additional uncertainties that have a material adverse effect on [its] results of operations," noting the impact could be "significant":

> The Individual, Small Group, and Medicare Advantage markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. ***As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores, and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates.*** Consequently, ***our estimate of our health plans' risk scores*** for any period, and any resulting change in our accrual of revenues related thereto, ***could have a material adverse effect on our results of operations,*** financial condition, and cash flows. The data provided to CMS to determine the risk score are subject to audit by CMS even several years after the annual settlements occur. ***If the risk adjustment data we submit are found to incorrectly overstate the health risk of our members, we may be required to refund funds previously received by us and/or be subject to penalties or sanctions,***

*including potential liability under the FCA, which could be significant* and would reduce our revenue in the year that repayment or settlement is required.

(Ex. F, Reg. St. at 33-34.)[6]  Oscar re-emphasized these risks in the MD&A section, warning that Oscar is "subject to comprehensive oversight from CMS," which includes RADV audits on "diagnosis codes submitted in support of enhanced payments . . . to ensure such diagnosis codes are valid and supported by medical record documentation."  (Ex. F, Reg. St. at 126.)

### C.    Regulatory Changes and a Global Pandemic Trigger Particular Uncertainty for the 2019 RADV Audit

There was particular uncertainty around these audits at the time of the IPO.  *First*, on November 24, 2020, just months before the IPO, CMS amended the program by (1) revising the methodology for error rate calculations and (2) changing the way it applies RADV results to risk adjustment transfers, switching from a prospective approach to a concurrent one.  (Ex. F, Reg. St. at 31; *see also* Ex. G, CMS Amendments.)  Oscar warned that "the future impact of these changes [was] unclear" and that "such changes may ultimately increase financial recoveries from the government's ability to retrospectively claw back or recover funds from health insurers." (Ex. F, Reg. St. at 31.)  Indeed, in its report of 2019 and 2020 RADV adjustments, CMS acknowledged that these amendments "contributed to the increase in the number of state market risk pools being adjusted."  (Ex. H, Nov. 2022 CMS Report, at 5.)

*Second*, as explained in the IPO Documents, the uncertainty from these changes was compounded by the COVID-19 pandemic.  For example, Oscar warned that as a result of the pandemic, Oscar may be unable to "appropriately *document [members'] health risks and diagnoses to substantiate payments*" that Oscar may be entitled to under risk adjustment

---

[6]    *See also* Ex. F, Reg. St. at 61 (listing "unanticipated results of risk adjustment programs" as an "important factor[]" that could impact Oscar's business); *id.* at 126 ("[T]he OIG also audits risk adjustment . . . and we anticipate this remaining a focus of government investigations in the next few years.").

programs.  (Ex. F, Reg. St. at 37.)  This concern that the pandemic would make it more "difficult for providers to respond to issuer requests for the medical documentation needed to complete audits," given providers were focused on caring for patients, was reflected in the comments to the amended rule itself.  (*See* Ex. G, CMS Amendments, at 77,004.)  Additionally, due to the pandemic, CMS postponed the 2019 audit, which required issuers like Oscar to prepare data for two years of audits (2019 and 2020) in the span of one year.  (AC ¶ 55; Ex. I, Nov. 10, 2021 Tr. at 6.)  This imposed a significant operational burden not just on insurers, who now had to obtain twice the amount of data in one year, but also on health care providers who needed to respond to a considerably greater number of data requests from insurers like Oscar.

### D.    Post-IPO Disclosures

On November 10, 2021, Oscar disclosed that its MLR increased 920 basis points year-over-year from 90.5% in 3Q20 to 99.7% in 3Q21, which was "primarily driven by higher net COVID costs as compared to the net benefit in 3Q20, an unfavorable prior year Risk Adjustment Data Validation (RADV) result, and the impact of significant SEP membership growth."  (AC ¶ 53; Ex. J, Nov. 10, 2021 Form 8-K, at 1.)  On that same day, Oscar held its 3Q21 earnings call with analysts and investors, during which Oscar reported $20 million of risk adjustment expense that quarter related to the RADV audit.  (Ex. I, Nov. 10, 2021 Tr. at 6.)

