# Exhibit L

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Silverstrand Investments v. AMAG Pharmaceuticals, Inc.,   1st Cir.(Mass.),   February 4, 2013

Release No. 6835 (S.E.C. Release No.), Release No. 16961, Release No. 26831, Release No. 33-6835, Release No. 34-26831, Release No. IC - 16961, 43 S.E.C. Docket 1330, 1989 WL 1092885

S.E.C. Release No.

Securities Act of 1933

Securities Exchange Act of 1934

Investment Company Act of 1940

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS; CERTAIN INVESTMENT COMPANY DISCLOSURES

May 18, 1989

**\*1**  AGENCY: Securities and Exchange Commission

ACTION: Interpretive release.

SUMMARY: The Commission today announced the publication of an interpretive release regarding the disclosure required by Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). In addition to reporting the results of the first two phases of a continuing review project (the "MD&A Project" or the "Project") undertaken by the staff of the Division of Corporation Finance (the ""Division"), the release sets forth the Commission's views regarding several disclosure matters that should be considered by registrants in preparing MD&As. Additionally, in discussing appropriate MD&A disclosure as to participation in high yield, highly leveraged or non-investment grade loans and investments, the release also sets forth the position of the Commission concerning disclosures by investment companies which invest in, or are permitted to invest in, securities issued in highly leveraged transactions, even though investment companies are not subject to MD&A disclosure requirements.

**FOR FURTHER INFORMATION CONTACT:** Questions about specific filings should be directed to the staff members responsible for reviewing the documents the registrant files with the Commission. General questions about the release or the MD&A Project should be referred to Howard F. Morin, Assistant Director, at (202) 272-3203, Paul N. Edwards, Special Counsel, at (202) 272-3205, or Emanuel D. Strauss, Attorney-Adviser, Office of Chief Counsel, at (202) 272-2573, each of the Division of Corporation Finance, Securities and Exchange Commission, 450 Fifth Street NW., Washington, DC 20549. Questions about Investment Company Act issues should be referred to Carolyn Lewis, Assistant Director, Division of Investment Management, at (202) 272-2102.

**SUPPLEMENTARY INFORMATION:** In response to comments received on a concept release issued in 1987 (the "Concept Release"),[1]  the Commission undertook the MD&A Project, a special review of the adequacy of MD&A disclosures provided by registrants. Based on the results of the first two phases of the staff;s continuing Project, the Commission has concluded that further guidance should be given to registrants to improve overall compliance with the MD&A disclosure requirements.

I. Background

The current framework of MD&A was adopted in 1980,[2]  although the origins of the MD&A requirements date to 1968.[3] MD&A requires a discussion of liquidity, capital resources, results of operations, and other information necessary to an

understanding of a registrant's financial condition, changes in financial condition and results of operations. [4] While the MD&A requirements adopted in 1980 are far more comprehensive than earlier formulations, they are intentionally general, reflecting the Commission's view that a flexible approach elicits more meaningful disclosure and avoids boilerplate discussions, which a more specific approach could foster. One year after adoption of the current framework, the Commission published a release that included examples of MD&A disclosure to assist registrants. [5]

 **\*2**  In 1986, Coopers & Lybrand submitted to the Commission's Office of the Chief Accountant a proposal recommending increased MD&A disclosure of business risks and the performance by the independent auditor of specified review procedures with respect to these disclosures. Shortly thereafter, the managing partners of seven accounting firms [6] issued a white paper entitled "The Future Relevance, Reliability, and Credibility of Financial Information; Recommendations to the AICPA Board of Directors," which also called for increased risk disclosure, but contemplated that such disclosure would be separate from MD&A and would be subjected to audit coverage.

The Commission thereafter issued the Concept Release requesting comments concerning the adequacy of the MD&A requirements and the costs and benefits of the revisions suggested by the proposals. [7] Virtually all the 196 commentators opposed the proposals initiated by members of the accounting profession, and most took the position that there was no need to change the MD&A requirements. [8] A number of commentators, however, suggested that stricter enforcement and review, or additional guidance through an interpretive release, would improve compliance. Accordingly, the Division decided to undertake a special review of MD&A disclosures to assess the adequacy of disclosure practices and to identify any common areas of deficiencies, with a view to providing further guidance on compliance with the requirements of Item 303 of Regulation S-K and determining the need for revisions of the Item. Based on the results of the MD&A reviev, the Commission concurs with the view expressed by most commentators that no amendments to the MD&A requirements set forth in Regulation S-K are needed at this time.

II. Summary of the Project

The staff commenced work on the MD&A Project in early 1988. A total of 218 companies in 12 industries were selected for review in the first phase of this continuing project. [9] Specific industries were chosen so that the staff, through increased familiarity and additional research, could enhance its expertise regarding the industries. Each registrant was selected for an "issuer review" that focused on the registrant rather than any one report filed under the Securities Exchange Act of 1934 ("Exchange Act"). [10] Particular emphasis was placed on disclosures made in response to the MD&A requirements.

Of the 218 registrants reviewed, 206 received letters of comment, many of which related to more than one report. Three different categories of comments were issued: (a) Requests for amendment; (b) requests for supplemental information; and (c) requests for compliance in future filings ("futures" comments). [11] Amendments were filed by 72 registrants in response to staff comments.

Work on a second phase of the MD&A Project commenced in October 1988. A total of 141 companies in a second set of 12 industries [12] were selected for review, resulting in 139 comment letters being issued in December, 1988. To date, amendments by 53 registrants have been filed in response to staff comments.

 **\*3**  The amendments received in the first two phases principally addressed MD&A, the business description required under Item 101 of Regulation S-K, and the financial statements. More than one-half of the amendments substantively expanded MD&A, most often addressing one or more disclosure issues as to which guidance is provided in this release.

The Division has referred six registrants reviewed during the MD&A Project to the Division of Enforcement due primarily to substantive accounting problems which, in several instances, also affected the adequacy of the registrants' MD&As. The accounting problems encountered include, among other things, possible inadequate maintenance of accounting records and systems of internal controls and possible improper accounting regarding material acquisitions.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

The staff has already begun a third phase of the MD&A Project relating to 12 new industries, [13] using the Forms 10-K recently filed for the fiscal year ended November 30, 1988 or later.

III. Evaluation of Disclosure— Interpretive Guidance

*A. Introduction*

The MD&A requirements are intended to provide, in one section of a filing, [14] material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials. [15]

As the Commission has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company." [16]

The Commission has determined that interpretive guidance is needed regarding the following matters: prospective information required in MD&A; long and short-term liquidity and capital resources analysis; material changes in financial statement line items; required interim period disclosure; MD&A analysis on a segment basis; participation in high yield financings, highly leveraged transactions or non-investment grade loans and investments; the effects of federal financial assistance upon the operations of financial institutions; and preliminary merger negotiations.

