**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORIN CARPENTER and VICKI RILEY-FISCHER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> OSCAR HEALTH, INC., MARIO SCHLOSSER, SIDDHARTHA SANKARAN, ARI FISCHEL, JEFFERY H. BOYD, JOEL CUTLER, JOSHUA KUSHNER, TERI LIST, CHARLES E. PHILLIPS, JR., DAVID PLOUFFE, ELBERT O. ROBINSON, JR., VANESSA A. WITTMAN, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, WELLS FARGO SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, LIONTREE ADVISORS LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO., LLC, <br><br> Defendants. | Case No. 1:22-cv-03885 (VSB) (VF) <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ................................................................... 3

    A.    Oscar, A Health Insurance Company, Touts Its Access To Immediate And Accurate Claims Data................................................................................................................. 3

    B.    The Company's Success Is Measured By Its Medical Loss Ratio......................... 4

    C.    Failure To Provide Accurate Data Regarding Insurance Enrollees To Governmental Regulators Can Result In Negative Financial Ramifications For A Company ...... 4

    D.    The Company Sells $1.3 Billion Of Stock In Its IPO Without Disclosing That It Failed To Maintain Adequate Controls To Ensure The Integrity Of Premium Data Submitted To CMS For The RADV Audit ........................................................... 6

    E.    The Company Reveals That It Had Failed To Maintain Adequate Controls To Ensure The Integrity Of The Premium Data Submitted To CMS And That Relatedly It Lacked Effective Information Technology Controls........................................... 7

III.   ARGUMENT............................................................................................................... 9

    A.    The Securities Act Places A Minimal Burden On Plaintiffs.................................. 9

        1.    Notice Pleading Applies To The Claims At Issue .................................... 9

        2.    The Complaint Does Not Sound In Fraud ................................................. 9

        3.    There Is No Section 11 Scienter Requirement........................................ 11

    B.    The Complaint States A Claim For Securities Act Violations ............................ 12

        1.    The Registration Statement Contained Untrue Statements Of Fact And Omitted Material Facts Necessary To Make The Statements Not Misleading............................................................................................... 12

        2.    Defendants Did Not Fully Disclose The Internal Control Issues In Their Registration Statement ............................................................................ 16

        3.    The Lack Of Adequate Controls And Systems To Ensure The Integrity Of The Premium Data Submitted To Regulatory Authorities For The RADV Audit Was Material To Investors........................................................... 18

        4.    Defendants Violated Items 105 And 303 Of Regulation S-K.................. 21

        5.    The Underwriter Defendants Are Liable For Violations Of Section 11... 24

C.      The Complaint Alleges Violations Of Section 15 ................................................ 25

IV.    CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 15, 18

*Avalon Holdings Corp. v. Gentil*e,
  2019 WL 4640206 (S.D.N.Y. Sept. 24, 2019) ............................................................ 15

*Caiafa v. Sea Containers Ltd.*,
  2008 WL 11516813 (S.D.N.Y. May 15, 2008) ............................................................ 12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ........................................................................................ 11

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) .......................................................................... 22

*Das v. Rio Tinto PLC,*
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) .......................................................................... 13

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................... 10, 21

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ........................................................................................ 19

*Gordon v. Tencent Music Ent. Grp.*,
  2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021) ............................................................ 11

*Gray v. Alpha & Omega Semiconductor Ltd.*,
  2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021) ............................................................ 20

*Gutman v. Lizhi Inc.*,
  2022 WL 4646471 (E.D.N.Y. Oct 1, 2022) ................................................................ 22

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ........................................................................................ 18

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) .......................................................................... 23

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...................................................................................................... 9

*In re American Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................................... 13, 25

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................ 13

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015).......................................................................... 19

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   616 F. Supp. 3d 192 (E.D.N.Y. 2022) ....................................................................... 12

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................ 21

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................. 16, 23

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)................................................................ 9, 11, 12

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)........................................................................ 11

*In re Kidder Peabody Sec. Litig.*,
   10 F. Supp. 2d 398 (S.D.N.Y. 1998)..................................................................... 18, 19

*In re Lehman Bros. Sec. & Erisa Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)........................................................................ 13

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................ 13

*In re OSG Sec. Litig.*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013)................................................................... 10, 11

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).................................................................... 2, 18

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................... 11, 12

*In re TVIX Sec. Litig.*,
   25 F. Supp. 3d 444 (S.D.N.Y. 2014).......................................................................... 15

*L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
    517 F. Supp. 3d 196 (S.D.N.Y. 2021)................................................................. 17

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)................................................................ 9, 11, 18, 19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015).............................................................................. 25

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).......................................................................................... 12

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)........................................................................ 13, 17

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    2022 WL 17815767 (2d Cir. Dec. 20, 2022) ........................................ 10, 13, 17, 24

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013)............................................................................... 9

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x. 10 (2d Cir. 2011) ........................................................................ 19

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................... 12, 16

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)........................................................................ 11, 22

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020).................................................. 21, 22

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................... 10, 11, 16

*Solow v. Citigroup, Inc.*,
    827 F. Supp. 2d 280 (S.D.N.Y. 2011).................................................................. 9

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)................................................................................ 24

*Swanson v. Interface, Inc.*,
    2022 WL 2003990 (E.D.N.Y. June 6, 2022) ....................................................... 19

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ............................................................................................. 18

*Wallace v. IntraLinks*,
   2013 WL 1907685 (S.D.N.Y. May 8, 2013) ......................................................... 10

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .......................................................... 2

*Y-Gar Cap. LLC v. Credit Suisse Grp. AG,*
   2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ............................................................. 21

STATUTES

15 U.S.C. § 77k ...................................................................................................... 12

15 U.S.C. § 77k(a) .................................................................................................... 9

RULES

Fed. R. Civ. P. 9(b) ............................................................................................ 10, 11

Fed. R. Civ. P. 15(a) ............................................................................................... 25

REGULATIONS

17 C.F.R. § 229.105 ................................................................................................ 21

Court-appointed Lead Plaintiff Vicki Riley-Fischer and additional plaintiff Lorin Carpenter (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to the Oscar Defendants' motions to dismiss and the Underwriter Defendants' joinder thereto.[1]

## I.    PRELIMINARY STATEMENT

The Complaint alleges a well-pled and straightforward claim under Sections 11 and 15 of the Securities Act of 1933.  Specifically, Plaintiffs allege that Oscar Health, Inc. ("Oscar" or the "Company") omitted material facts from its registration statement and prospectus (collectively, the "Registration Statement"), issued in connection with the Company's $1.3 billion initial public offering (the "IPO").  These material facts, which existed at the time the Registration Statement and were obligated to be disclosed, include that the Company had failed to maintain adequate controls and systems to ensure the integrity of the premium data submitted to regulatory authorities and that, as a result, there was a material risk that the Centers for Medicare & Medicaid Services ("CMS") would impose a financial adjustment following the audit for the 2019 benefit year.