### E.    This Action

On May 12, 2022, Lorin Carpenter filed the initial complaint in this action, asserting claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77(k), (o), against Oscar, the officers who signed and non-officer directors who authorized the signing of the Registration Statement, and the ten underwriters of the IPO.[7]  That complaint

---

[7]    Ms. Carpenter allegedly purchased 400 shares on March 17, 2021.  (ECF No. 1, at 23.)

claimed that certain statements in the Registration Statement were materially false and misleading because they failed to disclose growing COVID-19 costs, that Oscar would be negatively impacted by an unfavorable RADV audit, and that Oscar would be negatively impacted by significant SEP membership growth.  (ECF No. 1, ¶ 9.)  On September 27, 2022, Vicki Riley-Fischer was appointed co-lead plaintiff along with Robert Scott Heon, who (along with his counsel) has since withdrawn as co-lead plaintiff (and co-lead counsel, respectively).  (ECF Nos. 63, 75.)[8]

On December 6, 2020, lead plaintiff Ms. Riley-Fischer and Ms. Carpenter filed an amended complaint challenging a new set of statements and asserting a new theory that Oscar did not disclose that it had "failed to maintain adequate controls."  (AC ¶ 5.)  Plaintiffs challenge three statements: (1) Oscar "perform[s] ongoing monitoring of [its] compliance with CMS risk adjustment requirements and other applicable laws," (2) Oscar "refines its estimates as new information becomes available" as part of its risk adjustment process, and (3) "[t]he result of risk adjustment programs may impact [Oscar's] revenue."  (*Id.* ¶¶ 68-76.)  The AC alleges that these statements were materially false or misleading because Oscar failed to maintain adequate controls to ensure the integrity of data submitted for the RADV audit.  (*Id.*)

---

[8]    Mr. Heon allegedly purchased 6,410 shares (ECF No. 19-1 at 3) and Ms. Riley-Fischer allegedly purchased 16,133 shares (ECF No. 27-2, at 3).  Although they initially sought appointment as lead plaintiff separately (ECF Nos. 17 & 25), they later sought appointment as co-lead plaintiffs (ECF No. 50), without explaining how two otherwise unrelated individuals could effectively manage the litigation as a group (*see* ECF No. 52, at 2).  After the Court raised questions about this (*see* ECF No. 60), the two submitted another declaration to explain how they could operate as a group (ECF No. 62), and were ultimately appointed (ECF No. 63).

## **ARGUMENT**

### **I.  PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION**

The AC should be dismissed because it fails to plead an actionable misstatement or omission. To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the IPO Documents contained (i) a misrepresentation of material fact, (ii) an omission of material fact in contravention of an affirmative legal disclosure obligation, or (iii) an omission of material information that was necessary to prevent other disclosures from being misleading. *See In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

A Section 11 claim, even when "based on negligent conduct," must "allege a false or misleading statement or omission in more than conclusory terms." *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 170 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation, mere labels and conclusions, and a formulaic recitation[s] of the elements" of a claim. *Id.* at 175 (finding Section 11 claim failed under Rule 8); *In re Coty Inc. Sec. Litig.,* 2016 WL 1271065, at *12 (S.D.N.Y. Mar. 29, 2016) (dismissing claims because "Section 11 requires much more than the grab bag of suspicion and speculation contained in [p]laintiffs' pleading"). Where a Section 11 claim sounds in fraud, courts apply the heightened pleading standard of Rule 9(b), even when the plaintiff attempts to plead around fraud. *See Rombach*, 355 F.3d 164 at 172 (Section 11 claims that alleged registration statement contained "untrue statements of material facts" and "materially false and misleading written statements" sounded in fraud); *In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *16 (S.D.N.Y. Sept. 29, 2020) (Section 11 claim alleging Item 303 violation sounded in fraud). Here, despite Plaintiffs' attempt to disavow fraud (AC ¶¶ 69, 86, 95), the gravamen of their claims is that the Oscar Defendants committed fraud because