*B. Prospective Information*

Several specific provisions in Item 303 require disclosure of forward-looking information. MD&A requires discussions of "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." [17] Further, descriptions of known material trends in the registrant's capital resources and expected changes in the mix and cost of such resources are required. [18] Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. [19] Finally, the Instructions to Item 303 state that MD&A "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." [20]

 **\*4**  The Project results confirm that the distinction between prospective information that is required to be discussed and voluntary forward-looking disclosure is an area requiring additional attention. This critical distinction is explained in the Concept Release:

Both required disclosure regarding the future impact of presently known trends, events or uncertainties and optional forward-looking information may involve some prediction or projection. The distinction between the two rests with the nature of the prediction required. Required disclosure is based on *currrently known trends, events, and uncertainties that are reasonably expected to have material effects,* such as: A reduction in the registrant's product prices; erosion in the ragistrant's market share;

changes in insurance coverage; or the likely non-renewal of a material contract. In contrast, optional forward-looking disclosure involves *anticipating a future trend or event or anticipating a less predictable impact of a known event, trend or uncertainty.* [21]

The rules establishing a safe harbor for disclosure of "forward-looking statements" define such statements to include statements of "future economic performance contained in" MD&A. These safe harbors apply to required statements concerning the future effect of known trends, demands, commitments, events or uncertainties, as well as to optional forward-looking statements. [22]

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation. [23] Registrants preparing their MD&A disclosure should determine and carefully review what trends, demands, commitments, events or uncertainties are known to management. In the following example, [24] the registrant discloses the reasonably likely material effects on operating results of a known trend in the form of an expected further decline in unit sales of mature products.

While market conditions in general remained relatively unchanged in 1987, unit volumes declined 10% as the Company's older products, representing 40% of overall revenues, continue to approach the end of their life cycle. Unit volumes of the older products are expected to continue to decrease at an accelerated pace in the future and materially adversely affect revenues and operating profits.

In preparing the MD&A disclosure, registrants should focus on each of the specific categories of known data. For example, Item 303(a)(2)(i) requires a description of the registrant's material "commitments" for capital expenditures as of the end of the latest fiscal period. However, even where no legal commitments, contractual or otherwise, have been made, disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend. Similarly, if the same registrant determines not to incur such expenditures, a known uncertainty would exist regarding continuation of the current growth trend. If the adverse effect on the registrant from discontinuation of the growth trend is reasonably likely to be material, disclosure is required. Disclosure of planned material expenditures is also required, for example, when such expenditures are necessary to support a new, publicly announced product or line of business. [25]

 **\*5**  In the following example, the registrant discusses planned capital expenditures, and related financing sources, necessary to maintain sales growth.

The Company plans to open 20 to 25 new stores in fiscal 1988. As a result, the Company expects the trend of higher sales in fiscal 1988 to continue at approximately the same rate as in recent years. Management estimates that approximately $50 to $60 million will be required to finance the Company's cost of opening such stores. In addition, the Company's expansion program will require increases in inventory of about $1 million per store, which are anticipated to be financed principally by trade credit. Funds required to finance the Company's store expansion program are expected to come primarily from new credit facilities with the remainder provided by funds generated from operations and increased lease financings. The Company recently entered into a new borrowing agreement with its primary bank, which provides for additional borrowings of up to $50 million for future expansion. The Company intends to seek additional credit facilities during fiscal 1988.

Often a matter which had a material impact on past operating results also involves prospective effects which should be discussed. [26] In identifying the reason for a material change in income from continuing operations and quantifying its effects, the registrant in the following example also describes the reasonably likely effect of a known event: completion of an important contract.

The Company produced operating income of $22 million during 1987 as compared to $15 million during 1986, a 47 percent increase. Substantially all of the 47 percent increase can be attributed to the Company's completion of a major contract at a cost less than anticipated. It is expected that operating income during the current year will be significantly less, as only a portion

of the profit generated by the completed contract is expected to be replaced by new contracts as a result of a slowdown within the Company's principal industry.

Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

**\*6** In the following example, the registrant discloses the reasonably likely material effect of a known uncertainty regarding implementation of recently adopted legislation.

The Company had no firm cash commitments as of December 31, 1987 for capital expenditures. However, in 1987, legislation was enacted which may require that certain vehicles used in the Company's business be equipped with specified safety equipment by the end of 1991. Pursuant to this legislation, regulations have been proposed which, if promulgated, would require the expenditure by the Company of approximately $30 million over a three-year period.

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur. [27]

Each final determination resulting from the assessments made by management must be objectively reasonable, viewed as of the time the determination is made. [28]

Application of these principles may be illustrated using a common disclosure issue which was considered in the review of a number of Project registrants: designation as a potentially responsible party ("PRP") by the Environmental Protection Agency (the "EPA") under The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("Superfund"). [29]

*Facts:* A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.

Based upon the facts of this hypothetical base, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [30] For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*C. Liquidity—Capital Resources*

**\*7** Instruction 2 to Item 303(a) calls for an evaluation of "amounts and certainty of cash flows." "Except where it is otherwise clear from the discussion." Item 303(a)(1) and instructions 2 and 5 to Item 303(a) together also mandate indication of which balance sheet conditions or income or cash flow items should be considered in assessing liquidity, and a discussion of prospective information regarding the registrant's short and long-term sources of, and needs for, capital. Disclosure of material commitments for capital expenditures as of the end of the latest fiscal period is required by Item 303(a)(2). Trend analysis and a description of "any expected material changes in the mix and relative cost" of the registrant's capital resources must also be provided. [31]

Generally, short-term liquidity and short-term capital resources cover cash needs up to 12 months into the future. These cash needs and the sources of funds to meet such needs relate to the day-to-day operating expenses of the registrant and material commitments coming due during that 12-month period.

The discussion of long-term liquidity and long-term capital resources must address material capital expenditures, significant balloon payments or other payments due on long-term obligations, and other demands or commitments, including any off-balance sheet items, to be incurred beyond the next 12 months, as well as the proposed sources of funding required to satisfy such obligations. [32]

Where a material deficiency in short or long-term liquidity has been identified, the registrant should disclose the deficiency, as well as disclosing either its proposed remedy, that it has not decided on a remedy, or that it is currently unable to address the deficiency. [33] In the following example, a financially troubled registrant discusses the material effects of its cash flow problems on its business, and its efforts to remedy those problems.

The Company has violated certain requirements of its debt agreements relating to failure to maintain certain minimum ratios and levels of working capital and stockholders' equity. The Company's lenders have not declared the Company in default and have allowed the Company to remain in violation of these agreements. Were a default to be declared, the Company would not be able to continue to operate. A capital infusion of $4,000,000 is necessary to cure these defaults. The Company has engaged an investment banker and is considering various alternatives, including the sale of certain assets or the sale of common shares, to raise these funds.

The Company frequently has not been able to make timely payments to its trade and other creditors. As of year-end and as of February 29, 1988, the Company had past due payables in the amount of $525,000 and $705,000, respectively. Deferred payment terms have been negotiated with most of these vendors. However, certain vendors have suspended parts deliveries to the Company. As a result, the Company was not always able to make all shipments on time, although no orders have been cancelled to date. Were significant volumes of orders to be cancelled, the Company's ability to continue to operate would be jeopardized. The Company is currently seeking sources of working capital financing sufficient to fund delinquent balances and meet ongoing trade obligations.