As the Complaint explains, prior to the IPO, Oscar had submitted premium data to CMS as part of a mandatory audit procedure for the 2019 benefit year.  Then, after raising $1.3 billion in the IPO, the Company was forced to concede that it lacked appropriate systems to ensure accurate premium data was supplied to CMS and that it would be making changes, or "enhancements," to ensure accurate premium data was able to be supplied to CMS going forward.

---

[1] Unless otherwise specified, all capitalized terms have the definitions assigned in Plaintiffs' Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") (Dkt. No. 72), all emphasis in quotations is added, and all internal quotation marks and citations are omitted. All citations to "¶__" are to paragraphs of the Complaint. Citations to "Def. Br" refers to the Memorandum of Law in Support of the Oscar Defendants' Motion to Dismiss. Dkt. No. 80. The Underwriter Defendants joined with the Oscar Defendants' motion and memorandum in support thereof.  Dkt. No. 82.  As such, Plaintiffs refer to arguments made by the Oscar Defendants as made by Defendants.

Just months later, as part of its Annual Report, the Company admitted that it had a material weakness in internal control over its financial reporting related to information systems.[2]

Faced with Plaintiffs' sufficient allegations, Defendants resort to making a series of specious arguments. For example, they claim that it is somehow improper that Plaintiffs rely on admissions of Oscar's executives, including certain defendants, because they occurred after the IPO. This is nonsense. Of course, admissions from Oscar employees about the situation that existed before the IPO is relevant and can support Plaintiffs' claims. *See Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*1 (S.D.N.Y. Mar. 2, 2017) (finding that admission by corporate executive at end of Class Period that "the detailed engineering work was not there" supported finding that the initial cost estimate at the beginning of the class period was actionable).

Likewise, Defendants claim that the Registration Statement disclosed the risks at issue. But the risk warnings contained therein did not actually disclose to investors that the Company had then-existing internal controls issues. Instead, they just warned of generic audit and regulatory risks, and spoke of hypothetical risks whereas the internal controls issues and risks therefrom had already occurred. Defendants also claim that the internal control deficiencies did not need to be disclosed in the Registration Statement because they were immaterial. Even ignoring "[m]ateriality is a mixed question of law and fact and is rarely a basis for dismissal on the pleadings,"[3] the facts that the expense related to the undisclosed risk constituted 3% of Oscar's Medical Loss Ratio for the relevant quarter, the importance of the lack of internal controls to the Company's business and the market, and the Company's stock declined upon disclosure all support

---

[2] While this weakness was uncovered after the IPO, there is nothing on the record to indicate that this weakness did not exist prior to the IPO. The most logical inference is that it did exist but the Company was only forced to disclose it in its first annual report as a public company following its concession that it lacked controls for the premium data.

[3] *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015).

a finding of materiality here.

In sum, viewing the allegations in a light most favorable to Plaintiffs (as the Court must), the Complaint sufficiently alleges material omissions in the Registration Statement. That is enough to clear the low bar of pleading a Section 11 claim. The Court should deny the Motion to Dismiss in full.

## II.     STATEMENT OF RELEVANT FACTS

### A.     Oscar, A Health Insurance Company, Touts Its Access To Immediate And Accurate Claims Data

Oscar is a health insurance company that provides health insurance policies to business-employers and individuals, to the latter through both Medicare Advantage programs and through healthcare exchanges created under the 2010 Affordable Care Act ("ACA"), formally known as the Patient Protection and Affordable Care Act. ¶¶2, 37. Oscar differentiates itself as the "*first health insurance company built around a full stack technology platform*," whereby the Company offers conventional health insurance plans with a focus on using technology-driven customer interfaces, a full-service smartphone app, telemedicine, and online claims processing. ¶38.

In the Registration Statement, Oscar boasted that its "*full stack technology platform…allow[s] [Oscar]… to innovate like a technology company* and not a traditional insurer…" and that Oscar "*use[s] the tools and mindset of a* consumer *technology company* to solve problems in health care." ¶39. For example, on the August 12, 2021 earnings call, Defendant Schlosser explained in response to a question from an analyst about "the tech stack and [Oscar's] claims of visibility" that "*all the stuff [data] is readily available to []my fingertips*, I mean if I care to *look at it*, and obviously*, I do quite a bit.*" *Id.* Schlosser further explained that "*these numbers that we can pull up even by the minute* basically . . . . Even *on the claims side*, we generally think *we've got really good visibility there*, because it's obviously also a single source

3

of truth, which means the claim comes in, and *we can see it right away*." *Id.* CFO Blackley[4] even further explained that "And I'll just comment that if you were here with me, you would see that Mario [Schlosser] literally pulled up the dashboards and *was giving that answer using real-time data*. It's really one of the most amazing parts of this company that I've seen since I've joined." *Id.*

**B.      The Company's Success Is Measured By Its Medical Loss Ratio**

Medical Loss Ratio ("MLR") is a metric that measures the portion of an insurer's income spent on paying patients' claims. ¶40.  According to the Registration Statement, Oscar's MLR is the quotient of the net claims before ceded quota share reinsurance and the net premiums before ceded quota share reinsurance.  *Id.*