the IPO Documents contained false and misleading statements about Oscar's internal controls and the Oscar Defendants **knew** of purportedly faulty controls but failed to disclose them.  (*See* AC ¶¶ 1, 3, 5, 9, 70, 72, 74-77, 83, 87, 99 (alleging IPO Documents were "false" and/or "misleading"); *id.* ¶¶ 70, 87, 90, 99 (alleging IPO Documents contained "untrue" or "inaccurate" statements of fact); *id.* ¶¶ 63-66 (alleging violations of Item 303, which requires disclosure of "known" trends or uncertainties); *see also id.* ¶ 9 ("[S]ubstantial acts in furtherance **of the alleged fraud or the effects of the fraud** have occurred in this District").)  Plaintiffs' claims thus sound in fraud and are subject to Rule 9(b).

### A.  Plaintiffs Fail To Allege a False or Misleading Statement

The AC fails to plead that any of the challenged statements were false or misleading when made.  *See Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009).  While Plaintiffs challenge statements that Oscar (1) monitors its compliance with CMS requirements and (2) refines its estimates as new information becomes available (AC ¶¶ 70-74), they plead no facts showing that either of these statements are false, *e.g.*, that Oscar did not perform ongoing monitoring or refine its estimates.  *See Rombach*, 355 F.3d at 174 ("[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."); *see also Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anonima*, 339 F. Supp. 3d 169, 181 (S.D.N.Y. 2018) (Broderick J.) (no misstatement regarding compliance with debt covenants where plaintiff failed to plead that defendant breached its covenants); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) (dismissing claims of inadequate controls "because [p]laintiff alleges neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed"), *aff'd*, 729 F. App'x 55 (2d Cir. 2018).

13

Rather than plead specific facts to support their claims, Plaintiffs summarily allege that because Oscar incurred a $20 million adjustment following the RADV audit, Oscar must have "failed to maintain adequate controls." (AC ¶ 4.) But the mere fact that a routine audit results in an unfavorable outcome "is not necessarily the result of faulty internal controls." *Das*, 332 F. Supp. 3d at 812; *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *16 (S.D.N.Y. Sept. 30, 2016) ("[T]he mere fact that [defendant]'s internal controls failed to catch these improper reimbursements does not demonstrate the falsity of [it]s statements that its controls were adequate."). Plaintiffs allege no "facts as to what internal controls were insufficient or not followed, how any internal controls may have been insufficient or not followed, or what actions could or should have been taken." *Das*, 332 F. Supp. 3d at 812; *Peifa Xu v. Gridsum Holding Inc.*, 2021 WL 773002, at *11 (S.D.N.Y. Feb. 23, 2021) (dismissing Section 11 claims based on conclusory allegations of internal control weaknesses); *In re Royal Bank of Scotland Grp. plc Sec. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) (dismissing Securities Act claims because plaintiffs failed to "cite any contemporaneous support to show that the [internal controls] were not followed," explaining that "[p]ointing to the subsequent subprime market collapse and alleging that RBS must therefore have failed to follow its internal control procedures is not sufficient"), *aff'd sub nom.*, 540 F. App'x 33 (2d Cir. 2013); *see also Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018) ("Where plaintiffs allege that internal controls are deficient, courts have consistently required plaintiffs to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why.").

The AC fails to plead how or why statements about Oscar's internal controls were false or misleading.  Indeed, as explained in the IPO Documents, risk adjustments may be the result of factors having nothing to do with controls.  For example, as Oscar disclosed and as reflected in the CMS Amendments, Oscar may be unable to obtain the documentation from health care providers needed to substantiate payments it was owed under risk adjustment programs—a concern exacerbated during the pandemic—resulting in a negative RADV adjustment.  (*See supra* § C (citing Ex. F, Reg. St. at 37; Ex. G, CMS Amendments, at 77,004); *see also* Ex. E, Dec. 2019 CMS White Paper, at 16 (stating that some "error should be expected in the compilation of data for risk scores because providers' documentation . . . varies across provider types and groups").)  Oscar also explained the subjective nature of RADV audits, noting the "variability of certain factors" that go into risk adjustment, which could materially impact Oscar's revenue estimates.  (Ex. F, Reg. St. at 33-34, 42).  And as explained above, Oscar was navigating (1) changes in the methodology used by CMS, (2) changes in the timing of when CMS applied RADV results to risk adjustment transfers, and (3) the COVID-19 pandemic.  (*See supra* § C; *see also* Ex. F, Reg. St. at 31.)  Plaintiffs ignore all of these challenges and disclosures and instead ask the Court to assume without any factual basis that the $20 million adjustment was the result of inadequate controls.