**\*8** Short and long-term liquidity and capital resources analysis should become more comparable from registrant to registrant as a result of the Financial Accounting Standards Board's recent issuance of SFAS 95, [34] which requires the statement of changes in financial position to be replaced by a statement of cash flows as part of a full set of financial statements. This new statement reports net cash provided or used by each of operating, investing and financing activities, as defined, and the net effect of those flows on cash and cash equivalents.

Registrants are expected to use the statement of cash flows, and other appropriate indicators, in analyzing their liquidity, and to present a balanced discussion dealing with cash flows from investing and financing activities as well as from operations. This discussion should address those matters that have materially affected the most recent period presented but are not expected to have short or long-term implications, and those matters that have not materially affected the most recent period presented but are

expected materially to affect future periods. [35] Examples of such matters include: (a) Discretionary operating expenses such as expenses relating to advertising, research and development or maintenance of equipment; (b) debt refinancings or redemptions; or (c) levels of financing provided by suppliers or to customers. Liquidity analysis premised upon the new statement of cash flows and prepared in accordance with this guidance should enhance the utility to investors of MD&A disclosure by improving comparability from registrant to registrant and providing information more directly relevant to liquidity than that previously premised upon the statement of changes in financial position.

*D. Material Changes*

Some Project registrants did not provide adequate disclosure of the reasons for material year-to-year changes in line items, or discussion and quantification of the contribution of two or more factors to such material changes. Instruction 4 to Item 303(a) requires a discussion of the causes of material changes from year-to-year in financial statement line items "to the extent necessary to an understanding of the registrant's businesses as a whole." An analysis of changes in line items is required where material and where the changes diverge from changes in related line items of the financial statements, where identification and quantification of the extent of contribution of each of two or more factors is necessary to an understanding of a material change, or where there are material increases or decreases in net sales or revenue. [36]

Discussion of the impact of discontinued operations and of extraordinary gains and losses is also required where these items have had or are reasonably likely to have a material effect on reported or future financial condition or results of operations. Other non-recurring items should be discussed as ""unusual or infrequent" events or transactions "that materially affected the amount of reported income from continuing operations." [37]

 **\*9** As Instruction 4 to Item 303(a) states, repetition and line-by-line analysis is not required or generally appropriate when the causes for a change in one line item also relates to other line items. The same Instruction also states that the discussion need not recite amounts of changes readily computable from the financial statement and "shall not merely repeat numerical data contained in" such statements. However, quantification should otherwise be as precise, including use of dollar amounts or percentages, as reasonably practicable.

In the following example, the registrant analyzes the reasons for a material change in revenues and in so doing describes the effects of offsetting developments.

Revenue from sales of single-family homes for 1987 increased 6% from 1986. The increase resulted from a 14% increase in the average sales price per home, partially offset by a 6% decrease in the number of homes delivered. Revenues from sales of single-family homes for 1986 increased 2% from 1985. The average sales price per home in 1986 increased 6%, which was offset by a 4% decrease in the number of homes delivered.

The increase in the average sales prices in 1987 and 1986 is primarily the result of the Company's increased emphasis on higher priced single-family homes. The decrease in homes delivered in 1987 and 1986 was attributable to a decline in sales in Texas. The significant decline in oil prices and its resulting effect on energy-related business has further impacted the already depressed Texas area housing market and is expected to do so for the foreseeable future. The Company curtailed housing operations during 1987 in certain areas in Texas in response to this change in the housing market. Although the number of homes sold is expected to continue to decline during the current year as a result of this action, this decline is expected to be offset by increases in average sales prices.

*E. Interim Period Reporting*

The second sentence of Item 303(b) states that MD&A relating to interim period financial statements "shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item, except that the impact of inflation and

changing prices on operations for interim periods need not be addressed."[38] As this sentence indicates, material changes to each and every specific disclosure requirement contained in paragraph (a), with the noted exception, should be discussed. This would include, for example, internal and external sources of liquidity, expected material changes in the mix and relative cost of such resources, and unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.[39]

In light of the obligation to update MD&A disclosure periodically, the impact of known trends, demands, commitments, events or uncertainties arising during the interim period which are reasonably likely to have material effects on financial condition or results of operations constitutes required disclosure in MD&A.[40] For example, a calendar year end registrant describes, in its June 30 Form 10-Q, a recent event which is reasonably likely to have a material future effect on its financial condition or results of operations.

 **\*10** The Company was advised in late June that Company A, its principal customer, which accounted for 28% and 30% of revenues for the last six months and prior fiscal year, respectively, intends to terminate all purchases effective during the third quarter, due to in-house capabilities recently developed by this customer. The Company is materially dependent on its business with this customer and anticipates upon such termination a material adverse effect on revenues and income. Efforts are being made to replace revenues attributable to such customer by developing new customers. The Company expects it will take at least 6 months to generate such replacement revenues.

*F. Other Observations*

1. Segment Analysis

In many cases, MD&As of Project registrants with more than one segment were prepared on a segment as well as consolidated basis. In formulating a judgment as to whether a discussion of segment information is necessary to an understanding of the business, a multi-segment registrant preparing a full fiscal year MD&A should analyze revenues, profitability, and the cash needs of its significant industry segments. To the extent any segment contributes in a materially disproportionate way to those items, or where discussion on a consolidated basis would present an incomplete and misleading picture of the enterprise, segment discussion should be included. This may occur, for example, when there are legal or other restrictions upon the free flow of funds from one segment, subsidiary or division of the registrant to others; when known trends, demands, commitments, events or uncertainties within a segment are reasonably likely to have a material effect on the business as a whole; when the ability to dispose of identified assets of a segment may be relevant to the financial flexibility of the registrant; and in other circumstances in which the registrant concludes that segment analysis is appropriate to an understanding of its business.[41]

The following example illustrates segment disclosure for a manufacturer with two segments. The two segments contributed to operating income amounts that were disproportionate to their respective revenues. The registrant discusses sales and operating income trends, factors explaining such trends, and where applicable, known events that will impact future results of operations of the segment.

Net Sales by Industry Segment

| Industry segments | 1987 | | 1986 | | 1985 | |
|---|---|---|---|---|---|---|
| | ($ million) | Percent of total | ($ million) | Percent of total | ($ million) | Percent of total |
| Segment I......................... | 585 | 55 | 479 | 53 | 420 | 48 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Segment II......................... | 472 | 45 | 433 | 47 | 457 | 52 |
| Total sales......................... | 1057 | 100 | 912 | 100 | 877 | 100 |

### 1987 vs. 1986

**\*11**  Segment I sales increased 22% in 1987 over the 1986 period. The increase included the effect of the acquisition of Corporation T. Excluding this acquisition, sales would have increased by 16% over 1986. Product Line A sales increased by 18% due to a 24% increase in selling prices, partially offset by lower shipments. Product Line B sales increased by 35% due to a 17% increase in selling prices and a 15% increase in shipment volume.

Segment II sales increased 9% due to a 12% increase in selling prices partly offset by a 3% reduction in shipment volumes.

### 1986 v. 1985

Segment I sales increased 14% in 1986. Product Line A sales increased 22%, in spite of a slight reduction in shipments, because of a 23% increase in selling prices.