Many states and the ACA have established a minimum MLR to limit the amount of premium dollars that insurers can keep for administration, marketing and profits. ¶41. These requirements were established in response to concerns that "[m]any insurance companies spend a substantial portion of consumers' premium dollars on administrative costs and profits, including executive salaries, overhead, and marketing." *Id.*  Accordingly, the ACA established federal MLR minimums wherein health insurance issuers like Oscar are required to provide an annual rebate to enrollees if the issuer's MLR fails to meet these minimums.  *Id.*

**C.      Failure To Provide Accurate Data Regarding Insurance Enrollees To Governmental Regulators Can Result In Negative Financial Ramifications For A Company**

Under the ACA, insurers cannot deny coverage or charge higher premiums on the basis of health status.  ¶45.  There was a concern that this would lead to "risk selection," whereby insurers are incentivized to avoid enrolling those who require costly medical care and instead attracting

---

[4] Blackley became CFO within weeks of the IPO. ¶39.

healthier consumers, which would "make the market less efficient." *Id.*

To protect against this and a related concern that those most in need of healthcare are more likely to purchase insurance, thereby increasing premiums, the law implemented several risk mitigation strategies, including the risk adjustment program. *Id.* The risk adjustment program "compensate[s] health insurance plans for differences in enrollee health mix so that plan premiums reflect differences in scope of coverage and other plan factors, but not the difference in health status." ¶46. In other words, the risk adjustment program helps spread healthcare costs such that plans that end up with healthier populations compensate plans that have more costly enrollees (*i.e.,* plans with low actuarial risk compensate those with high actuarial risk). *Id.*

The risk adjustment program is effectuated via risk adjustment data validation ("RADV") audits performed by the U.S. Centers for Medicare and Medicaid Services ("CMS") and the Office of the Inspector General for the U.S. Department of Health and Human Services ("OIG"). ¶47. After assessing each individual's relative risk based on their demographics and diagnoses, the operative model "averages all individual risk scores in risk adjustment covered plans and uses the plan average risk scores combined with other factors [] to calculate the funds transferred between plans." *Id.* Transfers are intended to bridge the gap between the estimated premium with risk selection and the estimated premium without risk selection. *Id.*

For each benefit year, the issuer of a covered plan submits data regarding enrollees' individual risk scores to HHS through a dedicated data environment, i.e. an EDGE server. ¶48. "To ensure accurate reporting, the U.S. Department of Health and Human Services ("***HHS")*** *recommends that insurers first validate their data through an independent audit and then submit the data to HHS for a second audit*." *Id.* If there are any errors found through these audits, the insurer's payments will be retrospectively adjusted. *Id.*

The submission of incorrect claims data would not impact others in the risk pools but would result in the understatement of an issuer's plan average risk score. ¶49. But an error in premium data submitted by an issuer would distort the risk adjustment analysis for all issuers in the risk pool since some issuers would receive less payment than they otherwise are entitled to, which would make the marketplace inefficient. ¶50. To safeguard against this result, CMS disincentivized issuers from submitting incorrect data: if an issuer submitted incorrect claims data CMS would merely prevent the issuer from submitting supplementary data (¶49) but if incorrect *premium* data was submitted, CMS would negatively adjust that issuer's transfer amount to balance the risk pool. ¶50. This negative adjustment would be in the form of an increased risk adjustment charge or reduced risk adjustment payment, depending on the remainder of the analysis. *Id.*

As such, the result from the RADV audit would be an increase in net premiums (if there was a payment) or reduce net premiums (if there was a charge/expense). ¶51. Accordingly, reducing the net premiums for a given period will affect the denominator of the MLR, thereby increasing the MLR for that period. *Id.*

**D.    The Company Sells $1.3 Billion Of Stock In Its IPO Without Disclosing That It Failed To Maintain Adequate Controls To Ensure The Integrity Of Premium Data Submitted To CMS For The RADV Audit**

On March 2, 2021, the Company's Registration Statement on Form S-1 related to its IPO was declared effective and the Company's Class A common stock began trading on the NYSE on March 3, 2021. ¶52. Nowhere did the Registration Statement disclose that the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would impose a financial adjustment following its RADV audit for the 2019 benefit year. However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration

6

Statement but were negligently omitted.  *Id.*

The Company's IPO was a tremendous success with it receiving net proceeds of $1.3 billion after deducting underwriting discounts and commissions of $71.0 million.  *Id.*

### E.    The Company Reveals That It Had Failed To Maintain Adequate Controls To Ensure The Integrity Of The Premium Data Submitted To CMS And That Relatedly It Lacked Effective Information Technology Controls

On November 10, 2021, Oscar disclosed that its third quarter 2021 MLR increased 920 basis point year-over-year, to 99.7%.  ¶53.  The Company claimed that the MLR increase was "*primarily driven by* higher net COVID costs as compared to the net benefit in 3Q20, *an unfavorable prior year Risk Adjustment Data Validation (RADV) result*, and the impact of significant SEP membership growth." *Id.*  As the Company further explained "The InsuranceCo Administrative Expense Ratio increased by 70 bps YoY, *largely driven by the impact of the RADV on the denominator* as well as higher SEP distribution costs." *Id.*

On the same day, November 10, 2021, the Company held a conference call with analysts and investors to present Oscar's 2021 fiscal second quarter 2021 results.  *Id.*  On the call, Defendant Schlosser reiterated that the increase in MLR was in part the result of the adverse RADV audit results. As he explained, "Our consolidated *Medical Loss Ratio* for the quarter was 99.7%. This is *clearly higher than anticipated, driven in part by* net core utilization that was higher than expected, by higher-than-expected special enrollment growth and by some *adverse risk adjustment audit results*." ¶54. On that same call, the CFO Blackley further explained that the Company recognized approximately $20 million of risk adjustment expense this quarter related to the RADV audit and that as a result, they had "made further enhancements" to the Company's "risk adjustment process in 2021." ¶55. As a result of these changes, or "enhancements," Blackley stated that they did not believe that there would be this same issue, or "headwind" with the 2021 RADV audit. As Blackley explained:

Turning to risk adjustment. ***We recognized approximately $20 million of risk adjustment expense this quarter related to our risk adjustment data validation audit or RADV results***. The RADV exercise is atypical this year due to COVID. It spans two years, 2019 and 2020. ***The majority of the RADV headwinds relate to the 2019 audit results, which were recently completed***. We're seeing a marked improvement in 2020 audit results. And thus far, we've seen better results in 2020— excuse me, and ***we have made further enhancements in our risk adjustment process in 2021***. As such, we expect this is a headwind for the quarter, but not going forward.