Nor was Oscar required to speculate about the audit's outcome in the IPO Documents.  Plaintiffs claim that the Registration Statement was "misleading" by stating that risk adjustment programs "***may***" impact Oscar's revenue, claiming this presented the risk as a "mere hypothetical."  (AC ¶¶ 75-76.)  But the audit results had not yet been released and no adjustment had been imposed at the time of the IPO, so Oscar was not required to speculate in its SEC filings about the outcome of an ***ongoing and yet-to-be completed*** audit.  *See City of Pontiac*

15

*Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183-84 (2d Cir. 2014) (issuer satisfied disclosure obligations by disclosing pending legal proceedings and associated risks); *Singh v. Schikan*, 106 F. Supp. 3d 439, 449 (S.D.N.Y. 2015) (issuer is "not required to predict negative results or to hypothesize its failure"); *see also Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 211 (S.D.N.Y. 2021) ("[A]n increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading."). And Plaintiffs do not allege anywhere that the Oscar Defendants knew as of the IPO that controls relating to the RADV audit were allegedly deficient such that they could have disclosed that information. *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (dismissing Section 11 claims because plaintiffs failed to "allege[] facts detailing defendants' contemporaneous knowledge").

The standard that Plaintiffs would have this Court impose—of accurately predicting the future results of an audit that is still ongoing—is unreasonable and not the law. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (affirming dismissal where "[Plaintiff] essentially argues that Defendants should have anticipated the outcome of the negotiations sooner"); *Coronel*, 2009 WL 174656, at *14 ("[R]etrospective analysis of awareness cannot be the basis for a [Securities Act] claim."). Because it is well established that "[t]he securities laws do not require clairvoyance in the preparation of offering documents," these claimed omissions are not actionable. *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664, 672 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009); *see also In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 444 ("Section 11 claim[s] cannot be based on a 'backward-looking assessment' of the registration statement.").

B.        **The IPO Documents Fully Disclosed the Risks at Issue**

The challenged statements also were not misleading because the IPO Documents expressly "warn[ed] investors of exactly the risk[s] the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39-40 (2d Cir. 2017) (affirming dismissal of Section 11 claim for this reason); *Garnett v. RLX Tech. Inc.*, 2022 WL 4632323, at *18 (S.D.N.Y. Sept. 30, 2020) (dismissing Section 11 claim with prejudice for this reason); *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017) (Broderick J.) (no material misstatement for Section 10(b) claim where "the same documents on which the SAC relies for the purported misstatements disclose the information Plaintiffs claim" was omitted), *aff'd sub nom.*, 732 F. App'x 37 (2d Cir. 2018).  As discussed above, Oscar disclosed that it was subject to increased governmental "scrutiny" through RADV audits, and that the effects of recent amendments to the RADV process were "unclear" and could "impact [Oscar's] revenue."  (Ex. F, Reg. St. at 31, 33-34, 132.)  Far from assuring that its CMS submissions would not be subject to adverse adjustments, Oscar's disclosures made clear that this was an area of substantial risk, and its statements about compliance—such as those indicating that the Company was continually "refin[ing] its estimates" (AC ¶ 73)—"suggest[ed] a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness."  *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019).

Plaintiffs challenge Oscar's statement that "[w]e perform ongoing monitoring of our compliance" (AC ¶ 71), but omit that Oscar warned that "[w]hile *we believe* our compliance efforts and relationships with providers and other third parties comply with applicable laws, we may be subject to audits . . . by government agencies."  (Ex. F, Reg. St. at 31.)  *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (registration statement must be read in

17

context); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015). Plaintiffs do not allege that this belief was not "honestly held" or that the supporting facts supplied were untrue. *Omnicare*, 575 U.S. at 186.