Product Line B sales declined 5% due mainly to a 7% decrease in selling prices, partially offset by higher shipments.

The 5% decline in Segment II sales reflected a 3% reduction in selling prices and a 2% decline in shipments.

The substantial increases in selling prices of Product Line A during 1987 and 1986 occurred primarily because of heightened worldwide demand which exceeded the industry's production capacity. The Company expects these conditions to continue for the next several years. The Company anticipates that shipment volumes of Product Line A will increase as its new production facility reaches commercial production levels in 1988.

Segment II shipment volumes have declined during the past two years primarily because of the discontinuation of certain products which were marginally profitable and did not have significant growth potential.

## OPERATING PROFIT BY INDUSTRY SEGMENT

| Industry segments | 1987 | | 1986 | | 1985 | |
|---|---|---|---|---|---|---|
| | ($ million) | Percent of total | ($ million) | Percent of total | ($ million) | Percent of total |
| Segment I............................ | 126 | 75 | 108 | 66 | 67 | 55 |
| Segment II........................... | 42 | 25 | 51 | 32 | 54 | 45 |
| Operating profit.................... | 168 | 100 | 159 | 100 | 121 | 100 |

### 1987 vs. 1986

**\*12**  Segment I operating profit was $18 million (17%) higher in 1987 than in 1986. This increase includes the effects of higher sales prices and slightly improved margins on Product Line A, higher shipments of Product Line B and the acquisition of Corporation T. Excluding this acquisition operating profit would have been 11% higher than in 1986. Partially offsetting these

increases are costs and expenses of $11 million related to new plant start-up, slightly reduced margins on Product Line B sales and a $9 million increase in research and development expenses.

Segment II operating profit declined $9 million (18%) due mainly to substantially higher costs in 1987 resulting from a 23% increase in average raw material costs which could not be fully recovered through sales price increases. The Company expects that Segment II margins will continue to decline, although at a lesser rate than in 1987 as competitive factors limit the Company's ability to recover cost increases.

1986 vs. 1985

Segment I operating profit was $41 million (61%) higher in 1986 than in 1985. After excluding the effect of the $23 million non-recurring charge for the early retirement program in 1985, Segment I operating profit in 1986 was $18 million (27%) higher than in 1985. This increase reflected higher prices and a corresponding 21% increase in margins on Product Line A, and a 17% increase in margins on Product Line B due primarily to cost reductions resulting from the early retirement program.

Segment II operating profit declined about $3 million (6%) due mainly to lower selling prices and slightly reduced margins in 1986.

2. Participation in High Yield Financings. Highly Leveraged Transactions or Non-Investment Grade Loans and Investments

A registrant, whether a financial institution (such as a bank, thrift, insurance company or finance company), broker-dealer or one of its affiliates, or any other public company, may participate in several ways, directly or indirectly, in high yield financings, or highly leveraged transactions or make non-investment grade loans or investments relating to corporate restructurings such as leveraged buyouts, recapitalizations including significant stock buybacks and cash dividends, and acquisitions or mergers.[42] A registrant may participate in the financing of such a transaction either as originator, syndicator, lender, purchaser, or secured senior debt, or as an investor in other debt instruments (often unsecured or subordinated), redeemable preferred stock or other equity securities. Participation in high yield or highly leveraged transactions, as well as investment in non-investment grade securities, generally involves greater returns, in the form of higher fees and higher average yields or potential market gains. Participation in such transactions may involve greater risks, often related to credit worthiness, solvency, relative liquidity of the secondary trading market, potential market losses, and vulnerability to rising interest rates and economic downturns.[43]

 **\*13**  Similar risk-reward exposure appears to exist when the growing practice by certain registrants of originating low down-payment mortgages without obtaining mortgage insurance. Other registrants have substantial participation in venture capital financings.

In view of these potentially greater returns and potentially greater risks, disclosure of the nature and extent of a registrant's involvement with high yield or highly leveraged transactions and non-investment grade loans and investments may be required under one or more of several MD&A items, and registrants should consider carefully the extent of disclosure required.[44] MD&A analysis is required if such participation has had or is reasonably likely to have a material effect on financial condition or results of operations.

In determining the adequacy of disclosure concerning participation in high yield, highly leveraged and noninvestment grade loans and investments, registrants should consider the need to disclose:

1. Relevant lending and investing policies, including credit and risk management policies;

2. The amounts of holdings, stated separately by type if individually material, including guarantees and repurchase or other commitments to lend or acquire such loans and investments, and the potential risks inherent in such holdings;

3. Information regarding the level of activity during the period, *e.g.,* originations and retentions;

4. Amounts of holdings, if any, giving rise to significantly greater risks (that may have material effects on financial condition or results of operations) than are present in other similar transactions and instruments; for example, where the issuer is bankrupt or has issued securities on which interest payments are in default, or where there are significant concentrations (*e.g.,* in an individual borrower, industry or geographic area), particularly where those concentrations are in securities with relatively low trading market liquidity (such as those that depend upon a single market maker for their liquidity); and

5. Analysis of the actual and reasonably likely material effects of the above matters on income and operations, *e.g.,* the amounts of fees recognized and deferred, yields, amounts of realized and unrealized market gains or losses, and credit losses. Such disclosure may appear in the business discussion, or other appropriate location, but the effects resulting from participation should be analyzed in MD&A.

Similar concerns are raised with regard to investment companies that invest, or are permitted to invest, all or a portion of their portfolios in high-yield or non-investment grade securities. An investment company that seeks high income by investing in other than high-grade bonds (or is permitted to do so, even if it does not currently include such securities in its portfolio) should disclose in its prospectus the risks involved in such investments. [45] These risks include, but are not limited to, the risks described above, such as market price volatility based upon interest rate sensitivity, creditworthiness and relative liquidity of the secondary trading market, as well as the effects such risks may have on the net asset value of the fund. In addition, the board of directors of a fund that invests in such securities should carefully consider factors affecting the secondary market for such securities in determining whether or not any particular security is liquid or illiquid, and whether market quotations are "readily available" for purposes of valuing portfolio securities. [46]

 **\*14** The nature of disclosure required by non-investment companies will vary depending on the type of participation. In the following example the registrant is a bank holding company that participates in highly leveraged transactions as a lender and not as an investor.

The Company is active in originating and syndicating loans in highly leveraged corporate transactions. The Company generally includes in this category domestic and international loans and commitments made by the Banks in recapitalizations, acquisitions, and leveraged buyouts which result in the borrower's debt to total assets ratio exceeding 75%. As of December 31, 1988, the Company had loans outstanding in approximately 61 highly leveraged transactions in an aggregate principal amount of approximately $900 million, was committed under definitive loan agreements relating to approximately 23 highly leveraged transactions to lend an additional amount of approximately $650 million, and had other highly leveraged transactions at various stages of discussion or preliminary commitment. The Company's equity investments in highly leveraged transactions are not material.