* * *

***The second item impacting the MLR was the adverse risk adjustment data validation results, which drove approximately 300 basis points of MLR impact on a year-over-year basis***. As I mentioned, this is a headwind in the quarter, but it's not impacting our baseline.

¶55.  That Oscar provided incorrect premium data to CMS is confirmed by the monetary penalty imposed by CMS and the changes, or "enhancements," implemented to ensure that the systems were in place to supply accurate premium data to CMS.  ¶56.  Following these disclosures, Oscar's share price fell $4.05 per share, or 24.5%, to close at 12.47 per share on November 11, 2021. ¶57.

Thereafter, on February 25, 2022, the Company admitted that it had a material weakness in internal control over its financial reporting related to information systems:

> We did not design and maintain effective controls over certain information technology ("IT") general controls for information systems that are relevant to the preparation of our financial statements. Specifically, we did not design and maintain (i) program change management controls for certain financial systems to ensure that IT program and data changes affecting certain IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately, (ii) user access controls that adequately restrict user and privileged access to certain financial applications, programs and data to appropriate company personnel, and (iii) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

¶58.[5]

---

[5]While the Company claimed that these deficiencies did not result in a material misstatement to its financial statement, it admitted that "management has determined these deficiencies in the aggregate constitute a material weakness." ¶59.

8

### III.   ARGUMENT

#### A.   The Securities Act Places A Minimal Burden On Plaintiffs

##### 1.   Notice Pleading Applies To The Claims At Issue

To adequately plead a Section 11 claim, Plaintiffs "must allege that (1) Defendant is an individual specified by the statute; (2) Plaintiff purchased the registered securities; and (3) the registration statement for the offering contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 (S.D.N.Y. 2009) (citing 15 U.S.C. § 77k(a)); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case."). Accordingly, "Section 11 places a relatively minimal burden on a plaintiff." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). In fact, only "notice pleading" is required, i.e., "the 'short and plain statement' requirements" of Rule 8, unless a claim sounds in fraud. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013); *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011).

##### 2.   The Complaint Does Not Sound In Fraud

Defendants claim that "the gravamen" of Plaintiffs' claims sound in fraud and that as such, Rule 9(b)'s particularity requirement applies. Def. Br. at 12-13. This is simply untrue.

The Complaint expressly disavows any fraud-based claims. ¶¶69, 86, 95.[6] And the language cited from the Complaint that Defendants argue demonstrate that the claims are fraud

---

[6] Plaintiffs' counsel's scrivener's error in ¶9 referencing "fraud" in the venue section does not overcome these express disavowals.

based[7] "simply track[s] the language of Section 11," which indicates that it "do[es] not sound in fraud." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017); *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405 (S.D.N.Y. 2013) ("[U]nless a plaintiff specifically pleads a claim of fraud, a claim under Section 11 of the Securities Act is not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Rather, it is subject to the 'short and plain statement' requirements of Rule 8(a), and thus places a relatively minimal burden on a plaintiff."). As such, "[t]he majority of well-reasoned cases have rightly rejected this argument." *comScore, Inc.*, 268 F. Supp. 3d at 559 ("to hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach*, that claims under Section 11 need not sound in fraud ….") (citing *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004)).

Furthermore, contrary to Defendants' contentions, Plaintiffs' allegations regarding Defendants' "knowledge" of the facts that were not disclosed in the Registration Statement in no way alters the appropriate pleading standard. Def. Br. at 12-13. Plaintiffs assert multiple bases for a legal duty to disclose that the Company lacked effective controls over its information technology controls, including Item 303, which requires pleading a "known trends or uncertainties." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *2 (2d Cir. Dec. 20, 2022) ("[t]he failure to make a material disclosure required by Item 303 can serve as the basis for claims under Section[] 11"). But, contrary to Defendants' contention, that required allegation of knowledge does not necessarily imply fraud. *Wallace v. IntraLinks*, 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013) ("[T]he allegations that [the defendant] failed to disclose a known uncertainty supports the claim of Section 11 and 12(a)(2) liability pursuant to

---

[7] *See* Def. Br. at 13.

Regulation S–K, which plaintiffs are able to allege without requiring the application of Rule 9(b).").[8]  In fact, courts have repeatedly applied Rule 8 to Securities Act claims alleging an Item 303 violation because an issuer could negligently fail to disclose a known trend.  *Litwin*, 634 F.3d at 716-17; *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  As such, Plaintiffs' allegations of knowledge are consistent with strict liability or negligence. *See, e.g.*, *Fuwei Films*, 634 F. Supp. 2d at 437 (Rule 9(b) inapplicable to allegations defendants reviewed and signed the registration statement and failed to conduct proper due diligence); *OSG*, 971 F. Supp. 406 ("Plaintiffs' assertion that ... Defendants knew or should have known … does not constitute an allegation of fraud, but rather of negligence.").

### 3.       There Is No Section 11 Scienter Requirement

Defendants argue that if the Complaint sounds in fraud (it does not), this not only triggers Rule 9(b)'s particularity requirement, but also means that Plaintiffs must satisfy a scienter requirement, even though none exists in the statute.  Def. Br. at 12-13.  This has been resoundingly rejected by courts.  While "[c]laims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), [] that Rule does not add substantive elements such as scienter to any claim." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). "[A] plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2)" when subject to Rule 9(b). *Rombach*, 355 F.3d at 171; *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014) (even where Rule 9(b) applied to §11 claim, scienter need not be plead); *In re*

---

[8] In fact, even cases that have both Securities Act and Exchange Act allegations, which actually require scienter, such as Defendants' own cited authority *Gordon v. Tencent Music Ent. Grp.*, have found that the "§ 11 claim is not subject to the Rule 9(b) pleading standard, so long as 'each portion [is] sufficient to stand alone for its respective pleading purposes.'" 2021 WL 9183821, at *3 (E.D.N.Y. Mar. 31, 2021).

*HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 (S.D.N.Y. 2021) (declining to test Securities Act claims for scienter despite finding they sounded in fraud); *Fuwei Films*, 634 F. Supp. 2d at 434 (same).[9]  As the Supreme Court has explained, a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).

### B.      The Complaint States A Claim For Securities Act Violations

To state a *prima facie* claim under § 11, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; or (3) omitted a material fact necessary to make the statements made not misleading. 15 U.S.C. § 77k; *Omnicare*, 575 U.S. at 179.[10]  A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the 'total mix' of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011).

### 1.      The Registration Statement Contained Untrue Statements Of Fact And Omitted Material Facts Necessary To Make The Statements Not Misleading

The Company has admitted that it provided incorrect premium data to CMS.  ¶56.  The Company has further conceded that it lacked appropriate systems to ensure accurate premium data was able to be supplied to CMS.  *Id.*  This is even further confirmed by the changes, or

---

[9] Defendants' citations to cases that required scienter are inapposite because they involved situations where there were both fraud and negligence claims alleged based on the same conduct. *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 203 (E.D.N.Y. 2022) ("the theory underlying plaintiffs' Securities Act and Exchange Act claims is the same, and therefore the Securities Act claims against the Chembio defendants sound in fraud."); *Caiafa v. Sea Containers Ltd.*, 2008 WL 11516813, at *5 (S.D.N.Y. May 15, 2008) (similar).

[10] A plaintiff bringing claims under Section 11 need not plead scienter, reliance, or causation. *Sanofi*, 816 F.3d at 209.

"enhancements," that Blackley mentioned to ensure that the systems were in place to ensure accurate premium data was able to be supplied to CMS. *Id.* Moreover, the Company admitted that it had a material weakness in internal control over its financial reporting related to information systems. ¶58. These admissions provide sufficient support for the Complaint's allegations that Defendants violated their disclosure obligations in the Registration Statement by failing to disclose that the Company failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would impose a financial adjustment following its RADV audit for the 2019 benefit year. *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig*., 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (finding actionable statements of company's confidence in internal controls); *In re Lehman Bros. Sec. & Erisa Litig.,* 799 F. Supp. 2d 258, 285 (S.D.N.Y. 2011) (finding actionable statements of company's confidence in risk controls); *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig*., 763 F. Supp. 2d 423, 494 (S.D.N.Y. 2011) (same); *In re American Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010) (same).[11]

Defendants' statements in its Registration Statement touting its internal controls triggered a duty to disclose since "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co*., 761 F.3d 245, 250 & n.3 (2d Cir. 2014). *Moab Partners*, 2022 WL 17815767, at *4 ("Having chosen to speak ..., Defendants had a duty to speak accurately, giving all material facts ... to permit investors to evaluate the potential risks."). Thus,

---

[11] Defendants' support is inapposite. *See* Def. Br. at 4 ("The mere fact an annual, routine audit results in an unfavorable outcome 'is not necessarily the result of faulty internal controls[.]' (quoting *Das v. Rio Tinto PLC,* 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018)). *Das*, however, involved an unlawful payment by defendants that the Court found did not implicate internal controls. 332 F. Supp. 3d 786 at 812. Here, the Company has acknowledged that it had internal control issues related to its premium data that it lacked appropriate systems to ensure accurate premium data was able to be supplied to CMS. *See* Section II.E, *supra*.

when Defendants represented Oscar "***perform[s] ongoing monitoring of our compliance with CMS risk adjustment requirements*** and other applicable laws" (¶71), and "***refines its estimates as new information becomes available***"[12] as part of its risk adjustment process (¶73), they were required to speak fully and completely on the subject, disclosing the lack of adequate controls over the integrity of the data it submitted to the regulatory authorities for the RADV audit.

Faced with these well-pled claims, Defendants resort to a series of specious arguments. First, the Complaint is clear that Plaintiffs are alleging that the statements in the Registration Statement were misleading due to their omissions regarding Oscar's internal control issues and the related material risks. ¶¶72, 74. As such, Defendants' attempt to claim that there is no falsity because Plaintiffs do not allege specific facts contradicting the literal truth about the Company's statements regarding compliance with CMS requirements and the refining of estimates in the Registration Statement is irrelevant. Def. Br. at 13.

Second, Defendants claim that Plaintiffs "summarily allege" that "Oscar must have 'failed to maintain adequate controls" solely on the fact that Oscar incurred the $20 million adjustment following the RADV audit and that Plaintiffs do not plead "how or why statements about Oscar's internal controls were false or misleading." *See* Def. Br. at 14-15. This is simply untrue. Defendants admitted that they had a lack of internal controls that they had to "enhance" to ensure compliance with future risk adjustment processes and that the negative result of the RADV audit was partly "operational about how we got the data together to execute the audit." ¶56; *see* Section II.E, *supra*.[13] Defendants now try to walk back their admissions, claiming that more information

---

[12] Information which "is readily available to []my fingertips" (¶39), resulting in "really good visibility." ¶39.

[13] Since Defendants' cited cases did not involve admissions of inadequate internal controls, as is the case here, they are not applicable. *Cf*. Def. Br. at 14.

14

is required to be alleged,[14] but on a motion to dismiss, Plaintiffs' well-pled allegations must be accepted as true. *Avalon Holdings Corp. v. Gentile*, 2019 WL 4640206, at \*5 (S.D.N.Y. Sept. 24, 2019) ("In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Third, Defendants falsely claim that Plaintiffs are requiring the Company to "accurately predict[] the future results of an audit that is still ongoing" which "is unreasonable and not the law." Def. Br. at 16. Plaintiffs do not expect "clairvoyance" and nowhere does the Complaint allege that the Registration Statement was false for failing to predict the negative RADV audit.[15] Instead, the Complaint alleges "Oscar failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit and that, as a result, there was a material risk that CMS would a impose a financial adjustment following its RADV audit for the 2019 benefit year." *See, e.g.*, ¶72. While Defendants try to claim that a "material risk" to a company is akin to a prediction that is simply not the case. Regardless, the first part of the sentence regarding Oscar's failure "to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit" in no way has a future or predictive aspect to it.