Additionally, the AC "does not allege any affirmative misrepresentations" about internal controls and given that absence, "allegations of 'garden-variety mismanagement'" do not state a Securities Act claim. *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004). Indeed, far from guaranteeing that its controls were free from error, Oscar warned that no independent accounting firm had attested to the effectiveness of its internal controls over financial reporting. (Ex. F, Reg. St. at 7-8, 57-58, 98, F-2.) Accordingly, Oscar can hardly be accused of misleading the public about its controls. *See Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 396-97 (S.D.N.Y. Apr. 25, 2022) (dismissing Section 11 claim where registration statement included similar warnings).

While Plaintiffs point to material weaknesses in certain ***information technology*** controls disclosed in Oscar's Form 10-K filed on February 25, 2022, ***nearly an entire year after the IPO***, that disclosure states that these controls "were not effective ***as of December 31, 2021***." (AC ¶ 58; Ex. K, FY 2021 Form 10-K at 50.) There are no facts pled that these weaknesses existed at the time of the March 2021 IPO. In any event, Plaintiffs do not, and cannot, connect these controls to the RADV audit at issue. Oscar's February 2022 disclosure of weaknesses related to "certain information technology ('IT') general controls for information systems that are relevant to the preparation of [Oscar's] financial statements." (Ex. K, FY 2021 Form 10-K at 112; AC ¶ 58.) But Plaintiffs do not plead that the RADV adjustment was the result of, or had anything to do with, deficiencies in ***IT*** general controls for financial reporting. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (statements about controls

18

were not misleading because they did not mention the business practice at issue); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at \*18 (S.D.N.Y. Mar. 30, 2021) (allegations of unlawful "payment scheme in Russia and Ukraine" "ha[d] nothing to do with controls over financial reporting"), *aff'd sub nom.*, 54 F. 4th 82 (2d Cir. 2022).

Plaintiffs also point to a November 10, 2021 earnings call, where Oscar disclosed that the $20 million adjustment was partly "operational about how we got the data together" and that Oscar made "further enhancements" to its risk adjustment process. (Ex. I, Nov. 10, 2021 Tr. at 6, 11-12.) But the fact that Oscar decided to "enhance[]" its process is not an admission of inadequate controls. *See N. Collier Fire Control*, 2016 WL 5794774, at \*17 (announcement that defendant was taking "remedial steps to improve and strengthen its internal controls" did not support an inference that controls were inadequate); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 294-95 (S.D.N.Y. 2014) (repeated assurances that defendants "[d]esigned and [e]valuated the effectiveness" of their controls were not rendered misleading by the subsequent announcement that "they were implementing effective controls and procedures"), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

### C.    Plaintiffs Fail To Plead Violations Under Regulation S-K

Plaintiffs also fail to plead a violation of any obligations under Items 303 or 105 of Regulation S-K, 17 C.F.R. § 229.303 & 17 C.F.R. § 229.105. (AC ¶¶ 63-68.) Item 303 requires disclosure of "any *known* trends or uncertainties that have had or that are reasonably likely to have a material . . . impact on net sales or revenues or income." 17 C.F.R. § 229.303(b)(2)(ii). Critically, it only requires disclosure of trends that are both "(1) *known* to management and (2) '*reasonably likely*' to have material effects on the registrant's financial condition or results of operations." *Stadnick*, 861 F.3d at 39. Plaintiffs' claims fail for multiple reasons.