In recent years the Company has not made a loan in excess of $175 million in any individual highly leveraged transaction, and the Company has typically retained, after syndication and sales of loan participations, a principal amount not exceeding approximately $35 million in any such transaction. At December 31, 1988, only two loans had outstanding balances exceeding $35 million ($51 million and $47 million, respectively) and no industry represented more than 15% of the Company's total highly leveraged loan portfolio. Should an economic downturn or sustained period of rising interest rates occur, highly leveraged transaction borrowers may experience financial stress. As a result, risks associated with these transactions may be higher than for more traditional financing.

The Company estimates that its fees for lending and corporate finance activities relating to highly leveraged transactions were approximately $64 million during 1988, of which approximately $48 million was recognized as income and $16 million was deferred, compared with $40 million during 1987 of which approximately $32 million was recognized as income and $8 million was deferred. The deferred portion of such fees will be recognized over the terms of the related loans in accordance with Statement of Financial Accounting Standards Number 91.

In recent years, the Company has had no significant charge-offs of loans made in highly leveraged transactions. At December 31, 1988, approximately $25 million (3%) of such outstanding loans were on nonaccrual status, which was not materially greater than that for the Company's other lending activities.

A reduction in the Company's activities relating to highly leveraged transactions could have some negative impact on the Company's results of operations. The size of such impact would depend on the magnitude of the reduction and on the profitability of the activities to which the Company might redirect its resources. Although any estimate of the impact of a total discontinuation of all new highly leveraged transactions depends on various factors that cannot now be determined, the Company believes that such a discontinuation would reduce its gross revenues approximately 6% and net income by approximately 12%.

**\*15** In the following example, the registrant is an investor in noninvestment grade debt securities.

At December 31, 1988, the Company held in its portfolio, net of reserves, $81 million of high yield, unrated or less than investment grade corporate debt securities with an aggregate market value of $75 million. Investments in unrated or less than investment grade corporate debt securities have different risks than other investments in corporate debt securities rated investment grade and held by the Company. Risk of loss upon default by the borrower is significantly greater with respect to such corporate debt securities than with other corporate debt securities because these securities are generally unsecured and are often subordinated to other creditors of the issuer, and because these issuers usually have high levels of indebtedness and are more sensitive to adverse economic conditions, such as recession or increasing interest rates, than are investment grade issuers. In addition, investments by the Company in corporate debt securities of any given issuer are generally larger than its investments in most other securities, thus resulting in a greater impact in the event of default. There is only a thinly traded market for such securities and recent market quotations are not available for some of these securities. Market quotes are generally available only from a limited number of dealers and may not represent firm bids of such dealers or prices for actual sales. As of December 31, 1988, the Company's five largest investments in corporate debt securities aggregated $35 million, none of which individually exceeded $10 million, and had an approximate market value of $31 million.

3. Effects of Federal Financial Assistance Upon Operations

Many financial institutions, such as thrifts and banks, are receiving financial assistance in connection with federally assisted acquisitions or restructurings. Such assistance may take various forms and is intended to make the surviving financial institution a viable entity. Examples of such methods of assistance include: (a) Yield maintenance assistance (which guarantees additional interest on specified interest bearing assets, a level of return on specified non-interest-bearing assets, reimbursement if covered assets are ultimately collected or sold for amounts that are less than a specified amount, or any combination therof); (b) indemnification against certain loss contingencies; (c) the purchase of equity securities issued by the institution for cash or a note receivable from the federal agency; and (d) arrangements designed to insulate the surviving entity from the economic effects of problem assets acquired from the predecessor financial institution (such as a "put agreement" whereby the surviving institution may "put" troubled loans directly or indirectly to the federal agency at higher than their fair value).

If these or any other types of federal financial assistance have materially affected, or are reasonably likely to have a material future effect upon, financial condition or results of operations, the MD&A should provide disclosure of the nature, amounts, and effects of such assistance. [47]

**\*16** In the following example, a financial institution discloses the material effects of a federally assisted corporate reorganization. Such disclosure was in addition to various disclosures of the existence and effect of such federal assistance in the description of business portions of the filing (pursuant to Industry Guide 3) and in the registrant's financial statements.

During 1988, earnings for the Company included $60 million of assistance income, including (a) $10 million in indemnity from the Federal Agency in respect of litigation costs associated with the Company's predecessor and (b) $50 million related to the

1988 puts of troubled loans to the Federal Agency under the Company's Put Agreement. The assistance income arises from provisions in the Reorganization agreements that are intended to relieve the Company from the adverse economic effects of litigation and problem assets held by its predecessor. These provisions are intended to place the Company in substantially the same position as if such litigation and problem assets had been assumed by the Federal Agency at the time of the Reorganization. Based on existing economic circumstances, management believes that the expiration of the Put Agreement in June 1989 may adversely affect future operations including an increased level of non-performing loans and loan loss provisions which cannot be recovered pursuant to the Put Agreement.

4. Preliminary Merger Negotiations

While Item 303 could be read to impose a duty to disclose otherwise nondisclosed preliminary merger negotiations, as known events or uncertainties reasonably likely to have material effects on future financial condition or results of operations, the Commission did not intend to apply, and has not applied, Item 303 in this manner.[48] As reflected in the various disclosure requirements under the Securities Act and Exchange Act that specifically address merger transactions, the Commission historically has balanced the informational need of investors against the risk that premature disclosure[49] of negotiations may jeopardize completion of the transaction.[50] In general, the Commission's recognition that registrants have an interest in preserving the confidentiality of such negotiations is clearest in the context of a registrant's continuous reporting obligations under the Exchange Act, where disclosure on Form 8-K of acquisitions or dispositions of assets not in the ordinary course of business is triggered by completion of the transaction.[51]

In contrast, where a registrant registers securities for sale under the Securities Act, the Commission requires disclosure of material probable acquisitions and dispositions of businesses, including the financial statements of the business to be acquired or sold.[52] Where the proceeds from the sale of the securities being registered are to be used to finance an acquisition of a business, the registration statement must disclose the intended use of proceeds. Again, accommodating the need for confidentiality of negotiations, registrants are specifically permitted not to disclose in registration statements the identity of the parties and the nature of the business sought if the acquisition is not yet probable and the board of directors determines that the acquisition would be jeopardized.[53]

 **\*17**  The Commission's interpretation of Item 303, as applied to preliminary merger negotiations, incorporates the same policy determinations. Accordingly, where disclosure is not otherwise required, and has not otherwise been made, the MD&A need not contain a discussion of the impact of such negotiations where, in the registrant's view, inclusion of such information would jeopardize completion of the transaction. Where disclosure is otherwise required or has otherwise been made by or on behalf of the registrant, the interests in avoiding premature disclosure no longer exist. In such case, the negotiations would be subject to the same disclosure standards under Item 303 as any other known trend, demand, commitment, event or uncertainty. These policy determinations also would extend to preliminary negotiations for the acquisition or disposition of assets not in the ordinary course of business.

**IV. Conclusion**

In preparing MD&A disclosure, registrants should be guided by the general purpose of the MD&A requirements: to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with particular emphasis on the registrant's prospects for the future. The MD&A requirements are intentionally flexible and general. Because no two registrants are identical, good MD&A disclosure for one registrant is not necessarily good MD&A disclosure for another. The same is true for MD&A disclosure of the same registrant in different years. The flexibility of MD&A creates a framework for providing the marketplace with appropriate information concerning the registrant's financial condition, changes in financial condition and results of operations.