---

[14] Defendants claim that the negative RADV result could have been caused by a variety of reasons not related to their lack of internal controls. Def. Br. at 15. But these other hypothetical reasons are not what Defendants admitted to and, as such, are irrelevant. Moreover, Defendants use of CMS documents that were not referenced in the Complaint to create their own purported justification of their conduct is improper. *See* Def. Br. at 9-10 (Section entitled "Regulatory Changes and a Global Pandemic Trigger Particular Uncertainty for the 2019 RADV Audit").

[15] As such, Defendants' citation (Def. Br. at 1, 16) to *In re TVIX Sec. Litig.* is off-base. 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014) ("The Class Plaintiffs' contentions that Defendants knew at the time of their issuance that TVIX ETNs would become worthless in two years and that this knowledge should have been disclosed to investors are similarly unavailing").

15

Fourth, Defendants' attempt to obfuscate the causal connection between the deficient internal controls and the incorrect premium data falls short. By Defendants' own admission, the incorrect premium data was the result of deficiencies in the Company's controls. Specifically, concurrent with the disclosure of the $20 million risk adjustment expense, Blackley stated that Oscar has "made further enhancements in [its] risk adjustment process in 2021" and has seen better results. ¶55. This all but confirms that the risk adjustment result was well within Oscar's control, and not attributable to one of several third party reasons that Defendants offer. Def. Br. at 15.

### 2. Defendants Did Not Fully Disclose The Internal Control Issues In Their Registration Statement

Defendants argue that Plaintiffs' claims are barred because the Registration Statement disclosed that "no independent accounting firm had attested to the effectiveness of its internal controls over financial reporting" and "we believe our compliance efforts and relationships with providers and other third parties comply with applicable laws, we may be subject to audits … by government agencies." Def. Br. at 18.[16] But these risk warnings do not provide protection as they did not actually disclose to investors that the Company had then-existing internal control issues. *See, e.g.*, *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized. The warnings only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred."); s*ee also Rombach*, 355 F.3d at 173 ("Cautionary words about

---

[16] Plaintiffs do not contest that Oscar may be subject to audits. In fact, the Complaint acknowledges throughout out that Oscar would be subject to the RADV audit. Regardless, whether they believed their compliance efforts complied with applicable laws is not relevant because opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Omnicare*, 575 U.S. at 189.

future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Moreover, these disclosures are generic and do not even address the internal control problems at issue here.    For example, all insurance companies are subject to potential governmental audit risks.    But Oscar had existing internal controls issues that led to undisclosed risks from already submitted data to the government.    As such, the generic nature of Oscar's purported disclosure of risks does not shield it.    *See, e.g.*, *Moab Partners*, 2022 WL 17815767, at *4 ("omissions are not cured by disclosures MIC did make … which did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks"); *Jinkosolar*, 761 F.3d at 251 (generic warnings about financial risks from environmental regulations were rendered misleading by failure to disclose "then-ongoing and serious pollution violations"); *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 210 (S.D.N.Y. 2021) ("Under [Item 105], risk disclosures are actionable 'half-truths' when a company discloses a risk that could have an impact on its business when, in fact, that risk has already materialized.").

In their section about fully disclosing the risks, Defendants further claim that there are "no facts pled that these weaknesses existed at the time of the March 2021."    Def. Br. at 18.    This argument ignores the allegations of the Complaint.    As the Complaint alleges, the control issues involved premium data for 2019 and 2020.    *See, e.g.*, ¶55.    And as the Company further admitted, it had real time access to such data.    ¶55.    As such, the lack of control issues necessarily existed at the time it was collecting the premium data to CMS which was well-prior to the ***IPO in 2021***.    ¶55.

Likewise, Defendants try to claim that there is no connection between the February 2022 admission of weakness in information technology controls and their lack of premium data controls.    Def. Br. at 18.    Plaintiffs' complaint, however, explains this connection.    As the Complaint explains, Oscar failed to maintain adequate controls and systems to ensure the integrity of premium

17

data submitted to regulatory authorities for the RADV audit, that when the RADV audit results were released the Company admitted that further "enhancements" were needed to ensure the control issues that hampered the 2019 audit would not occur and again, and that soon after that disclosure, the Company disclosed that it had uncovered the information technology controls weakness. This series of facts and events lends significant credence to the contention that the admission of the material weakness is related to the lack of adequate controls that existed prior to the IPO.[17]

>   **3.    The Lack Of Adequate Controls And Systems To Ensure The Integrity Of The Premium Data Submitted To Regulatory Authorities For The RADV Audit Was Material To Investors**

On a motion to dismiss Securities Act claims, "[w]here the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower," than Rule 8's "relatively minimal burden." *Litwin,* 634 F.3d at 718. "[A] complaint fails to state a claim of securities fraud [only] if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (emphasis in original). "[I]t does not require a showing that such fact would have been outcome-determinative." *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 409 (S.D.N.Y. 1998). In fact, a fact may be material even if it would not have changed an investor's ultimate investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Materiality is a mixed question of law and fact and is rarely a basis for dismissal on the pleadings." *In re Petrobras*, 116 F. Supp. 3d at 378.

---

[17] Moreover, on a motion to dismiss, particularly one where notice pleading applies, Plaintiffs' allegations must be accepted as true. *Ashcroft*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief"). As such, Defendants' counter narrative should not be accepted as true over Plaintiffs' well-pled allegations.

Defendants would have this court apply a formulaic approach of 5% in assessing materiality of an alleged misrepresentation (Def. Br. at 24), an approach which has been consistently rejected.[18]  *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000); *see also Litwin*, 634 F.3d at 717.  "Defining materiality using some rigid percentage-based computation, especially one where the denominator is picked by defendants, would both permit Courts and defendants to move the goal posts and effectively sanction misstatements ... so long as the net effect was just below that threshold." *Swanson v. Interface, Inc*., 2022 WL 2003990, at *2 (E.D.N.Y. June 6, 2022).  Instead, a court must consider "both 'quantitative' and 'qualitative' factors in assessing an item's materiality," and that consideration should be undertaken in an integrative manner. *See Ganino*, 228 F.3d at 163; *see also Kidder Peabody*, 10 F. Supp. 2d at 410–11; SAB No. 99, 64 Fed. Reg. at 45, 152 ("Qualitative factors may cause misstatements of quantitatively small amounts to be material....").[19]

Regardless, Oscar recognized approximately $20 million of risk adjusted expense in Q2 2021 related to the RADV audit (¶¶4, 55), which as Defendants concede, correspond to an

---

[18] While a misstatement related to less than 5% may "carr[y] the preliminary assumption of immateriality," even Defendants agree that it cannot be the sole basis. *See* Def. Br. at p. 24 n.14; *see also Litwin,* 634 F.3d 706, 719 (2d Cir. 2011) (overturning district court's conclusion that misstatement was immaterial solely because it fell well below the 5% threshold).