19

*First*, Plaintiffs fail to plead that the RADV adjustment arising out of Oscar's purportedly faulty controls was a "trend" or "uncertainty" under Item 303. A "trend" is a "general development or change in a situation, which necessarily implicates the passage of time." *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021). "In considering whether a trend exists, the amount of time over which the events at issue are alleged to have developed is a factor the Court must take into account." *Id.*; *In re Pretium Res.*, 256 F. Supp. 3d at 482 n.11 ("a two month period of time does not establish a 'trend'" under Item 303). Here, Plaintiffs plead no facts as to when the purported trend began, nor its duration, let alone any facts regarding its degree or magnitude. *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) (no Item 303 trend pled because plaintiffs "fail to allege the existence of any causal event or moment in time that the declines allegedly began"); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 ("generic allegations" that sales were "struggling" and "forecasted to be down" are insufficient under Item 303 to "support [plaintiffs'] assertion that the sales of [defendant's products] were declining at the time of the IPO"). "Isolated occurrences" like the RADV adjustment are not trends or uncertainties that need to be disclosed under Item 303. *See In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010); *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016) (SEC investigation was "an isolated incident," not a "known trend" or "uncertainty").[9]

---

[9] Plaintiffs cite to the SEC Guidance to claim that a "one-time event" can require disclosure under Item 303. (*See* AC ¶ 65.) But that is not what the SEC Guidance says. The examples cited—like the reduction in product prices—require disclosure only when they are "currently known trends," not ***future*** one-time events (like the RADV adjustment). (*See* Ex. L, SEC Guidance, 1989 WL 1092885, at *4.) *See also Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (defendant's failure to disclose improper business practices that "created substantial 'uncertainty' about the Company's future operating performance" was not a violation of Item 303 because plaintiffs "fail[ed] to identify any adverse economic event or trend that occurred prior to the Offering").

20

***Second***, Plaintiffs fail to plead that any of the Oscar Defendants ***knew***, at the time of the IPO, of the purported "trend"–*i.e.*, that Oscar had inadequate controls that would lead to an unfavorable RADV audit adjustment. The Second Circuit has made clear that "[it] is not enough" for Plaintiffs to plead that Defendants "***should*** have known of the existing trend," but instead must plead that they ***"actually"*** had knowledge at the time of the filing. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("While it is true that Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend."). No such facts are alleged here.

Plaintiffs' reliance on statements made ***after*** the IPO (AC ¶¶ 39, 53-59) cannot support an inference that the Oscar Defendants knew about any problems with internal controls ***at the time of the IPO***. *See In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) ("[A]sk[ing] the Court to assume that Defendants ***must*** have known because something did in fact occur later" is "simply inadequate pleading."); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *8 (similar); *see also In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *8 ("Plaintiff identifies no case where post-IPO disclosures alone were sufficient" to state an Item 303 claim.).

Regardless, the post-IPO statements upon which Plaintiffs rely do not support their theory. For example, while Plaintiffs point to generic statements by Oscar's then-CEO and then-CFO that they had claims data "really available to [their] fingertips," which they reviewed "quite a bit" (AC ¶ 39), they plead no facts connecting these statements (or the data that they purportedly reviewed) to the RADV audit at issue or the CMS data "submitted to regulatory

21

authorities." (*Id.* ¶ 4.)  Nor do Plaintiffs "identify any specific trend that [Oscar's] management was alerted to" when viewing this data, or how this data would have revealed the purportedly inadequate controls.  *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7.  And the AC does not allege that Oscar's non-officer directors had access to the same claims data or that they had any other reason to know that Oscar's internal controls were purportedly inadequate.

 *Third*, Plaintiffs fail to allege that the purportedly inadequate controls were "reasonably likely" to have a material effect on the operations of the company.  The "reasonably likely" standard is not "so broad as to require defendants to disclose speculative uncertainties,' nor d[oes] it require disclosure of uncharged, unadjudicated wrongdoing."  *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 298 (E.D.N.Y. 2021), *aff'd sub nom.*, 2022 WL 774877 (2d Cir. Mar. 15, 2022); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758-59 (S.D.N.Y. 2018) (no Item 303 violation where plaintiffs failed to allege that it was "reasonably likely" that the undisclosed event would occur), *aff'd*, 806 F. App'x 35 (2d Cir. 2020).  Even if Plaintiffs had alleged that the Oscar Defendants were aware of faulty controls governing CMS data at the time of the IPO (and they have not), the Oscar Defendants were not required to publicly speculate about the results of CMS' audit process.  Nor do Plaintiffs plead facts suggesting that the audit was reasonably likely to generate a material loss to Oscar's operations. 17 C.F.R. § 229.303; *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d at 20 (dismissing Item 303 claim because plaintiffs failed to allege that a pending SEC settlement was reasonably likely to be larger than the immaterial amount (less than 1% of revenue) that was later announced); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (dismissing Item 303 claim because plaintiffs did "not sufficiently allege[] that [potential