The "Codification of Financial Reporting Policies" announced in Financial Reporting Release 1 (April 15, 1982) [47 FR 21028] is updated:

1. By amending the preamble to section 501 to delete its final three sentences and to substitute the following new language:

In 1988, a project was undertaken to evaluate current compliance with MD&A requirements. This project followed the issuance of a concept release in 1987 requesting public comment on, among other things, the adequacy of the existing MD&A requirements. In 1989, the Commission published Financial Reporting Release No. 36, which summarized the results of the project, included examples of disclosure and set forth the Commission's views regarding several disclosure matters under MD&A. The following excerpts from that release are presented to assist registrants in preparing MD&As. Registrants may wish to refer to the release for a discussion of the results of the project.

2. By deleting §§ 501.01 through 501.03, the first four paragraphs and first two sentences of the fifth paragraph of § 501.04.a, all of § 501.04.b and §§ 501.05.b through 501.05.f, and by redesignating amended § 501.04.a as § 501.03.b, § 501.05.a as § 501.08, and §§ 501.06 through 501.08 as §§ 501.09 through 501.11.

 **\*18**  3. By adding the following new Financial Reporting Codification sections consisting of sections from the release as indicated:

(a) Section 501.01. Evaluation of Disclosure—Interpretive Guidance, consisting of section III.A. of the release;

(b) Section 501.02. Prospective Information, consisting of section III.B. of the release;

(c) Section 501.03.a. Liquidity—Capital Resources, consisting of section III.C. of the release;

(d) Section 501.04. Material Changes, consisting of section III.D. of the release;

(e) Section 501.05. Interim Period Reporting, consisting of section III.E. of the release;

(f) Section 501.06. Other Observations (including subsections 501.06.a. Segment Analysis, 501.06.b. Participation in High Yield Financings, Highly Leveraged Transactions or Non-Investment Grade Loans and Investments, 501.06.c. Effects of Federal Financial Assistance Upon Operations, and 501.06.d, Preliminary Merger Negotiations), consisting of section III.F. of the release;

(g) Section 501.07. Conclusion, consisting of section IV of the release.

4. By revising the footnotes from the release which are included in the Codification and which contain the citation form "*supra,*" except footnote 35 of the release, to include the complete citation form rather than the "*supra*" form.

5. By renumbering the footnotes from the release which are included in the Codification, to run consecutively from number one through number forty.

6. By revising footnote 35 of the release (footnote 22 and renumbered), to cite *supra* to notes 4-17 rather than to notes 17-30.

The Codification is a separate publication of the Commission. It will not be published in the Federal Register/Code of Federal Regulations Systems.

**List of Subjects in Parts 211, 231, 241 and 271**

Reporting and recordkeeping requirements, Securities.

Parts 211, 231, 241 and 271 of Title 17, Chapter II of the Code of Federal Regulations are amended by adding this Release No. 33-6835, 34-26831, IC-16961 and FR-36 (May 18, 1989) to the lists of interpretive releases.

Jonathan G. Katz,
Secretary.

[FR Doc. 89-12422 Filed 5-23-89; 8:45 am]

BILLING CODE S010-01-M

## Footnotes

1    Securities Act Release No. 6711 (April 24, 1987) [52 FR 13715].

2    Securities Act Release No. 6231 (September 2, 1980) [45 FR 63630].

3    Securities Act Release No. 4936 (December 9, 1968) [33 FR 18617]; Securities Act Release No. 5520 (August 14, 1974) [39 FR 31894]. See also Securities Act Release No. 6711, *supra* n. 1, for a more detailed summary of the origins of the MD&A requirements.

4    17 CFR 229.303(a).

5    Securities Act Release No. 6349 (September 28, 1981), 23 SEC Docket 962 [not published in the Federal Register]; *see also* Securities Act Release No. 6791 (August 1, 1988) [53 FR 29226].

6    Arthur Andersen & Co.; Arthur Young; Coopers & Lybrand; Deloitte Haskins & Sells; Ernst & Whinney; Peal, Marwick, Mitchell & Co.; and Touche Ross & Co.

7    Securities Act Release No. 6711, supra n. 1. In the Concept Release, the Commission indicated that much of the business risk disclosure recommended in the Coopers & Lybrand proposal is required by current rules, although not necessarily by MD&A.

8    The comments are available for inspection and copying in the Commission's Public Reference Room at 450 5th Street, NW., Washington, DC [File No. S7-14-87].

9    The industries were: Miscellaneous Chemical Products; Retail-Grocery Stores; Airlines; Drugs; Real Estate Developers; Nursing Care Facilities/ Hospitals; Radio and Television Broadcasting/ Cable Television; Textile Mill Products/Knitting Mills; Computer Hardware; Building Contractors and Construction; Toys and Recreational Equipment; and Multi-segment Companies.

10   The most recent Form 10-K and subsequent reports filed under the Exchange Act were given full reviews and the prior 10-K and intervening reports, as well as proxy and registration statements filed during the period, were examined for background information.

11   Registrants received combinations of the above categories of comment. Many of the comment letters requested supplemental support for various presentations, and in several instances requests for amendments were revised to

futures comments during the review process. Conversely, several amendments were requested after staff consideration of supplemental responses provided by registrants. Compliance with futures comments is verified by staff review of subseqeunt filings.

The industries were: Banks; Savings and Loans; Meat Pruducts; Dairy Products; Miscellaneous Plastic Products; Furniture; Radio and Television Communication Equipment and Apparatus; Research and Measurement Instruments; Industrial Machinery; Computer Software; Eating Places; and Motion Picture-Television Production.

The industries are: Retail-Department Stores; Retail-Apparel Stores; Semiconductor and Related Devices; Crude Petroleum and Natural Gas; Railroads; Steel Works; Puper and Allied Products; Natural Gas Transmission; Lumber and Wood Products; Property-Casualty Insurance; Aircraft-Aircraft Engines; and Newspapers-Publishing and Printing.

The MD&A should contain a discussion of all the material impacts upon the registrant's financial condition or results of operations, including those arising from disclosure provided elsewhere in the filing.

Securities Act Release No. 6711, supra n. 1, at 13717.

Securities Act Release No. 6349, supra n. 5, at 964.

17 CFR 229.30(a)(1).

17 CFR 229.303(a)(2)(ii).

17 CFR 229.303(a)(3)(ii)

17 CFR 229.303(a), Instruction 3. The data known to management which may trigger required forward-looking disclosure is hereinafter referred to as ""known trends, demands, commitments, events or uncertainties."

Securities Act Release No. 6711, supra n. 1, at 13717 (emphasis added).

Rule 175(c) under the Securities Act of 1933 ("Securities Act"), 17 CFR 230.175(c), and Rule 3b-6(c) under the Exchange Act, 17 CFR 240.3b-6.