[19] The Court rejected similar arguments to Defendants' in *Kidder Peabody,* finding that misstatements affecting profits by 2.54%, with most individual misstatements affecting profits by 1%, could be material. 10 F. Supp. 2d at 409-10. The Court noted that while the misstatements in profits "may have been minor compared to GE's earnings as a whole, they were quite significant" to the profits of the subsidiary, and this would have been of "special interest" to an investor.  *Id.* at 410; *see also Litwin*, 634 F.3d at 720 ("Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality."); *New Orleans Emps. Ret. Sys. v. Celestica, Inc*., 455 F. App'x. 10, 16 (2d Cir. 2011) (refusing to dismiss complaint based on losses that "were minuscule in comparison to [defendant's] global assets and annual revenue" due to other qualitative factors); *In re BioScrip, Inc. Sec. Litig*., 95 F. Supp. 3d 711, 737 (S.D.N.Y. 2015) (Court could not conclude that misstatements relating to the departure of a major client accounting for 4.7% of Company's revenue were immaterial.)

approximately 3% increase in MLR for the relevant quarter.  Def. Br. at 24-5 n.12.  This amount

has been deemed material.  *See, e.g.*, *Gray v. Alpha & Omega Semiconductor Ltd*., 2021 WL

4429499, at *8 (S.D.N.Y. Sept. 27, 2021) (Misstatements accounting for 2 to 4.2% of the

Company's overall business could be material because the business was "qualitatively important

to []investors even if it accounted for a numerically small share of the overall business" and the

Company's actions were "likely to bring about regulatory penalties [which] reasonable investors

might consider…significant information….").

While the financial amount alone would be sufficient for materiality, focusing on it ignores

the importance of the lack of internal controls to the Company's business and the market as well

as of MLR to Oscar.  Oscar acknowledges explicitly and implicitly the importance of the MLR in

myriad ways.   According to the Registration Statement "***MLR is an important metric*** to

demonstrate the loss ratio of [Oscar's] costs to pay for health care of [its] members to the premiums

before ceded reinsurance."  ¶42. Oscar has included its MLR as a key non-GAAP metric in each

of its financial reports filed with the SEC.  *Id.*  That Oscar values the MLR is further evidenced by

the fact that the Company made performance-based awards to COO Meghan Joyce and CFO R.

Scott Blackley contingent on Oscar achieving an InsuranceCo Combined Ratio less than or equal

to 100%, a ratio that is computed by adding Oscar's MLR to the Company's InsuranceCo

Administrative Expense Ratio.   ¶43. Defendants also frequently touted MLR trends during

conference calls with analysts, underscoring that the metric was important and closely followed

by management.  ¶44.  For example, during the first quarter 2021 conference call held on May 13,

2021, Defendant Schlosser stated, "we view our improving MLR performance as a validation that

our technology-powered model is working."  *Id.*  Likewise, Oscar touted its internal controls as a

benefit to the Company.  *See* Section II.A, *supra*.  As such, the disclosures that informed the public

20

that its MLR was inaccurate and it was lacking appropriate internal controls was material.

Moreover, a "significant stock drop further supports an inference of materiality." *comScore*, 268 F. Supp. 3d at 550; *see also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 465-66 (S.D.N.Y. 2017) ("While market volatility alone is too blunt an instrument to be depended on in considering whether a fact is material, the significant volatility of [the company's securities], considered in aggregate with other SAB 99 factors, preclude the conclusion that the alleged misstatements and omissions ... were so obviously unimportant to a reasonable investor to be immaterial."). The disclosure affected Oscar's stock price by 24.5%, to close at $12.47 per share on November 11, 2021 (¶57), thus further demonstrating materiality.

### 4.    Defendants Violated Items 105 And 303 Of Regulation S-K

Defendants had affirmative disclosure obligations under Items 105 (formerly Item 503) and 303 of Regulation S-K. *Y-Gar Cap. LLC v. Credit Suisse Grp. AG,* 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020) ("Failure to make disclosure in accordance with [Items 105 and 303] can serve as the basis of a claim under Section 11[.]"). Even though there is no scienter requirement in Section 11, Item 303 requires knowledge of the trend or uncertainty. *See Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020). In contrast, Item 105 "has no such requirement." *Id*.[20]

Item 105 requires that a registration statement include "a discussion of the most significant factors that make the offering speculative or risky." *Panther Partners*, 2020 WL 5757628, at *10; *see* 17 C.F.R. § 229.105. As Defendants concede, when assessing Item 105, it is sufficient that plaintiff alleges that "both the facts existed" and were "knowable." Def. Br. at 23 n.10 (citing

---

[20] Defendants acknowledge that some courts do not require knowledge for an Item 105 claim. Def. Br. at 23 n.10.

21

*Gutman v. Lizhi Inc.*, 2022 WL 4646471 at \*4 (E.D.N.Y. Oct 1, 2022)).  Here, Plaintiffs have alleged that there was a lack of internal controls prior to the IPO and that such lack of internal controls was knowable to the Company and its executives – particularly these executives who claimed to have access and regularly monitor this data in real time.  Moreover, a lack of sufficient controls to ensure accurate premium data was able to be supplied to CMS was certainly a significant factor that made the IPO risky.  Defendants do not contest this.  Def. Br. at 23.