22

lawsuit against defendant] was "reasonably likely" to generate any loss, let alone a material loss"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Plaintiffs similarly fail to plead a violation of Item 105 of Regulation S-K, formerly known as Item 503(c), which requires disclosure of "the most significant factors that make an investment in the registrant or offering speculative or risky." *In re HEXO*, 524 F. Supp. 3d at 302. This "most significant factors" standard is "a considerably high standard, and goes beyond materiality." *Gordon v. Tencent Music Ent. Grp.*, 2021 WL 9183821, at *7 (E.D.N.Y. Mar. 31, 2021). As with Item 303, Plaintiffs must "demonstrate ***actual knowledge***." *Id.*; *see also In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *17 (S.D.N.Y. Jan. 10, 2023); *Garnett*, 2022 WL 4632323, at *15.[10] Thus, Plaintiffs' failure to plead knowledge and materiality for its Item 303 claim similarly dooms their Item 105 claim. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011); *City of Pontiac*, 752 F.3d at 183-84 (affirming dismissal of Section 11 claim premised on an Item 503(c) violation: "[d]isclosure is not a rite of confession").

## II.    PLAINTIFFS FAIL TO PLEAD MATERIALITY

Even if Plaintiffs had pled a misstatement or omission (and they have not), they fail to allege the materiality of any misstatement or omission, *i.e.*, that inadequate controls regarding RADV data would "affect the probable future of the company. . . [or] affect the desire of investors to buy, sell, or hold the company's securities." *Castellano*, 257 F.3d at 180. ***First***, the

---

[10]    Although some courts do not require actual knowledge for an Item 105 claim, the Oscar Defendants submit that the cases requiring actual knowledge reached the correct conclusion. Item 105 requires the disclosure of material factors that make an investment risky, along with an explanation of how each risk affects the registrant. *See* 17 C.F.R. § 229.105. It is hard to fathom how an issuer could be held to a strict liability standard for disclosing something as subjective as risk factors and be expected to explain how each of those risk factors affects it when the issuer ***does not actually know*** of the allegedly undisclosed risk factor. In any event, even the courts that do not require actual knowledge still require plaintiffs to "demonstrate that the allegedly omitted facts both existed, and were ***known or knowable,*** at the time of the offering." *Gutman v. Lizhi Inc.*, 2022 WL 4646471, at *4 (E.D.N.Y. Oct. 1, 2022) (dismissing claims under Item 105 based on an alleged failure to disclose risk of the pandemic on its business because "the risk of COVID-19 was neither known nor knowable"). No such facts are pled here.

challenged statements are too generic for a reasonable stockholder to have considered them

important in deciding whether to buy shares.  *See Singh*, 918 F.3d at 60-63 (vague statements of

having policies to comply with applicable requirements were immaterial); *ECA, Loc. 134 IBEW*

*Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009)

(statements regarding "highly disciplined" risk management processes were "puffery"); *Sjunde*

*AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 135 (S.D.N.Y. 2021) (Broderick

J.) (finding inactionable "vague generalizations" about risk management and controls, including

that defendant had "a comprehensive control framework . . . to minimize operational risks").  As

a matter of law, the generic statements about monitoring compliance or refining estimates would

not "have been viewed by the reasonable investor as having significantly altered the total mix of

the information made available."  *ECA, Loc. 134*, 553 F.3d at 197.