Cf. In re American Savings and Loan Association of Florida, Exchange Act Release No. 25788 [June 8,1968], 41 SEC Docket 78. In this administrative proceeding jointly conducted by the Commission and the Federal Home Loan Bank Board (the "FHLBB"), it was determined that the MD&As in a Form 10-K and two Forms 10-Q were inadequate under the FHLBB's disclosure requirements, which are substantially similar to the Commission's, for failing to disclose, among other matters, required forward-looking information regarding the potential exposure and risks associated with repurchase transactions between American Savings and Loan and E.S.M. Government Securities. Cf. also In re Burroughs Corporation, Exchange Act Release No. 21872 (March 20, 1965), 32 SEC Docket (CCH) 935 (failure to discuss the impact of inventory obsolescence); In re Marsh & McClennan Companies, Inc., Exchange Act Release No. 24023 (January 22, 1987), 37 SEC Docket (CCH) 634 (failure adequately to disclose, in a Form 10-K, the effects of a principal subsidiary's investing and financing activities).

The examples used herein, while modeled in large part upon Project registrants' original or revised MD&As, have been changed so that the registrants are not identified and particular points are emphasized. Of course, each example has been removed from its context as part of a larger document. The examples are provided for purposes of illustration only.

See Item 101(c)(1)(ii) of Regulation S-K.

See, e.g., In re Charter Company, Exchange Act Release No. 21647 (January 10, 1985), 32 SEC Docket (CCH) 289, in which the MD&A in the registrant's Form 10-K failed to disclose the favorable effect on earnings of the accounting method used, and the anticipated substantial reduction in future profits that would result from use of such method. Cf.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*SEC v. Baldwin-United Corporation.* Litigation Release No. 10678 (September 26, 1985) and *In re Robert S. Harrison,* Exchange Act Release No. 22466 (September 26, 1985), 34 SEC Docket (CCH) 141 (both involving a different means of accounting for the same insurance product as in *Charter*, and Baldwin-United Corporation's failure to disclose, in the MD&A of its Form 10-K, its failure to meet the earnings assumptions of the accounting model used, and internal estimates of insufficient taxable income to use tax benefits inherent in the earnings assumptions).

MD&A mandates disclosure of specified forward-looking information, and specifies its own standard for disclosure —*i.e.*, reasonably likely to have a material effect. This specific standard governs the circumstances in which Item 303 requires disclosure. The probability/magnitude test for materiality approved by the Supreme Court in *Basic, Inc., v. Levinson*, 108 S.Ct. 978 (1988), is inapposite to Item 303 disclosure.

Where a material change in a registrant's financial condition (such as a material increase or decrease in cash flows) or results of operations appears in a reporting period and the likelihood of such change was not discussed in prior reports, the Commission staff as part of its review of the current filing will inquire as to the circumstances existing at the time of the earlier filings to determine whether the registrant failed to discuss a known trend, demand, commitment, event or uncertainty as required by Item 303.

42 U.S.C. 9601, et seq. (1983 & Supp. 1988).

Designation as a PRP does not in and of itself trigger disclosure under Item 103 or Regulation S-K and Instruction 5 thereto, 17 CFR 229.103, regarding "Legal Proceedings," because PRP status alone does not provide knowledge that a governmental agency is contemplating a proceeding. Nonetheless, a registrant's particular circumstances, when coupled with PRP status, may provide that knowledge. While there are many ways a PRP can become subject to potential monetary sanctions, including triggering the stipulated penalty clause in a remedial agreement, the costs anticipated to be incurred under Superfund, pursuant to a remedial agreement entered into in the normal course of negotiation with the EPA, generally are not "sanctions" within either instruction 5 (B) or (C) to Item 103. Such remedial costs normally would constitute charges to income, or in some cases capital expenditures. The availability of insurance, indemnification or constribution may be relevant under Instruction 5 (A) or (B) in determining whether the criteria for disclosure have been met *Thomas A. Cole, Esq.*, (January 17, 1989).

Most registrants combine discussions of capital resources and liquidity as permitted by Item 303(a).

When viewed to encompass capital resources, the Commission's concept of liquidity is comparable to the Financial Accounting Standards Board's ("FASB") concept of financial flexibility or the ability of an enterprise to adjust its future cash flows to meet needs and opportunities, both expected and unexpected. Financial flexibility is broader than the FASB's concept of liquidity (defined as short-term nearness of assets and liabilities to cash) because it includes potential internal and external sources of cash not directly associated with items shown on the balance sheet.

Securities Act Release No. 6349, *supra* n. 5, at 972: see also Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises, ¶ 24a*

*See, e.g., In re Hiex Development USA, Inc.*, Exchange Act Release No. 26722 (April 13, 1989), 43 SEC Docket (CCH) 1041 (involving in part the registrant's failure to discuss in the MD&A of a Form 10, a material contractual commitment to purchase equipment from an affiliate over a ten year period).

*See, e.g., SEC v. The Charter Company,* Exchange Act Release No. 23350 (June 20, 1986), 35 SEC Docket (CCH) 1232, and *In re Roy M. Van Landingham and Wallace A. Patzke, Jr.,* Exchange Act Release No. 23349 (June 20, 1986), 35 SEC Docket (CCH) 1227, both involving Charter Company's liquidity disclosure concerning losses of trade credit demands by its banks for a series of materially restrictive loan covenants and discussions with Charter's banks regarding asset sales, dividend restrictions and operational changes.

In a filing which includes an independent accountant's report that is modified as a result of uncertainty about a registrant's continued existence, Section 607.02 of the Codification of Financial Reporting Policies requires ""appropriate and prominent disclosure of the registrant's financial difficulties and viable plans to overcome such difficulties."

34    Statement of Financial Accounting Standards No. 95, *Statement of Cash Flows*. While the new statement is required for annual financial statements for fiscal years ending after July 15, 1988, financial statements for prior years are not required to be restated, and interim financial statements in the initial year of application are not required to use the new statement. Such interim period statements must be restated when presented as comparative prior periods with future interim financial statements.

35    See 17 CFR 229.303(a), Instruction 3; supra n. 17-30 and accompanying text.

36    See SEC v. The E.F. Hutton Group, Inc., Exchange Act Release No. 22579 (October 29, 1985), 34 SEC Docket (CCH) 538, involving Hutton's failure to disclose that its bank overdrafting practices were the cause for material changes in interest income from year-to-year, and the risks and uncertainties associated with such practices.

Although Item 303(a)(3)(iii) speaks only to material increases, not decreases, in net sales or revenues, the Commission interprets Item 303(a)(3)(i) and Instruction 4 as seeking similar disclosure for material decreases in net sales or revenues.

37    17 CFR 229.303(a)(3)(i): see SEC v. Allegheny International, Inc., Litigation Release No. 11533 (September 9, 1987). 39 SEC Docket (CCH) 196 (failure to disclose a sale of realty that constituted an unusual and infrequent event which had a material impact on pre-tax income); see generally Accounting Principles Board Opinion No. 30.

38    17 CFR 229.303(b).

39    See, e.g., *In re American Express Company,* Exchange Act Release No. 23332 (June 17, 1986), 35 SEC Docket (CCH) 1163 (failure to discuss the impact, in several Forms 10-Q and a Form 10-K, of two reinsurance transactions by an insurance subsidiary which were treated by the registrant as materially increasing net income, but which lacked economic substance); *In re Michael R. Moury.* Exchange Act Release No. 23067 (March 26, 1986), 35 SEC Docket (CCH) 435 (the MD&A in a Form 10-Q was found deficient for its failure to disclose the effects on net income of the reversal of previously established reserves).