Defendants' two bases for dismissal of the Item 105 claim is that Plaintiffs' fail "to plead knowledge and materiality."  Def. Br. at 23.  Again, knowledge is not a requirement and the internal controls issues were "knowable," satisfying the standard.  And, as discussed in Section III.B.3, *supra*, the internal control deficiency that resulted in inaccurate premium data was material. *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (since Item 503 [105] requires "a discussion of the most significant factors that make the offering speculative or risky," "courts typically analyze the sufficiency of Item 503 [105] disclosures with the familiar materiality standard.").  As such, Plaintiffs state an Item 105 claim.

While Item 303 does have a knowledge component, it is not akin to scienter. *Panther Partners*, 2020 WL 5757628, \*10 ("While Item 303 requires a description of 'any known trends or uncertainties that are material … plaintiffs need not plead defendants' knowledge[,] as there is no scienter requirement in Section 11").  Instead, in order to state a 1933 Act claim based on an Item 303 violation, a plaintiff only needs to plead facts sufficient to give rise to a ***plausible*** inference (rather than a strong inference) that management knew about the trend or uncertainty and that management reasonably expected it would likely have a material effect on the registrant's financial condition. *See, e.g.*, *Ikanos*, 681 F.3d at 115 ("the proposed complaint stated a claim because it ***plausibly*** alleged that the defects constituted a known trend or uncertainty that the

22

Company reasonably expected would have a material unfavorable impact on revenues"); *Facebook*, 986 F. Supp. 2d at 509 ("[A]ll Item 303 requires in order to trigger a disclosure obligation [is] a known trend that [defendant] reasonably expected would materially affect its investments and revenues.").

Here, Plaintiffs allege that Oscar executives had access to the premium control at issue (for 2019 and 2020) long before the IPO and that it regularly reviewed this data. As the Complaint alleges, the control issues involved premium data for 2019 and 2020. *See, e.g.*, ¶55. These facts are sufficient to give rise to a ***plausible*** inference that management knew about the internal controls issue prior to the IPO. *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 840 (S.D.N.Y. 2019) ("failure to convert or retain Carmike loyalty program members was plausibly knowable prior to the SPO").

Defendants respond that the result of the RADV audit (the $20 million revenue adjustment) was not a "trend" or "uncertainty" under Item 303 as "trends" must occur over time. Def. Br. 20. This argument is a classic strawman. Plaintiffs do not allege that the result of the RADV was a "trend." Instead, as the Complaint clearly explains, "Defendants' omission of the fact that Oscar failed to maintain adequate controls and systems to ensure the integrity of premium data submitted to regulatory authorities for the RADV audit violated Item 303." ¶68. Since the failure began ***at the latest*** when the Company was collecting and compiling its 2019 premium data well before the IPO, even under Defendants' own logic and their cited cases, the lack of internal controls constituted a trend. *See* Def. Br. at 20 ("In considering whether a trend exists, the amount of time over which the events at issue are alleged have developed is a factor the Court must take into account.") (citing cases).

Defendants further argue that there are no allegations that the "inadequate controls were

23

'reasonably likely'" to have a material effect on the operations of the company.  Def. Br. at 22.

And that assuming that Plaintiffs' allegations are treated as correct (as they must), that the "Oscar

Defendants were not required to publicly speculate about the results of [the] CMS' audit process."

*Id.*  This argument is another red-herring.  Plaintiffs are not arguing that Oscar had to provide an

estimate of the result publicly, just that they had to disclose the control deficiencies and the

resulting risk thereof.   Oscar was required, however, to determine if the control deficiencies could

have a material effect on its business.  As the Second Circuit explained:

> even if Defendants could not determine with certainty that IMO 2020 would be
> implemented, they were required to evaluate IMO 2020's consequences on the
> assumption that it would come to fruition and to disclose its potential impact unless
> Defendants "determine[d] that a material effect on the registrant's financial
> condition or results of operations is not reasonably likely to occur." *Id.* As pleaded,
> it would not have been "objectively reasonable" for Defendants to determine that
> IMO 2020 would not likely have a material effect on MIC's financial condition or
> operations.

*Moab Partners*, 2022 WL 17815767, at *3 (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d

94, 102–03 (2d Cir. 2015) (Item 303 materiality analysis requires "balancing ... both the indicated

probability that the event will occur and the anticipated magnitude of the event in light of the

totality of the company activity.")). If Oscar had actually evaluated the consequences that internal

control deficiencies related to the collection of premium data, as required, they would have

determined that it had a material impact on Oscar, as it actually did. *See* Section III.B.3, *supra.*[21]

### 5.    The Underwriter Defendants Are Liable For Violations Of Section 11

The Complaint has adequately alleged that the Registration Statement was materially false

and misleading in violation of Section 11.  Like the Oscar Defendants, the Underwriter Defendants

are also liable for the material misstatements and omissions in the Registration Statement.  *See*

---

[21] Likewise, it would not have been "objectively reasonable" for the Company or its executives to
believe that a RADV adjustment was avoidable where Oscar submitted inaccurate premium data.

*Am. Int'l Grp.*, 741 F. Supp. 2d at 536 ("With respect to any sale of a security pursuant to a misleading registration statement, Section 11 extends potential liability to . . . underwriters . . . who provide their consent to be named as having prepared or certified any part of the registration statement or any report used in connection with the registration statement.").

### C.   The Complaint Alleges Violations Of Section 15

Defendants' only argument concerning the Complaint's Section 15 claims is their contention that it fails to plead a primary violation under Section 11. Def. Br. at 25. Since Defendants do not dispute that the Individual Defendants were control persons for purposes of Section 15 of the Securities Act and Plaintiffs have adequately pled a primary violation of Section 11, Plaintiffs have also established control person liability.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motion to dismiss in its entirety. Alternatively, if the Court grants any part of Defendants' motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a) ("The Court should freely give leave to amend when justice so requires."); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 191 (2d Cir. 2015).

Dated: June 5, 2023                     **GLANCY PRONGAY & MURRAY LLP**


By: */s/ Casey E. Sadler*
Casey E. Sadler (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: csadler@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiff Vicki Riley-Fischer and Additional Plaintiff Lorin Carpenter and Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

26

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 5, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed June 5, 2023.


*/s/ Casey E. Sadler*
Casey E. Sadler