   ***Second***, "a misstatement related to less than 5% of a financial statement carries the

preliminary assumption of immateriality."  *IBEW Loc.  Union No. 58 Pension Tr. Fund &*

*Annuity Fund v. RBS Grp., PLC*, 783 F.3d 383, 390-91 (2d Cir. 2015).[11]  This assumption applies

here because the $20 million adjustment (which Plaintiffs plead was the result of faulty controls),

(AC ¶ 4) amounted to a mere 2.99% increase to the MLR for the relevant quarter (Q3 2021) and

a 0.74% increase for the year (FY 2021),[12] and represented only 1% of Oscar's $1.8 billion

---

[11]   Although this assumption of immateriality can be overcome by qualitative factors, no such factors are pled here, let alone any that are "particularly egregious." *Menora Mivtachim Ins.*, 2021 WL 1199035, at *20.

[12]   Oscar calculates its MLR by dividing its net claims by its net premiums. (*See* Ex. M, Form 10-Q, Q3 2021 at 45.)  Adding the $20 million adjustment to Oscar's $668 million in net premiums for its third quarter in 2021 (when the expense was incurred), and then dividing Oscar's net claims ($666 million) by that sum, yields what Oscar's MLR would have been without the expense—96.8%. (*See id.*)  This represents only a 2.99% change from Oscar's 3Q21 MLR of 99.7%. (*Id.*)  Adding the $20 million adjustment to Oscar's $2.7 billion in net premiums for FY 2021, and then dividing Oscar's net claims ($2.4 billion) by that sum, yields what Oscar's MLR would have been without the expense—88.3%. (*See* Ex. K, Form 10-K, FY 2021 at 59.)  This represents only a 0.74% change from Oscar's FY 2021 MLR of 88.9%. (*Id.*)

revenue for FY 2021.  (Ex. K, FY 2021 Form 10-K at 78.)[13]  Such a small impact would not

"affect the desire of investors to buy, sell, or hold the company's securities."  *Castellano*, 257

F.3d at 180; *see also ECA, Loc. 134*, 553 F.3d at 204 (misstatement related to less than 5% of

defendant's assets entitled to presumption of immateriality).  Indeed, the $20 million RADV

adjustment, "which drove approximately 300 basis points of MLR impact on a year-over-year

basis . . . *[was] not impacting [Oscar's] baseline.*"  (Ex. I, Nov. 10, 2021 Tr. at 7.)

### III.    PLAINTIFFS FAIL TO PLEAD SCIENTER

Although the Court need not reach the issue, Plaintiffs' claims also should be dismissed

because they fail to plead scienter.  Because Plaintiffs' claims sound in fraud (*supra* Section I),

Plaintiffs must state with particularity facts giving rise to a strong inference of scienter—*i.e.*, that

the Oscar Defendants acted with fraudulent intent.  *See In re Chembio Diagnostics, Inc. Sec.

Litig.*, 2022 WL 2872671, at *7 (E.D.N.Y. July 21, 2022).  Plaintiffs make no such allegations,

which provides a separate basis for dismissal.  *See Caiafa v. Sea Containers Ltd.*, 2008 WL

11516813, at *6 (S.D.N.Y. May 15, 2008).

### IV.    PLAINTIFFS FAIL TO STATE A SECTION 15 CLAIM

Because Plaintiffs fail to allege a violation of Section 11, their Section 15 claim must also

be dismissed.  *See ECA, Loc. 134*, 553 F.3d at 207.

### CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice.

---

[13]    Even compared to Oscar's Q3 2021 *quarterly* revenue, the $20 million expense makes up only 4.5% of this figure ($444 million).  (*See* Ex. M, Form 10-Q, Q3 2021 at 9.)

25

Dated: New York, New York
     April 4, 2023

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:  <u>s/ Jay B. Kasner</u>
Jay B. Kasner
(jay.kasner@skadden.com)
Alexander C. Drylewski
(alexander.drylewski@skadden.com)
Tansy Woan
(tansy.woan@skadden.com)
One Manhattan West
New York, New York 10001-8603
Telephone: (212) 735-3000

*Attorneys for Defendants Oscar Health,*
  *Inc., Mario Schlosser, Siddhartha*
  *Sankaran, Ari Fischel, Jeffery H. Boyd,*
  *Joel Cutler, Joshua Kushner, Teri List,*
  *Charles E. Phillips, Jr., David Plouffe,*
  *Elbert O. Robinson, Jr., and Vanessa A.*
  *Wittman*