40    See *SEC v. Ronson Corporation.* Litigation Release No. 10093 (August 15, 1983). 28 SEC Docket (CCH) 841, where the MD&As in a Form 10-K and two Forms 10-Q were found to be inadequate in their failure to state that Ronson's largest customer had shut down its operations which required purchases from Ronson, that it was unlikely that this customer would resume purchases in the short term and that, due to technological changes being made at this customer's facilities, once purchases were resumed, an indefinite reduction in necessary purchases of 30-50% was likely.

41    Registrants affected by Statement of Financial Accounting Standards No. 94. *Consolidation of All Majority-Owned Subsidiaries,* which requires, among other things, consolidation of non-homogeneous subsidiaries, should recognize that segment analysis generally will be appropriate, inasmuch as the prior justification for not consolidating these operations was that they had different characteristics from those of the parent and its other affiliates. See id. at ¶ 55 (recognizing that although the aggregation, of assets, liabilities and operations from non-homogeneous activities may obscure important information about these activities, the disclosures required by Statement of Financial Accounting Standards No. 14. *Financial Reporting for Segments of a Business Enterprise*, can provide meaningful information about the different operations within a business enterprise).

42    On February 16, 1989 the Federal Reserve Board issued bank examination guidelines regarding highly leveraged transactions. Letter from William Taylor, Director. Division of Banking Supervision and Regulation, to the Officer in Charge of Supervision at each Federal Reserve Bank (February 16, 1989). The guidelines are intended to assist bank examiners in identifying exposures that may warrant closer scrutiny and are not intended to imply criticism of any particular transaction, nor to suggest what is deemed to be an appropriate degree of leverage in any particular industry.

In these guidelines, criteria to define a highly leveraged financing include identification of borrowers whose debt to total assets ratio exceeds 75%. Registrants may refer to this guidance or to other recognized criteria that may be developed in defining highly leveraged transactions. In any event, registrants should indicate how highly leveraged transactions are defined for disclosure purposes. In this regard, the Commission recognizes that leverage characteristics may vary from industry to industry, and that debt ratios that are appropriate for some industries may be unusually high or low in other industries. Similarly, the Commission does not intend to imply criticism of any particular transaction or to suggest an appropriate degree of leverage in any particular industry or for any particular firm.

43    *See, e.g.,* P. Asquith, D. Mullins, Jr., and E. Wolff, Original Issue High Yield Bonds: Aging Analyses of Defaults, Exchanges, and Calls [March, 1989).

44    Other related disclosure includes Schedule 1 of Rule 12-02 of Regulation S—X, 17 CFR 210.12-02, which requires separate disclosure for each particular issue of corporate securities carried on the balance sheet at greater than 2% of total assets, and allows reasonable groupings, *e.g.,* by similar investment risk, of all other securities. Also, for securities with significantly greater investment risk factors than are typical for that class of issuer, such as securities where interest is in default or the issuer is in bankruptcy, separate listing or grouping is required to be accompanied by a brief description of the relevant risk factors. Guide 3, Item III(c)(4) requires bank holding companies to disclose concentrations of loans exceeding 10% of total loans, and defines "concentration" to exist where a number of borrowers are engaged in similar activities that would cause them to be similarly impacted by economic or other conditions. Item II of Guide 3 instructs that consideration should be given to disclosure of the risk characteristics of securities held as investments. Savings and loan holding companies should provide similar disclosures pursuant to Staff Accounting Bulletin Topic 11:K. Insurance companies are also subject to similar requirements under Article 7 of Regulation S-X, Rule 7-03(a)(1), Notes 5-6, 17 CFR 210.7-03(a)(1).

45    *See* Guide 20 to Form N-1A.

46    *See* Guide 28 to Form N-1A.

47    For a related discussion of the accounting treatment and financial statement disclosure of federal assistance associated with regulatory-assisted acquisitions of banking and thrift institutions, see *EITF Abstracts,* Issue No. 88-19.

48    *See, e.g.,* Brief for the Securities and Exchange Commission as Amicus Curiae at 7 and note 3, *Basic, Inc. v. Levinson, supra* n. 27: *In the Matter of Carnation Company,* Exchange Act Release No. 22214 (July 8, 1985), 33 SEC Docket (CCH) 874.

49    *See Basic, Inc.* v. *Levinson, supra* n. 27, at 985 ("Arguments based on the premise that some disclosure would be 'premature' in a sense are more properly considered under the rubric of an issuer's duty to disclose. The 'secrecy' rationale is simply inapposite to the definition of materiality.").

50    *See, e.g.,* Securities Exchange Act Release No. 16384 (November 29, 1979) (44 FR 70326, 70336) (considering these conflicting interests in adopting Item 7 of Schedule 14D-9, 17 CFR 240.101, which requires that the subject company of a public tender offer provide two levels of disclosure: (a) a statement as to whether or not "any negotiation [which would result in certain transactions or fundamental changes] is being undertaken or is underway *** in response to the tender offer," which disclosure need not include "the possible terms of the transaction or the parties thereto" if in the registrant's view such disclosure would jeopardize the negotiations; and (b) a description of "any transaction, board resolution, agreement in principle, or a signed contract" relating to such transactions or changes).

51    Item 2 of Form 8-K, 17 CFR 249.308. *See also* Item 8 of Form 10-K, 17 CFR 249.310 (excluding pro forma financial information otherwise called for by Article 11 of Regulation S-X from the financial information required); Item 1 of Form 10-Q. 17 CFR 249.308a, and Rule 10-01 of Regulation S-X, 17 CFR 210.10-01.

With respect to the disposal of a segment of a business, however, Accounting Principles Board Opinion 30 requires that results of operations of the segment be reclassified as discontinued operations, and any estimated loss on disposal be recorded, as of the date management commits itself to a formal plan to dispose of the segment (*i.e.*, the "measurement date"). Filings, including periodic reports under the Exchange Act that contain annual or interim financial statements are required to reflect the prescribed accounting treatment as of the measurement date.

52    Article 11 of Regulation S-X, 17 CFR 210.11-01 *et seq.* (generally requiring the provision of pro forma financial information where a significant acquisition or disposition "has occurred or is probable"). Entry into the continuous reporting system by registration under the Exchange Act also requires the provision of such pro forma financial information. Item 13 of Form 10, 17 CFR 249.210, *See also* Item 14 of Schedule 14A, 17 CFR 240.14a-101 (requiring Article 11 pro forma financial information and extensive other information about certain extraordinary transactions if shareholder action is to be taken with respect to such a transaction).

53    Item 504 of Regulation S-K. 17 CFR 229.504. Instruction 6.

Release No. 6835 (S.E.C. Release No.), Release No. 16961, Release No. 26831, Release No. 33-6835, Release No. 34-26831, Release No. IC - 16961, 43 S.E.C. Docket 1330, 1989 WL 1092885

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.